**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

| | |
|---|---|
| THE COURTLAND COMPANY, INC., a West Virginia Business Corporation,<br><br>Plaintiff,<br><br>v.<br><br>UNION CARBIDE CORPORATION, a New York Corporation,<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. ___2:21-cv-00101_____

**COMPLAINT FOR "CITIZEN SUIT" RELIEF, PURSUANT TO SECTION 505 OF THE CLEAN WATER ACT, 33 U.S.C. § 1362, REQUIRING DEFENDANT UNION CARBIDE CORPORATION (1) FORTHWITH TO CEASE AND DESIST FROM ALLOWING FURTHER UNPERMITTED DISCHARGES OF POLLUTANTS TO NAVIGABLE WATERS OF THE UNITED STATES; AND (2) TO ABATE THE CONTINUING ADVERSE ENDANGERMENTS TO HEALTH AND THE ENVIRONMENT RESULTING FROM SUCH UNPERMITTED DISCHARGES**

Plaintiff, the Courtland Company, Inc. ("Courtland"), by and through its undersigned counsel, makes the following allegations upon knowledge as to itself and upon information and belief as to all other matters:

## I.    *NATURE OF THIS CASE*:

**1.**    Whether intentionally or through wanton, willful and callous indifference to the resulting, adverse impacts on health and the environment, Defendant, Union Carbide Corporation ("UCC"), by more than four (4) decades of its acts, omissions, on-going violations of federal and state environmental and public health protection laws, and through its breaches of common law duties owed to Plaintiff and the public at large, has caused and is continuing to cause the unpermitted discharge of toxic, noxious, harmful and hazardous pollutants into navigable waters of the United States and into public waters of the State of West Virginia, and such pollutants have become present and threaten to become further present at, on, and under Plaintiff's property and

in soils, groundwater, and surface waters in the immediate vicinity thereof.  Such unpermitted discharges of pollutants have occurred at and from a parcel of land owned and operated by Defendant UCC beginning no later than the 1950s, which parcel lies both east and north of property owned by the Plaintiff in South Charleston, West Virginia and contains:  **(1)** a rail yard, at which hazardous and toxic chemicals have been both stored onsite, released and disposed of to environmental media, and then permitted to leach into the environment, including soils, surface waters (including Davis Creek and the Kanawha River) and groundwater underlying Plaintiff's property; and **(2)** a waste disposal site that Defendant UCC illegally failed formally to report to state and federal environmental and public health protection regulators, which is located on the very banks of the Davis Creek and which is entirely noncompliant with applicable state and federal law, at which **Solid Wastes**, **Hazardous Wastes**, and **Hazardous Substances**—all "pollutants" within the meaning of Section 502(6) of the federal Clean Water Act ("CWA"), 33 U.S.C. § 1362(6)—have been disposed of and are continuing to be disposed of at and from such waste disposal site.  **Leachate** from this UCC waste disposal site containing these hazardous wastes and hazardous substances have been discharged, and are continuing to be discharged, directly to navigable waters, including the Davis Creek and the Kanawha River without the NPDES**1** permit required by 33 U.S.C. §§ 1311 and 1342 and by the West Virginia Water Pollution

---

**1**   The proper discernment and application of Congressional intent embodied in the Clean Water Act requires a cogent understanding of the term "NPDES," which refers to the National Pollutant Discharge Elimination System created by Congress in Section 402 of the federal Water Pollution Control Act, as amended by the Clean Water Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1342, that imposes a federal permit requirement on all **Discharges of a Pollutant** as part of national program that as of yet has failed (in substantial part due to preexisting historical, unabated pollution) to achieve the clearly stated objective of Congress, which is not to limit, **but to eliminate**, all discharges of pollutants to waters of the United States:

> The objective of this Act [*i.e.,* the Federal Water Pollution Control Act, as amended by the federal Clean Water Act, 33 U.S.C. §§ 1251 *et seq.*] is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.  In order to achieve this objective, it

Control Act, W. Va. Code Chapter 22, Article 11. In addition, that same **leachate** containing those same **Hazardous Wastes, Hazardous Substances** and **Solid Wastes** have been **Discharged** and are continuing to be **Discharged** to the groundwater under that UCC waste disposal facility, which groundwater is very proximate to, and hydraulically connected with, those same **Waters of the U.S.**, resulting in the conveyance of those **Hazardous Wastes**, **Hazardous Substances** and **Solid Wastes** to those surface waters in a manner that is the functional equivalent of a direct **Discharge** of those **Hazardous Wastes**, **Hazardous Substance**, and **Solid Wastes** to those surface waters.

2.   Accordingly, Plaintiff brings this "Citizen Suit" enforcement action pursuant to CWA Section 505, 33 U.S.C. 1365 ("CWA") to: **(a)** require Defendant UCC forthwith to cease and desist allowing the on-going, unpermitted **Discharge of Pollutants** and **Storm Water Associated with Industrial Activities** to navigable waters at and from its Filmont Waste Disposal Site in violation of the requirements of CWA Sections 301 and 402, 33 U.S.C. §§ 1311 and 1342, **(b)** secure judicial abatement of the continuing adverse impacts to navigable waters and related environmental media, including sediments underlying such navigable waters, resulting from decades of UCC's CWA past and on-going violations; **(c)** recover plaintiff's reasonable litigation

------

is hereby declared that, consistent with the provisions of this Act—

**(1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;**

(2) it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983;

**(3) it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited;**

       **       \*\*          \*\*             \*\*             \*\***

(7) it is the national policy that programs for the control of nonpoint sources of pollution be developed and implemented **in an expeditious manner** so as to enable the goals of this Act to be met through the control of both point and nonpoint sources of pollution.

Clean Water Act § 101, 33 U.S.C. § 1251 [Bolding emphasis added].

costs, non-exclusively including plaintiff's attorney fees and costs, expert witness fees and costs and court costs incurred in obtaining such relief; and **(d)** obtain an order requiring UCC to pay to the United States Government, civil penalties pursuant to CWA Sections 309(d) and 505(a), 33 U.S.C. §§ 1319(d) and 1365(a); and **(e)** secure such other relief as this Court may deem necessary and appropriate, including all relief under Rule 54(c), Federal Rules of Civil Procedure.

## II.  *JURISDICTION AND VENUE***:**

**3.**   This Court has original jurisdiction over the subject matter of Count I of this Complaint, without regard to the amount in controversy or the citizenship of the parties, pursuant CWA § 505, 33 U.S.C. § 1365, and 28 U.S.C. § 1331.

**4.**   Pursuant to CWA § 505, 33 U.S.C. § 1365, and 28 U.S.C. § 1391(b)(2), venue lies in this Judicial District, since a substantial part of the acts, omissions, and events which are described herein and which give rise to Plaintiff's claims, including the discharges of pollutants into navigable waters referenced herein, occurred in this judicial district, causing harmful impacts to such **Navigable Waters** within the meaning of CWA § 502(7), 33 U.S.C. § 1362(7), within this judicial district.

## III.   *NOTICE:*

**5.**   In compliance with the requirements of CWA § 505(b)(1), 33 U.S.C. § 1365(b)(1), on November 10, 2020 Plaintiff sent its Notice of Violation, a copy of which is attached hereto as **Exhibit 1** and incorporated herein, to Defendant UCC and all required federal and West Virginia governmental officers and entities.

**6.**   More than 60 days have elapsed since Plaintiff sent its Notice of Violation.

**7.**   Neither the United States, the U.S. Environmental Protection Agency ("USEPA"), the State of West Virginia nor the West Virginia Department of Environmental Protection

("WVDEP") have commenced any civil or criminal action described in CWA § 505(b)(1)(B) with respect to any of the matters addressed in Plaintiff's Notice of Violation prior to the commencement of this action.

### IV. *THE PARTIES*:

**8.** Plaintiff Courtland is a West Virginia Business Corporation with its principal place of business in the City of South Charleston (Kanawha County), West Virginia. Courtland is the owner, in fee simple, of approximately 13.8 acres of land on Davis Creek in the City of South Charleston, Kanawha County, West Virginia, which real property is described as real estate purchased by Courtland by deed from The Charleston National Bank as Trustee under the Will of Lulu B. Dickenson Owens, Deceased, Kanawha County Recorder's Office, Book 1932 Page 440 ("the Courtland Property").

**9.** Defendant UCC is a New York Corporation with its principal place of business in the State of Connecticut. Since approximately 1946, Defendant UCC has been the owner of Kanawha County Tax Parcel No. 22-14-9, located at approximately 38° 21' 29.018" North latitude and 81° 42' 29.212" West longitude ("UCC Parcel"), which parcel contains a rail yard ("UCC Railyard") and a waste disposal **Facility** ("Filmont Waste Disposal Facility," sometimes known as "Filmont Dump" or "Filmont Landfill"[2]). Beginning in no later than the 1950s and continuing through the 1980s, UCC accepted for **Disposal** and **Disposed of Solid Wastes**, **Hazardous Wastes**, and **Hazardous Substances** at its Filmont Waste Disposal Facility—a facility that was never designed or constructed to contain the wastes put into it in a manner that is protective of

---

[2] In modern, common parlance, the term "landfill" refers to a Sanitary Landfill that is designed, constructed, and operated, with impermeable liners and leachate collection and monitoring systems, to contain the wastes disposed in those facilities and to protect the surrounding environment. To a certainty, UCC's Filmont Waste Disposal Facility is not now, and never has been, a "Sanitary Landfill."

public health or the **Environment**.  Consequently, toxic **leachate** and other **Pollutants** have been seeping and discharging both directly to Navigable Waters and via groundwater to Navigable Waters, including the Davis Creek, the Ward Branch, the North Drainage Ditch, and the South Boundary Creek (also known as the South Boundary Drainage Ditch), and continue to do so to this very day, through discernible, confined and discrete conveyances, including but not limited to various pipes, ditches, channels, tunnels, conduits, and discrete fissures.  In direct violation of federal and West Virginia laws that have been in place and in effect for decades, UCC has also permitted the continuous and unpermitted **Discharge** of **Storm Waters Associated with Industrial Activities** from its Filmont Waste Disposal Facility to surrounding surface waters, including those Waters of the U.S. described above.  UCC has received and is continuing to receive an economic benefit by avoiding the costs of and failing either to control, prevent, or stop these unpermitted **Discharges** or properly to obtain the permits required of it under CWA Sections 301 and 402, 33 U.S.C. §§1311 and 1342.

**10.**  In or about 2001, UCC became a wholly-owned subsidiary of the Dow Chemical Company, Inc. ("Dow"), which since that date and through its officers and employees, has controlled and continues to control all operations of UCC, inclusive of all decisions concerning **Hazardous Waste**, **Hazardous Substance**, and **Solid Waste** handling, treatment, **Storage**, and **Disposal** and all decisions concerning the environmental remediation of both legacy and current UCC sites, including both the UCC Railyard and Filmont Waste Disposal Site/Facility.

## V.  <u>DEFINITIONS</u>:

**11.** Words used in this Complaint are to be taken and understood in their natural and ordinary sense unless this Complaint indicates that a different meaning was intended.  Unless otherwise expressly provided herein, **terms used in this Complaint that are defined in this**

**Section IV are indicated in the text of this Complaint by both bolding and initial capitalization of each operative word and are intended to have the meaning assigned to them in this Section IV.** Whenever terms listed below are used in this Complaint or in any appendices now or later attached to this Complaint and incorporated hereunder, the following definitions are intended to apply:

**a.** Consistent with its definition in the federal regulations duly promulgated by USEPA pursuant to its authority under the CWA and codified at 40 C.F.R. § 122.2, the term "**CWA and Regulations**" as used herein means:

the Clean Water Act (CWA) and applicable regulations promulgated thereunder. In the case of an approved State program, it includes State program requirements.

**b.** Consistent with its definition in CWA § 502(16), the term "**Discharge**" as used herein means:

when used without qualification includes a **Discharges of a Pollutant**, and a **Discharge of Pollutants**.

**c.** Consistent with the relevant provisions of its definition in the federal regulations duly promulgated by USEPA pursuant to its authority under the CWA and codified at 40 C.F.R. § 122.2, the term "**Discharge of a Pollutant**" as used herein means:

**(A)** The term "discharge of a pollutant" and the term "discharge of pollutants" each means any addition of any pollutant to navigable waters from any point source, ….

**(B)** This definition includes additions of pollutants into waters of the United States from: surface runoff which is collected or channeled by man; discharges through pipes, sewers, or other conveyances owned by a State, municipality, or other person which do not lead to a treatment works; and discharges through pipes, sewers, or other conveyances, leading into privately owned treatment works.

**d.** Consistent with its definition in the federal regulations duly promulgated by USEPA pursuant to its authority under the CWA and codified at 40 C.F.R. § 122.2, the term "**Facility**" as used herein means:

any NPDES "point source" or any other facility or activity (including land or appurtenances thereto) that is subject to regulation under the NPDES program.

**e.** Consistent with its definition in the federal regulations duly promulgated by USEPA pursuant to its authority under the CWA and codified at 40 C.F.R. § 122.2, the term "**Hazardous Substance**" as used herein means:

any substance designated under *40 C.F.R., Part 116* pursuant to section 311 of CWA.

**f.** Consistent with its definition in 40 C.F.R. § 257.2 and in the West Virginia Solid Waste Management Rule promulgated by WVDEP pursuant to its authority under the West Virginia Solid

Waste Management Act, W. Va. Code § 22-15-5, and codified at W. Va. C.S.R. § 33-1-2.66, the term "**Leachate**" as used herein means:

> any liquid that has come into contact with, passed through or emerged from solid waste and contains soluble, suspended, or miscible materials removed from such waste.

**g.** The terms "**National Contingency Plan**" and "**NCP**" each mean the National Oil and Hazardous Substances Pollution Contingency Plan, now codified at 40 C.F.R., Part 300, which was originally promulgated in 1968 and greatly expanded in 1972 by the Administrator of the U.S. Environmental Protection Agency pursuant to the Spill Response provisions of Section 311 of the federal Clean Water Act, 33 U.S.C. § 1321, and which was, pursuant to the Congressional mandate in Section 105(a) of the federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended ("CERCLA" or "federal Superfund Act"), 42 U.S.C. § 9605(a), re-promulgated to address the Responses (*i.e.,* the precise scope and nature of necessary and proper investigation and clean-up actions) appropriate to releases and threatened releases of hazardous substances that are the central focus of the remedial provisions of the Clean Water Act and CERCLA.

**h.** Consistent with its definition in CWA § 502(7), 33 U.S.C. § 1362(7), the term "**Navigable Waters**" as used herein means:

> The waters of the United States, including the territorial seas.

**i.** Consistent with the relevant provisions of its definition in CWA § 502(5), 33 U.S.C. § 1362(5), the term "**Person**" as used herein means:

> an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a state, or any interstate body.

**j.** Consistent with its definition in the federal regulations duly promulgated by USEPA pursuant to its authority under the CWA and codified at 40 C.F.R. § 122.2, the term "**Point Source**" as used herein means:

> [A]ny discernible, confined, and discrete conveyance, including but not limited to, any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, landfill leachate collection system, vessel or other floating craft from which pollutants are or may be discharged.  This term does not include return flows from irrigated agriculture or agricultural storm water runoff.

**k.** Consistent with the relevant provisions of its definition in CWA § 502(6), 33 U.S.C. § 1362(6), the term "**Pollutant**" as used herein means:

> dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.  This term does not mean . . . . (**B**) water, gas, or other material which is injected into a well to facilitate production of oil or gas, or water derived in association with oil or gas production and disposed of in a well, if the well used either to facilitate production or for disposal purposes is approved by authority of the State in which

the well is located, and if such State determines that such injection or disposal will not result in the degradation of ground or surface water resources.

This definition includes additions of pollutants into waters of the United States from: surface runoff which is collected or channeled by man; discharges through pipes, sewers, or other conveyances owned by a State, municipality, or other person which do not lead to a treatment works; and discharges through pipes, sewers, or other conveyances, leading into privately owned treatment works.

**l.** Consistent with its definition in CWA § 502(19), 33 U.S.C. § 1362(19), the term **"Pollution"** as used herein means:

the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water.

**m.** Consistent with its definition in the federal regulations duly promulgated by USEPA pursuant to its authority under the CWA and codified at 40 C.F.R. § 122.26(b)(13), the term **"Storm Water "** as used herein means:

storm water runoff, snow melt runoff, and surface runoff and drainage.

**n.** Consistent with its definition in the federal regulations duly promulgated by USEPA pursuant to its authority under the CWA and codified at 40 C.F.R. § 122.26(b)(14), the term **"Storm Water Discharge Associated with Industrial Activity"** as used herein means:

the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant.  The term does not include discharges from facilities or activities excluded from the NPDES program under this part 122.  For the categories of industries identified in this section, the term includes, but is not limited to, storm water discharges from industrial plant yards; immediate access roads and rail lines used or traveled by carriers of raw materials, manufactured products, waste material, or by-products used or created by the facility; material handling sites; refuse sites; sites used for the application or disposal of process waste waters (as defined at part 401 of this chapter); sites used for the storage and maintenance of material handling equipment; sites used for residual treatment, storage, or disposal; shipping and receiving areas; manufacturing buildings; storage areas (including tank farms) for raw materials, and intermediate and final products; and areas where industrial activity has taken place in the past and significant materials remain and are exposed to storm water.  For the purposes of this paragraph, material handling activities include storage, loading and unloading, transportation, or conveyance of any raw material, intermediate product, final product, by-product or waste product.  The term excludes areas located on plant lands separate from the plant's industrial activities, such as office buildings and accompanying parking lots as long as the drainage from the excluded areas is not mixed with storm water drained from the above described areas.  Industrial facilities …include those facilities designated under the provisions of paragraph (a)(1)(v) of this section.  **The following categories of facilities are considered to be engaging in "industrial activity" for purposes of paragraph (b)(14):**

**(i)**Facilities subject to storm water effluent limitations guidelines, new source performance standards, or toxic pollutant effluent standards under 40 C.F.R.

subchapter N (except facilities with toxic pollutant effluent standards which are exempted under category (xi) in paragraph (b)(14) of this section);

      ***      ***      ***      ***

**(iv)** Hazardous waste treatment, storage, or disposal facilities, including those that are operating under interim status or a permit under subtitle C of RCRA;

**(v) Landfills, land application sites, and open dumps that receive or have received any industrial wastes (waste that is received from any of the facilities described under this subsection) including those that are subject to regulation under subtitle D of RCRA;**

[Bolding emphasis added].

**o.** Consistent with the relevant provisions of its definition in CWA §§ 307(a)(1) and 502(13), 33 U.S.C. §§ 1317(a)(1) and 1362(13), the term "**Toxic Pollutant**" as used herein means:

**(A)** those pollutants, or combinations of pollutants, including disease-causing agents, which after discharge and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will, on the basis of information available to the Administrator [of USEPA], cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring; and

**(B)** those pollutants listed by the Administrator of USEPA in federal regulations promulgated pursuant to the authority conveyed in CWA Section 307(a)(1), 33 U.S.C. § 1317(a)(1), which regulations are now codified at 40 C.F.R. § 401.15.

**p.** Consistent with its definition in the federal regulations duly promulgated by USEPA pursuant to its authority under the CWA and codified at 40 C.F.R. § 122.2, the terms "**Waters of the United States**" and "**Waters of the U.S.**" as used herein each mean:

**(a)** All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;

**(b)** All interstate waters, including interstate "wetlands;"

**(c)** All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, "wetlands," sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce including any such waters:

**(1)** Which are or could be used by interstate or foreign travelers for recreational or other purposes;

**(2)** From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or

**(3)** Which are used or could be used for industrial purposes by industries in interstate commerce;

**(d)**All impoundments of waters otherwise defined as waters of the United States under this definition;

**(e)**Tributaries of waters identified in paragraphs (a) through (d) of this definition;

**(f)**The territorial sea; and

**(g)**"Wetlands" adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a) through (f) of this definition.

Waste treatment systems, including treatment ponds or lagoons designed to meet the requirements of CWA (other than cooling ponds as defined in *40 C.F.R. § 423.11(m)* which also meet the criteria of this definition) are not waters of the United States.  This exclusion applies only to manmade bodies of water which neither were originally created in waters of the United States (such as disposal area in wetlands) nor resulted from the impoundment of waters of the United States. [See Note 1 of this section.]

## VI. *FACTS COMMON TO ALL COUNTS*:

**12.**  UCC's Filmont Waste Disposal **Facility** is a part of the same nearly 31-acre parcel of real property also occupied by UCC's Massey Rail Yard located within the municipal boundaries of South Charleston, West Virginia.  The parcel is owned by UCC and operated by UCC and Dow.  This Waste Disposal **Facility** is located on the northern part of the parcel and extends to the west to form the very bank of Davis Creek.  It is also immediately adjacent to the Courtland real property, generally on the north side (See Figure 1, below).

**13.**  Although Courtland purchased its real property in South Charleston, WV in 1980 and has since continuously owned that real property, which is immediately adjacent to and downgradient of UCC's Filmont Waste Disposal **Facility**/Massey Rail Yard facilities in South Charleston, it first learned of the existence and contents of UCC's Filmont Waste Disposal **Facility** when that information was revealed during deposition testimony by a UCC/Dow environmental technical representative in October 2019.  According to this sworn testimony, provided under penalty of perjury, the UCC Filmont Waste Disposal **Facility** was used by UCC in the 1970's and 1980's and received waste from the UCC South Charleston chemical manufacturing facility.  The Dow/UCC representative testified under oath that he did not know exactly what went into the

Filmont so-called "landfill" other than wastes associated with the manufacture of Dynel, a fiber made from vinyl chloride and acrylonitrile at UCC's South Charleston chemical manufacturing site.  He also testified that he did not know how UCC's Filmont Waste Disposal **Facility** was constructed, but stated that he did **not** think that it was built to the standards required by Subtitles C (*i.e.,* Hazardous Waste Management) or Subtitle D (*i.e.,* Solid Waste Management) of the federal Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as further amended, 42 U.S.C. §§ 6901 – 6991m (hereinafter:  "RCRA," or "federal Solid and Hazardous Waste Management Act").



*Figure 1*

**14.**  UCC has represented to the City of South Charleston that its Filmont so-called "Landfill" received wastes from the 1950s through the 1980s.

**15.**  Additional research revealed that in addition to unknown wastes and wastes from Dynel manufacturing, the UCC Filmont Waste Disposal **Facility** not only received bottom-ash

from two (2) Union Carbide South Charleston facility power plants that burned primarily coal, but also "wastes", and wastewater treatment plant grit resulting from the treatment of UCC South Charleston chemical manufacturing facility influent to the South Charleston Wastewater Treatment Plant.  This grit contained biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether and various inorganics including arsenic, chrome, lead and mercury.  UCC has also admitted that the landfill contains "buried drums," the contents of which are unknown, and that other drums were dumped at the site.  UCC documents indicate that the Filmont Waste Disposal **Facility** was used for the disposal of mercury batteries.  In addition, UCC has admitted that its Filmont Waste Disposal **Facility** was used as a **Disposal** location for organic chemicals wastes used or generated in its industrial processes.

16.  Historic aerial photography reveals large piles of what is likely bottom ash at UCC's Filmont Waste Disposal **Facility** in 1971, as well as other ongoing site management activities. 1984 aerial photographs also indicate the presence of what is likely large piles of bottom ash as well as other activities at UCC's Filmont Waste Disposal **Facility**.  1996 aerials show the site as flattened and vegetated.

17.  UCC had installed three (3) monitoring wells across Davis Creek and downgradient from its Filmont Waste Disposal Site.  Contamination from UCC's Filmont Waste Disposal **Facility** was discovered in these wells some time prior to 2012, including 1,4-dioxane and, according to the witness, "some ethers".  The presence of these **Pollutants and Contaminants** from this then-inactive waste disposal **Facility** was not reported by UCC to any federal or state governmental agency with environmental and public health protection jurisdiction.

**18.**   The depth of UCC's Filmont Waste Disposal Site is unknown, though it does come to and actually forms the very bank of Davis Creek and appears to cover part of the Davis Creek floodplain.  In addition, it is clear that UCC's Filmont Waste Disposal Site has filled in and covered the historical Davis Creek channels.  At the banks of both the Davis Creek and the Ward Branch thereof (which runs along the western portion of northern edge of UCC's Filmont Waste Disposal Site), the following waste materials from the Filmont Waste Disposal **Facility** are visible and physically located within the creek:  notably broken concrete; iron rebar; and other construction debris.  At the edge of Davis Creek, the so-called "landfill" appears to be at least 20-30 feet high with waste and fill material estimated to be ranging from at least 30 to 60 feet below ground surface.

**19.**   A sequence of historic aerial photos show extensive work at UCC's Filmont Waste Disposal **Facility** through the 1970s evidencing the progression of the waste disposal site expanding over time to cover and fill-in the historic Davis Creek channels, which channels are and



*Figure 2*
*The Filmont Disposal Facility (northern edge, along Ward Branch of Davis Creek)*

have been since their filling the source of **Discharges of Pollutants** and seeps which are releasing

and **Discharging Pollutants** from those **Points Sources** into the **Waters of the United States** within the Davis Creek Watershed.

 **20.**  UCC and its contractors have acknowledged that fill materials from its Filmont Disposal Site are present on Courtland's property.  UCC has also acknowledged that groundwater from one portion of its Filmont Disposal **Facility** flows onto Courtland's property.

 **21.**  UCC has identified one or more particular **Discharges** (which UCC calls "seeps") from its Filmont Waste Disposal **Facility** over a period that of time that extends more than 15 years.  Such **Discharges** include one seep previously identified by UCC's consultants of landfill materials flowing into the North Boundary Drainage Ditch, on the north side of UCC' Filmont Waste Disposal **Facility**.  The North Boundary Drainage Ditch flows westward and **Discharges** to the Ward Branch of the Davis Creek.  **UCC has been aware of this Discharge and the continuous, ongoing, and unpermitted Discharges of Pollutants from its Filmont Waste Disposal Facility for many years, as it has been called to their attention by CH2M Hill, environmental consultants employed by UCC and its parent company, Dow Chemical Company.**  Courtland's own environmental engineering consultant, D. Scott Simonton, Ph.D., P.E., has identified an additional "seep" ("Ward Branch Seep") which **Discharges**, on a continuous and on-going basis, various **leachate** and liquid dump materials from UCC's Filmont Disposal **Facility** into the Ward Branch of the Davis Creek, at a point to the west of the seep referenced above.  On information and belief, there are additional seeps from UCC's Filmont Waste Disposal **Facility**, from and through which UCC and Dow **Discharge** or permit to be **Discharged**, on an ongoing and continuous basis, various **Pollutants** (described below), from UCC's Filmont Disposal **Facility** and into Davis Creek, the Ward Branch of Davis Creek, the North Boundary Drainage Ditch, and the South Boundary Drainage Ditch.

22.  UCC's Filmont Waste Disposal **Facility**, the North Boundary Drainage Ditch, and the South Boundary Drainage Ditch are each a **Point Source** in that each is a discernible, confined and discrete conveyance, including but not limited to a pipe, ditch, channel, tunnel, conduit, well, discrete fissure, or container, from which pollutants are or may be either:  **(a) Discharged** directly into navigable waters, or **(b) Released** to groundwater that is directly and hydraulically connect to very proximate surface waters, thus constituting the functional equivalent of a direct **Discharge** to such **Navigable Waters**, by which pollutants are **Discharged** to **Navigable Waters** (*see County of Maui v. Hawaii Wildlife Fund,* __ U.S. __, 2020 WL 1941966 (April 23, 2020)).  From these locations, UCC has **Discharged**, and continues to **Discharge** on a continuous and on-going basis, **Pollutants** into the **Navigable Water of the United States**, specifically including Davis Creek and the Ward Branch of the Davis Creek (collectively, "Davis Creek Watershed").  The **Pollutants** which UCC and Dow have **Discharged** and continue to allow to be **Discharged**, on an ongoing and continuous basis, at and from UCC's Filmont Waste Disposal **Facility**, through such **Point Sources**, and to the **Waters of the United States**, include the following:  Acetone; 2-Butanone; Di-n-butyl phthalate; 1,4-Dioxane; Arsenic; Barium; Beryllium; Cadmium; Chromium; Copper; Lead; Nickel; Selenium; Manganese; Mercury; and Zinc.  Additionally, **Discharges** from the aforementioned **Point Sources** have included and continue to include exceptionally high concentrations of iron, at levels well above background, as is obvious from the appearance of orange sludges on the banks of Ward Branch and Davis Creek at or near the disposal site location (See Figure 3, below.) and covering part of the creek bottoms with orange sludges. (See Figures 4 and 5).  Each such substance is a **Pollutant** as that term is defined in CWA § 502(6), 33 U.S.C. § 1362(6).

23.  The South Boundary Drainage Ditch (a/k/a the South Boundary Creek) flows (while on UCC property) from the vicinity of the Massey Rail Yard then adjacent to UCC's Filmont

Waste Disposal **Facility**, which **Discharges** to such drainage ditch, then onto and across the Courtland Property and into the Davis Creek. While on the Courtland Property, the South Boundary Drainage Ditch leaves contaminated sediments (resulting from UCC's **Discharges**) on Courtland's property, which sediments have accumulated and continue to accumulate at that location and within the South Boundary Creek and ultimately are **Discharged** into Davis Creek.

24.    Moreover, although the Davis Creek, in the vicinity of the Courtland Property and the Filmont Disposal Site, generally flows to the north and away from Courtland's Property, flow during certain periods causes waters contaminated by the Filmont Disposal **Facility** and their accompanying sediments to flow southward, contaminating both the Davis Creek adjacent to the Courtland Property and the bank of Courtland's Property adjacent to that creek, interfering with Courtland's use of its property and adversely impacting its value. Indeed, sediments from UCC's Filmont Disposal **Facility** are currently visible on Courtland's Property not only along the South Boundary Drainage Ditch but also along the bank of the Davis Creek.

25.    In the course of constructing its unlined Filmont Waste Disposal **Facility**, UCC filled the historical Davis Creek channels with **Pollutants**.

26.    Furthermore, aerial photos show extensive fill materials being placed at UCC's Filmont Waste Disposal **Facility** evidencing the progression of that waste disposal site expanding over time to cover and fill-in the historic Davis Creek channels, which channels are, and have been since their filling, the direct, discrete, on-going source of **Discharges of Pollutants** into the **Waters of the United States**.

27.    The historical Davis Creek channels are preferential pathways for **Pollutants** to be **Discharged** into the **Water of the United States**, including the Ward Branch, the South Boundary Creek, or Davis Creek.

28.   Although UCC has **Discharged** and has allowed the **Discharge** of the above-referenced **Pollutants** on an ongoing and continuous basis from a date no later than January 1, 1990, to the present date from **Point Sources** at or on UCC's Filmont Waste Disposal Site directly to **Navigable Waters**, and from **Point Sources** at or on UCC's Filmont Waste Disposal **Facility** directly to groundwater that is proximate to and hydraulically directly connected to **Navigable Waters**, which **Discharges** are the functional equivalents to direct **Discharges** to navigable waters of the United States, UCC does not currently have and never has had the federal or state permit for such **Discharges that is now and has been legally required since at least the early 1970s.**. Accordingly, all such **Discharges of Pollutants** are and have been since the effective date of the CWA in violation of CWA §§ 311(a) and 402, 33 U.S.C. §§ 1311 and 1342.



Figure 3—Wastewater discharge and orange sludges on the banks of Ward Branch of the Davis Creek, indicative of exceptionally high discharges of iron from the Filmont Disposal Site to the creek bank and the creek itself.

29.   Plaintiff Courtland's environmental consultant, D Scott Simonton, Ph.D., P.E., made detailed observations of multiple discharges, from a vessel in the Davis Creek, on September 11, 2020.   Dr. Simonton's observations are contained and memorialized in the Supplemental Declaration of D. Scott Simonton, Ph.D., P.E. in Support of Courtland Company's Motion for

Preliminary Injunction Relief, filed as ECF No. 111 in Case No. 2:19-cv-00894.

 

*Figures 4 and 5- Orange sludges in Davis Creek, indicative of exceptionally high discharges of iron from the Filmont Disposal Site (in background) to the creek itself*

     **30.**  Some of Dr. Simonton's September 11, 2020, observations were recorded by digital

video means, and such videos, which show both the **Discharges** and the contaminated sediments

are available for viewing at the following links:

    a.  https://drive.google.com/file/d/1ses-kfQs-iV5ixIeqKCHWGaQUQ0-XGEv/view?usp=sharing

    b.  https://drive.google.com/file/d/1kkZqJaLqCLB8OqNp9sZX2WehBjUXDppt/view?usp=sharing[3]

    c.  https://drive.google.com/file/d/1jBBJKmzzrhXKeL4KmyAy1YORut4FWha1/view?usp=sharing

    d.  https://drive.google.com/file/d/1rJAS96oSzNHe8T0yf6uuum9F1u0lyDxi/view?usp=sharing

---

[3]  The second of these videos (Video b) provides the best view of the constant, ongoing, and unpermitted seepage of toxic pollution from this location, as observed on September 11, 2020.

31.  At the discharge depicted in Figure 3, above, Dr. Simonton collected a sample of the waste liquid that was **Discharging,** and which continues to **Discharge** from UCC's Filmont Waste Disposal **Facility** to the Ward Branch.  He also sampled the orange sludge immediately below where the waste liquid dropped from the dump on its way to the Ward Branch.  Dr. Simonton collected a third sample immediately upstream of and across the creek from the liquid discharge.

32.  Laboratory analysis of these samples revealed that both the dump material liquid and the associated sludge are highly contaminated with **Toxic Pollutants** from UCC's Filmont dump. The liquid flowing from UCC's Filmont Waste Dump is contaminated with at least the following **Pollutants** iron, aluminum, manganese, arsenic, beryllium, cadmium, chromium, copper, nickel, selenium and zinc.

33.  Dr. Simonton determined that the sludge material immediately below where the waste liquid dropped from UCC's Filmont Waste Dump is contaminated with at least the following **Pollutants** iron, arsenic, mercury, copper, cadmium, lead, nickel, selenium and zinc.  Based on his observations and analysis, it is apparent that the orange sludge materials along the Ward Branch, the Davis Creek, and the South Boundary Creek—including sludge materials observed on Courtland's property—are similarly contaminated.

34.  Each of the foregoing contaminants, which UCC has **Discharged** and continues to **Discharge** to Ward Branch, Davis Creek, and the South Boundary Creek and which have become present in sediments of those **Waters of the United States**, is a **Pollutant** because each is both a **Solid Waste** and an "industrial waste."  Moreover, each is a **Toxic Pollutant**:

   a.  **Arsenic** is a federal CWA Priority **Pollutant** and **Toxic Pollutant**, and a RCRA Subtitle C toxicity characteristic contaminant (D004) under 40 C.F.R. § 261.24.  Arsenic concentrations in groundwater at the UCC **Facility** exceed the human health-based Maximum Contaminant Levels (hereinafter:  "**MCLs**") promulgated pursuant to the federal Safe Drinking Water Act, 42 U.S.C. §§ 300f – 300j-26 (hereinafter:  "**SDWA**"). Inorganic arsenic has been recognized as a human poison since ancient times and is a

carcinogen. Arsenic exerts its toxicity by inactivating up to 200 enzymes, especially those involved in cellular energy pathways and DNA synthesis and repair. Acute arsenic poisoning is associated initially with nausea, vomiting, abdominal pain, and severe diarrhea. Encephalopathy and peripheral neuropathy are reported as effects of arsenic poisoning. Arsenic is a well-documented human carcinogen affecting numerous organs. Arsenic compounds cause short-term and long-term adverse effects in individual plants and animals and in populations and communities of organisms. The drinking water **MCL** for arsenic is 10 ug/l, which is exceeded in the groundwater both at the UCC Facility and on the Courtland property. Arsenic has been reported by UCC to the City of South Charleston as one of the contaminants that has flowed from UCC's Filmont **Hazardous Waste** dump across or under Davis Creek onto City of South Charleston property immediately adjacent to a residential area.

b. **Chromium** is a federal CWA Priority **Pollutant** and **Toxic Pollutant**, and a RCRA Subtitle C toxicity characteristic contaminant (D007) under 40 C.F.R. § 261.24. Chromium concentrations in groundwater at the UCC Facility exceed the SDWA **MCL**. Chromium presents a substantial threat to aquatic life. It destabilizes the ecosystem due to toxic impacts on biota and bioaccumulation in certain organisms. It also produces cytotoxicity and has a detrimental impact on the behavior of fish, such as hypertrophy and paraplegia at gill epithelium, uneven swimming and suspended feeding. Various research studies indicate adverse effects of chromium in fish at hematological level similar to anemia, thrombocytopenia, decrease in hemoglobin and total erythrocytes count. At bio-chemical level, a decline in glycogen, lipids and proteins was observed. The SDWA **MCL** for total chromium (*i.e.,* 100 ug/l) is exceeded in the groundwater at the Courtland property.

c. **Cadmium** is a CWA Priority **Pollutant** and **Toxic Pollutant**, and a **RCRA** Subtitle C toxicity characteristic contaminant (D006) under 40 C.F.R. § 261.24. Cadmium concentrations in groundwater at the UCC Facility exceed the SDWA **MCL**. Cadmium is a non-essential metal with no biological function in aquatic animals. In addition to acute effects such as mortality, chronic exposure to cadmium can lead to adverse effects on growth, reproduction, immune and endocrine systems, development, and behavior in aquatic organisms. Kidney damage has long since been described to be the main problem for humans chronically exposed to cadmium, and cadmium exposure is associated with bone damage. There is some proof that cadmium exposure can cause cancer.

d. **Lead** is a federal **CWA** Priority **Pollutant** and **Toxic Pollutant**, and a **RCRA** Subtitle C toxicity characteristic contaminant (D008) under 40 C.F.R. § 261.24. Lead concentrations in groundwater at the UCC Facility exceed the SDWA Action Level. Lead adversely affects algae, invertebrates, and fish. There are also limited adverse effects in amphibians, including loss of sodium, reduced learning capability, and developmental problems. Fish exposed to high levels of lead exhibit a wide range of adverse effects including muscular and neurological degeneration and destruction, growth inhibition, mortality, reproductive problems, and paralysis.

e. **Selenium** is a federal CWA Priority **Pollutant** and **Toxic Pollutant**, and a **RCRA** Subtitle C toxicity characteristic contaminant (D010) under 40 C.F.R. § 261.24. Selenium concentrations in groundwater at the UCC Facility exceed the SDWA **MCL**. Selenium undergoes bioconcentration, bioaccumulation, and biomagnification as trophic levels increase. It can enter the food web through both sediments and surface water. Elevated

levels cause growth reduction in green algae.  In other aquatic organisms, the following adverse effects have been observed: loss of equilibrium and other neurological disorders, liver damage, reproductive failure, reduced growth, reduced movement rate, chromosomal aberrations, reduced hemoglobin and increased white blood cell count, and necrosis of the ovaries.

f.  **Mercury** is a federal CWA Priority **Pollutant** and **Toxic Pollutant**.  Mercury exposure can harm the brain, heart, kidneys, lungs, and immune system of people of all ages.  Some forms of mercury in the bloodstream of babies developing in the womb and young children may harm their developing nervous systems, affecting their ability to think and learn.  Mercury's harmful effects on animals include death, reduced reproduction, slower growth and development, and abnormal behavior.  It is a **RCRA Subtitle C Hazardous Waste** under 40 C.F.R. § 261.3, listed as a hazardous waste under Subpart D of 40 C.F.R., Part 261 (in particular, under 40 C.F.R. § 261.33, with Hazardous Waste code U151 when it has been, as it has been at UCC's Filmont so-called "Landfill," discarded into the environment).  Mercury is known to have been discarded by UCC into UCC's Filmont waste dump.

g.  **Iron** is seen at extremely high concentrations in the direct discharge from UCC's Filmont waste dump to Ward Brach and is also seen in the direct groundwater discharge from the Filmont dump to Davis Creek as ferric hydroxide sludge blankets.  Precipitation of ferric hydroxide may result in a complete blanketing of the stream bottom, adversely affecting both macroinvertebrates and fish.  Because the gill surface of the fish tends to be alkaline, soluble ferrous iron can be oxidized to insoluble ferric compounds which then cover the gill lamellae and inhibit respiration.  At a low water temperature and in the presence of iron, iron-depositing bacteria will multiply rapidly on the gills and further contribute to the oxidation of ferrous iron compounds.  Their filamentous colonies cover the gills.  The precipitated iron compounds and tufts of the iron bacteria reduce the gill area available for respiration, damage the respiratory epithelium and may thus suffocate the fish.  In a similar toxic action, iron compounds can precipitate on the surface of fish eggs which then die due to a lack of oxygen.  Both Ward Branch and Davis Creek have been identified as impaired relative to iron by WVDEP and have Total Maximum Daily Loads (TMDLs) for iron. (https://dep.wv.gov/WWE/watershed/TMDL/grpb/Documents/LowerKanawha_TMDL_B2_2011/Lower_Kan_EPA_Approved_2012/FINAL_EPA_Approved_LowKan_TMDL_Report_6-5-12.pdf).

h.  **2-Butanone** is used as a solvent.  Acute (short-term) inhalation exposure to 2-Butanone in humans results in irritation to the eyes, nose, and throat.  Limited information is available on the chronic (long-term) effects of 2-Butanone in humans.  Chronic inhalation studies in animals have reported slight neurological, liver, kidney, and respiratory effects.  Developmental effects, including decreased fetal weight and fetal malformations, have been reported in mice and rats exposed to 2-Butanone via inhalation and ingestion.  Material Safety Data Sheets (hereinafter "**MSDS**") prepared by the manufacturer of the chemical product 2-Butanone state that it is dangerous to aquatic life in high concentrations and may be dangerous if it enters water intakes.  2-Butanone is a RCRA Subtitle C "hazardous waste" pursuant to 40 C.F.R. § 261.3, because it is:  **(a)** with respect to its presence in environmental media at and emanating from the UCC Facility, a discarded material and "solid waste" under within the meaning of 40 C.F.R. § 261.2; **(b)** not excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4(b); and **(c)** listed as a

hazardous waste under Subpart D of 40 C.F.R., Part 261 (in particular under 40 C.F.R. § 261.33, with waste code U159) when it has been, as it has been within the groundwater at the Courtland property, discarded or intended to be discarded.

i.  **Acetone** is used as a solvent and as a synthetic intermediate.  The substance may have adverse effects on the central nervous system, liver, kidneys, and gastrointestinal tract.  The substance may also have adverse effects on the blood and bone marrow.  There are limited data that indicates acetone may adversely affect the male reproductive system.  **MSDSs** for the chemical product Acetone direct users to avoid releases of it to the environment.  Acetone is a RCRA Subtitle C "hazardous waste" pursuant to 40 C.F.R. § 261.3, because it is:  **(a)** with respect to its presence in environmental media at and emanating from the UCC Facility, a discarded material and "solid waste" within the meaning of 40 C.F.R. § 261.2;  **(b)** not excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4(b); and **(c)** listed as a hazardous waste under Subpart D of 40 C.F.R., Part 261 (in particular, **(i)** under 40 C.F.R. § 261.33, with waste code U002 when it has been, as it has been with respect to the groundwater at the Courtland property, discarded or intended to be discarded; and **(ii)** under 40 C.F.R. § 261.31, with waste code F003, as the acetone disposed of by UCC has been used and, as a result of contamination, can no longer serve the purpose for which it was produced, without processing.

j.  **Di-n-butyl phthalate** ("DBP") is a CWA Priority **Pollutant**.  It is a chemical that is added to plastics.  The U.S. Consumer Product Safety Commission ("CPSC") considers DBP to be systemically toxic.  Studies reviewed by CPSC provided evidence that DBP can be considered toxic to reproductive systems under the Federal Toxic Substances Control Act.  The studies showed that DBP reduced fertility, mating and pregnancy rates, as well as reduced sperm concentrations in male rats.  DBP may induce adverse health effects by altering hormones.  DBP is very toxic to aquatic organisms.  DBP is a RCRA Subtitle C "hazardous waste" pursuant to 40 C.F.R. § 261.3, because it is:  **(a)** with respect to its presence in environmental media at and emanating from the UCC Facility, a discarded material and "solid waste" under within the meaning of 40 C.F.R. § 261.2; **(b)** not excluded from regulation as a hazardous waste under 40 C.F.R. § 261.4(b); and **(c)** listed as a hazardous waste under Subpart D of 40 C.F.R., Part 261 (in particular under 40 C.F.R. § 261.33(a) or (b), with waste code U069) when it has been, as it has been within the groundwater at the Courtland property, discarded or intended to be discarded.

35.  At some time shortly before 2012, UCC's environmental consultants discovered **Toxic Pollutants**, non-exclusively including 1,4-dioxane, in the monitoring wells across Davis Creek.

36.  UCC's environmental consultants have also detected 1,4-dioxane, a **Toxic Pollutant**, in the groundwater underlying UCC's Filmont Waste Disposal **Facility**.

37.  UCC's environmental consultants have detected 1,4-dioxane, a **Toxic Pollutant**, in the groundwater underlying UCC's Massey Railyard.

**38.** UCC's environmental consultants have detected 1,4-dioxane, a **Toxic Pollutant**, in the Greenhouse Area at the UCC Tech Park facility.

**39.** UCC's environmental consultants have detected 1,4-dioxane, a **Toxic Pollutant**, at the Ward Hollow area at the UCC Tech Park facility.

**40.** UCC's environmental consultants have detected at least the following **Pollutants** in the **sediments** within **Waters of the United States** at or in the vicinity of UCC's Filmont Waste Disposal **Facility**: 2-Methylnaphthalene, Acetone, Acenaphthene, Acenaphthylene, Anthracene, Arsenic, Barium, Benzo (a) anthracene, Benzo (a) pyrene, Benzo (b) fluoranthene, Benzo (g,h,i) perylene, Benzo(k)fluoranthene, Chromium, Chrysene, Dibenzo (a,h) anthracene, Fluoranthene, Fluorene, Indeno (1,2,3-c,d) pyrene, Lead, Mercury, Nickel, Naphthalene, Phenanthrene, Pyrene, Selenium, and VOCs, Total.

**41.** UCC's environmental consultants have detected at least the following **Pollutants** in the **surface waters** at or in the vicinity of its Filmont Waste Disposal **Facility**: 1,4-Dioxane (p-Dioxane), 2,4,5-Trichlorophenol, 2,4-Dichlorophenol, 2,4-Dinitrophenol, 2-Chlorophenol, 2-Methylphenol, 2-Nitrophenol, 3-Methylphenol & 4-Methylphenol, 4,6-Dinitro-2-methylphenol, 4-Chloro-3-methylphenol, 4-Nitrophenol, Arsenic, Arsenic, Dissolved, Barium, Barium, Dissolved, Bis (2-chloroisopropyl) ether, bis(2-Ethylhexyl)phthalate, Chlorobenzene, Hardness (AS CaCO3), Iron, Lead, Pentachlorophenol, Phenol, Selenium, Selenium, Dissolved, and VOCs, Total.

**42.** UCC's environmental consultants have detected at least the following **Pollutants** in the **surface soil** at its Filmont Waste Disposal **Facility**: Arsenic, Barium, Cadmium, Chromium, Lead, Mercury, Selenium, Silver, Chloroform, N-Nitrosodiphenylamine, 2,4-Dimethylphenol, 2-Methylnaphthalene, bis(2-Ethylhexyl)phthalate, Benzo(g,h,i)perylene, Benzo(a)anthracene,

Benzo(a)pyrene, Benzo(b)fluoranthene, Benzo(k)fluoranthene, Chrysene, Dibenzofuran, Fluoranthene, Fluorene, Indeno(1,2,3-cd)pyrene, Naphthalene, Phenanthrene, and Pyrene.

43. UCC's environmental consultants have detected at least the following **Pollutants** in the **groundwater** at its Filmont Waste Disposal **Facility**: 1,1,1-Trichloroethane, 1,1-Dichloroethane, 1,4-Dioxane (p-Dioxane), 2,4,5-Trichlorophenol, 2,4-Dichlorophenol, 2,4-Dinitrophenol, 2,4-Dinitrotoluene, 2-Chlorophenol, 2-Methylnaphthalene, 2-Methylphenol, 2-Nitrophenol, 3,3'-Dichlorobenzidine, 3-Methylphenol & 4-Methylphenol, 3-Nitroaniline, 4,6-Dinitro-2-methylphenol, 4-Chloro-3-methylphenol, 4-Nitrophenol, Acetone, Arsenic, Arsenic, Dissolved, Barium, Barium, Dissolved, Benzene, Benzo (a) anthracene, Benzo (a) pyrene, Benzo (b) fluoranthene, Benzo (g,h,i) perylene, Benzo(k)fluoranthene, Bis (2-chloroethyl) ether, Bis (2-chloroisopropyl) ether, Bis (2-ethylhexyl) phthalate, Cadmium, Cadmium, Dissolved, Carbon disulfide, Chlorobenzene, Chloroform, Chromium, Chromium, Dissolved, Chrysene, cis-1,2-Dichloroethylene, Di-n-butylphthalate, Di-n-octylphthalate, Ethylbenzene, Fluoranthene, Fluorene, Hexachlorocyclopentadiene, Indeno (1,2,3-c,d) pyrene, Iron, Iron, Dissolved, Lead, Lead, Dissolved, Mercury, Mercury, Dissolved, Naphthalene, Nickel, Nickel, Dissolved, Pentachlorophenol, PHC as Diesel Fuel, Phenanthrene, Phenol, Pyrene, Selenium, Selenium, Dissolved, Silver, Silver, Dissolved, Styrene, tert-Butyl Methyl Ether, Toluene, Vinyl acetate, Vinyl chloride, VOCs, Total, and Xylenes, Total.

44. UCC's environmental consultants have detected at least the following **Pollutants** in the **groundwater** across the Davis Creek emanating from its Filmont Waste Disposal **Facility**: 1,4-Dioxane (p-Dioxane), Acetone, Arsenic, Arsenic Dissolved, Barium, Barium, Dissolved, Bis (2-ethylhexyl) phthalate, Chromium, Chromium Dissolved, Di-n-butylphthalate, Lead, Lead, Dissolved, Selenium, Selenium Dissolved, tert-Butyl Methyl Ether, and VOCs, Total.

**45.** UCC's environmental consultants have detected at least the following **Pollutants** in the **groundwater** at UCC's Massey Rail Yard: 1,2-Dichloropropane, 1,4-Dioxane (p-Dioxane), Arsenic, Arsenic, Dissolved, Barium, Benzene, Benzo (a) anthracene, Benzo (a) pyrene, Benzo (b) fluoranthene, Benzo(k)fluoranthene, Bis (2-chloroethyl) ether, Bis (2-ethylhexyl) phthalate, Cadmium, Iron, Lead, and Naphthalene.

**46.** After reviewing Dr. Simonton's declaration and viewing his videos and photos, WV DEP made its own visit to UCC's Filmont Waste Dump, on or about October 28, 2020, and thereafter issued a Notice of Violation of the West Virginia Water Pollution Control Act, to UCC, noting that it was allowing "industrial or other wastes to discharge directly and indirectly from seeps and pipes . . . into Ward Branch without a valid WV/NPDES permit," as detailed in **Exhibit 2** hereto, which is incorporated by reference.

**47.** The observations reflected in Dr. Simonton's declaration, made on September 11, 2020, were confirmed by Dr. Simonton when on January 18, 2021, he again visited UCC's Filmont Waste Disposal **Facility** and noted that the **Discharges** he previously observed were ongoing, continuous, and unabated.

## COUNT I:

### CITIZEN SUIT RELIEF PURSUANT TO CWA SECTION 505, 33 U.S.C. § 1365, REGARDING DEFENDANT UCC'S: (1) ONGOING, UNPERMITTED DISCHARGES OF POLLUTANTS TO NAVIGABLE WATERS IN VIOLATION OF CLEAN WATER ACT SECTIONS 301 AND 402; AND (2) ADEQUATE ABATMENT OF THE CONTINUING, ADVERSE IMPACTS ON NAVIGABLE WATERS RESULTING FROM DECADES OF UCC'S PAST CWA VIOLATIONS

**48.** Plaintiff incorporates and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

**49.** Section 301(a) of the federal Clean Water Act ("CWA"), 33 U.S.C. § 1311(a), prohibits the **Discharge of a Pollutant** by any **Person** into **Navigable Waters**, except in

compliance with the terms and conditions of a permit, known as a National Pollutant Discharge Elimination System ("NPDES") permit issued by U.S. EPA or an authorized state pursuant to CWA § 402, 33 U.S.C. § 1342.

50.   CWA §402(a), 33 U.S.C. § 1342(a), provides that the permit-issuing authority may issue a NPDES Permit that authorizes the **Discharge** only if that **Discharge** will meet all applicable requirements of the CWA and such other conditions as the permitting authority determines necessary to effectuate the provisions of the CWA.

51.   CWA § 303(a), 33 U.S.C. § 1313(a), requires that states adopt ambient water quality standards and establish water quality criteria for particular water bodies that will protect designated uses of the water.

52.   In CWA § 402(p)(4)(A), Congress authorized and instructed the Administrator of U.S. EPA to "establish regulations setting forth the permit requirements for stormwater discharges [associated with industrial activity]."  33 U.S.C. § 1342(p)(4)(A).  The Administrator did so, and such regulations are codified at 40 C.F.R. § 122.26.

53.   Acting pursuant to authority granted under CWA § 402(a)(2), 33 U.S.C. § 1342(a)(2), the Administrator of U.S. EPA has authorized WVDEP to issue NPDES permits. 47 Fed. Reg. 22363 (May 10, 1983).  The applicable West Virginia law regarding NPDES permits is the West Virginia Water Pollution Control Act ("WVWPCA"), W.Va. Code, Chapter 22, Article 11.

54.   Both the North Boundary Creek (Ward Branch) and Davis Creek in South Charleston, WV are each a **Navigable Water** within the meaning CWA §§ 301(a) and 502(7), 33 U.S.C. §§ 1311(a) and 1362(7), respectively, because both such waterways are **Waters of the United States**.

55.   UCC's Filmont Waste Disposal **Facility**, the various "seeps" and **Discharges** from

that **Facility** (including, without limitation, the "seeps" and **Discharges** identified by UCC's

consultant and the **Discharge** depicted in Figure 3, above, and Video b in fn. 3, above), and each

of the two (2) adjoining ditches – one (1) on the north side (known as the North Boundary Drainage

Ditch) which runs into the Ward Branch and the other on the south side of UCC's Filmont Disposal

Site which runs into the South Boundary Creek -- adjoining it and connecting to the North

Boundary Creek (Ward Branch) and Davis Creek, are each a **Point Source**.

**56.** UCC has for decades been allowing the **Discharge of Pollutants**, and is currently

continuing to allow the **Discharge of Pollutants**, from UCC's Filmont Waste Disposal Site

directly into Davis Creek through seeps on the side of that Open Dump that forms a part of the

east bank of Davis Creek and the south bank of the Ward Branch[4], including (without limitation)

---

[4]  This undisputable fact, standing alone, establishes that UCC's Filmont "landfill" is **_per se_ illegal under West Virginia law:**

> **1.6.a.** The discharge, deposit, injection, dumping, spilling, leaking burning, burying, **or otherwise placing of any solid waste or leachate into or on any land or water so that such solid waste or any constituent thereof may enter the environment or be emitted into the air, or discharged into any waters, including groundwaters, is prohibited** unless specifically authorized by a permit or permits from the Department.

> **1.6.b.** Solid waste facilities or activities failing to satisfy this subsection are considered open dumps, as defined in section 2, and will be subject to the actions and penalties outlined in W. Va. Code §22-15-15 [which expressly prohibits any landowner from allowing its land in West Virginia to be used as or for an "open dump."]

W. Va. Code of State Regulations (C.S.R.) § 33-1-1.6.  In turn, the Section 2 referred to in the foregoing West Virginia regulation defines the term "open dump" as follows:

> **2.84.** "Open Dump" means any solid waste disposal that does not have a permit under W. Va. Code §22-15-1 _et seq._, and is not otherwise authorized by an order of the Secretary; or is in violation of state law; **or where solid waste is disposed in a manner that does not protect the environment.**

W. Va. C.S.R. § 33-1-2.84.  It is beyond dispute that UCC's Filmont so-called "landfill" is a "solid waste facility" within the meaning of the foregoing West Virginia Regulations:

> **2.123.** "Solid Waste Facility" means any system, facility, land, contiguous land, improvements on the land, structures or other appurtenances or methods used for processing, recycling or disposing of solid waste, including landfills, solid waste disposal surface impoundments, transfer stations, incinerators, recycling facilities, materials recovery facilities, mixed

the **Discharge** depicted in Figure 3, above, and Video b in fn. 3, above.  Each such **Discharge** or "seep" is also a **Point Source**.

**57.**  UCC has for decades been allowing **Discharges of Pollutants**, and is currently continuing to allow **Discharges of Pollutants** from its Filmont Waste Disposal Site to Davis Creek via groundwater that is hydraulically connected to each of the very proximate ditches adjoining UCC's Filmont Disposal Site and to Davis Creek.  This past and ongoing **Discharge of Pollutants** via groundwater to **Navigable Waters of the United States** is, and has been continuously since the creation of UCC's Filmont waste dump, in every regard, non-exclusively including the unlined nature of the Filmont Waste Disposal **Facility** and its design and operation without any leachate control, collection or compliant monitoring system, the distance the polluted groundwater must travel to reach Davis Creek (varying from less than a foot to just a few feet), and the high porosity and permeability of the soils through which the polluted groundwater must travel to reach Davis Creek, the "functional equivalent" of a direct **Discharge** of those **Pollutants** to Davis Creek.

**58.**  UCC does not now have and never has had an NPDES permit issued by either U.S. EPA or the WVDEP authorizing the **Discharge of a Pollutant** from its Filmont Waste Disposal **Facility** to **Navigable Waters**, specifically including Davis Creek in South Charleston, WV.

**59.**  Pursuant to CWA §§ 505(f)(1), (2) and (4), 33 U.S.C.§ 1365(f)(1), (2) and (4), the prohibition of unpermitted **Discharges of Pollutants** and **Toxic Pollutants** in CWA §§ 301(a) and 307, respectively, 33 U.S.C. §§ 1311 and 1317, are each an "effluent standard or limitation" for purposes of CWA § 505, 33 U.S.C. § 1365, and, thus, enforceable pursuant to the CWA "Citizen Suit" provision, CWA § 505, 33 U.S.C. § 1365.

---

waste processing facilities, sewage sludge processing facilities, commercial composting facilities and other such facilities not herein specified . . . .

## COUNT II:

**CITIZEN SUIT RELIEF PURSUANT TO CWA SECTION 505, 33 U.S.C. § 1365, REQUIRING DEFENDANT UCC FORTHWITH TO CEASE AND DESIST: (1) ONGOING, UNPERMITTED STORMWATER DISCHARGES OF POLLUTANTS TO NAVIGABLE WATERS IN VIOLATION OF CLEAN WATER ACT SECTIONS 301 AND 402; AND (2) TO ABATE THE CONTINUING, ADVERSE IMPACTS ON NAVIGABLE WATERS RESULTING FROM DECADES OF UCC'S PAST CWA VIOLATIONS**

**60.** Plaintiff incorporates and realleges the allegations set forth in the foregoing paragraphs as if fully set forth herein.

**61.** In CWA § 402(p)(4)(A), 33 U.S.C. § 1342(p)(4)(A), Congress authorized and instructed the Administrator of U.S. EPA to "establish regulations setting forth the permit requirements for stormwater discharges [associated with industrial activity]." The U.S. EPA Administrator did so, and the resulting duly promulgated regulations are codified at 40 C.F.R. § 122.26 and became effective in November 1990. Prior to that date, the UCC's Filmont Waste Disposal Site had received wastes from **Facilities** described in 40 C.F.R. § 122.26(b)(14)(ii), non-exclusively including UCC South Charleston Chemical Plant (Industry Group 32). and (ix), the South Charleston Wastewater Treatment Plant.

**62.** On information and belief, the **Storm Water** collection system on UCC's Filmont Waste Disposal **Facility**, including **Storm Water** collection system at UCC's Massey Railyard discharge into either the historical Davis Creek channels, which are directly hydrologically connect to the Ward Branch and to the South Boundary Creek, or directly to the South Boundary Creek (South Boundary Drainage Ditch).

**63. Storm Water** is captured by the stormwater collection system at UCC's Massey Railyard facility, but is not treated before it is **Discharged** into to the **Waters of the United States**.

**64. Storm Water** at and flowing from and across UCC's Filmont Waste Disposal **Facility** is not controlled or treated and infiltrates though wastes disposed at UCC's Filmont Disposal

**Facility** and are then **Discharged** to surface water or flows across the disposal site and directly to surface waters.  The **Discharges** of **Storm Water** flowing from UCC's Filmont Waste Disposal **Facility** directly into Davis Creek, the Ward Branch of the Davis Creek, and the two (2) drainage ditches adjoining its Filmont Disposal Site are each a **Stormwater Discharge Associated with Industrial Activity**.  Therefore, UCC is, and has been continuously for the past 30 years, required to have a stormwater discharge permit applicable to its Filmont waste disposal **Facility** pursuant to the requirements of CWA §§ 301(a) and 402(p), 33 U.S.C. §§ 1311(a) and1342(p), and their implementing regulations.

    **65.**  UCC does not now have and never has had a stormwater discharge permit from either U.S. EPA or the West Virginia Department of Environmental Protection (hereinafter:  "WVDEP") allowing it to discharge **Storm Water** from UCC's Filmont Disposal **Facility** to surface waters. Notwithstanding this plain fact, UCC has, for decades, been illegally **Discharging**, and continues to date illegally to **Discharge Storm Water Associated with Industrial Activity** from UCC's Filmont Waste Disposal Site to **Navigable Waters** without the permit and controls required by CWA § 402(p) and its implementing regulations.

    **66.**  UCC's illegal **Storm Water Discharges** have polluted the surface waters surrounding its Filmont Waste Disposal **Facility**, causing the unpermitted addition of **Pollutants**, **Toxic Pollutants**, and **Hazardous Substances** to such surface waters and to the underlying sediments.

    **67.** UCC's illegal **Storm Water Discharges** have adversely impacted and continue adversely to impact Courtland's property, adding contaminated sediments to the South Boundary Drainage Ditch, which flows across Courtland's Property on the way to the Davis Creek.

    **68.**  UCC's Filmont Waste Disposal **Facility** received wastes from **Facilities** described in 40 C.F.R. §§ 122.26(b)(14)(ii), non-exclusively including UCC South Charleston Chemical Plant (Industry Group 32). and (ix), the South Charleston Wastewater Treatment Plant.

69.   **Storm Water** at and flowing from and across UCC's Filmont Waste Disposal **Facility** is not controlled or treated and infiltrates through UCC's Filmont Disposal **Facility** then to surface water, or flows across the Open Dump and directly to surface water.

70.   The **Storm Water** capture systems at UCC's Filmont Waste Disposal **Facility** and at its Massey Railyard are unpermitted direct, discrete, on-going **Discharge Point Sources** for **Pollutants** and **Toxic Pollutants** from UCC's Filmont Waste Disposal **Facility** into the **Waters of the United States**.

71.   The discharge of **Storm Water** from UCC's Filmont Disposal **Facility** directly into Davis Creek and directly into the two (2) drainage ditches adjoining its Filmont Waste Disposal Site are each a "**Storm Water Discharge Associated with Industrial Activity**" as defined in 40 C.F.R. § 122.26(b)(14)(v) and, therefore, for more than three (3) decades UCC has required, and continues to date to require, an NPDES permit pursuant to the terms of CWA § 402(p), 33 U.S.C. § 1342(p) and its implementing regulations in order to lawfully effect or allow such **Discharges**.

72.   UCC, which does not now have and never has had a permit from either U.S. EPA or the WVDEP to **Discharge Storm Water** from its Filmont Waste Disposal **Facility** to surface waters, has for decades been illegally **Discharging**, and continues to date illegally to **Discharge**, **Storm Water Associated with Industrial Activity** from its Filmont Waste Disposal **Facility** to **Navigable Waters** without the permit required by CWA § 402(p) and its implementing regulations.

73.   UCC is subject to an injunction under CWA § 505, 33 U.S.C. § 1365, ordering it to: **(i)** forthwith cease its illegal discharges from its Filmont Waste Disposal **Facility** of **Pollutants** and of **Storm Water Associated with Industrial Activity** to **Navigable Waters** without the permits required by the CWA; and **(b)** competently and timely to investigate and abate in

compliance with the requirement of the **National Contingency Plan** the ongoing endangerments to **Navigable Waters** that is continuing to be caused by existing contamination of sediments within surface waterways resulting from UCC's illegal **Discharges of Pollutants** and **Storm Water Associated with Industrial Activities** from its Filmont Waste Disposal **Facility**.

**74.**    Pursuant to CWA § 505(f)(1) and (2), 33 U.S.C.§ 1365(f)(1) and (2), the prohibition of the unpermitted **Discharges of Storm Water Associated with Industrial Activities** in CWA §§ 301(a) and 402(p), respectively, 33 U.S.C. §§ 1311 and 1342(p), are each an "effluent standard or limitation" for purposes of CWA § 505, 33 U.S.C. § 1365, and, thus, enforceable pursuant to CWA § 505, 33 U.S.C. § 1365.

## IV.    *PRAYER FOR RELIEF*:

WHEREFORE, Plaintiff respectfully requests that this Court award the following relief as against Defendant UCC:

**A**.    the issuance of a permanent injunction pursuant to § 505 of federal Clean Water Act, 33 U.S.C. §1365, requiring UCC:  **(i)** forthwith to cease its illegal **Discharges** from its Filmont Disposal Site of **Pollutants** and of **Storm Water Associated with Industrial Activity** to **Navigable Waters** without the permits required by the CWA; and **(ii)** timely and competently to investigate and abate in compliance with the requirement of the **National Contingency Plan** the ongoing endangerments to **Navigable Waters** sediments underlying, adjacent to, and within surface waterways resulting from UCC's illegal discharges of **Toxic Pollutants**, **Hazardous Substances** and **Storm Water Associated with Industrial Activities** from its Filmont Waste Disposal **Facility**;

**B.**    an award of civil penalties, to be paid to the United States of America pursuant to 33 U.S.C. §§  1319(d) and 1365(a) in the amount to be determined by the Court upon relevant proof

not to exceed the statutory maximum civil penalty per day of violation for each violation committed relative to UCC's Filmont so-called "Landfill" **Facility** and the UCC Massey Railyard of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to the CWA, including (without limitation) those violations specifically identified herein;

  **C**. an award to Plaintiff of its reasonable attorney fees and litigation costs, including (without limitation) expert witness fees, incurred in obtaining relief the "Citizen Suit" claims brought herein under the CWA.

  **D**. Such other and further relief as this Court deems necessary and appropriate.


   Respectfully submitted:

   **Neely and Callaghan**
   **Lead Trial Counsel for Plaintiff, The Courtland Company, Inc.**


BY: /s/ Michael O. Callaghan
   Michael O. Callaghan, Esq. WV Bar No. 5509
   NEELY & CALLAGHAN
   1337 Virginia Street East
   Charleston, WV  25301
   Telephone:  304-343-6500
   Cell: 304-545-4794
   Facsimile:  304-343-6528
   E-Mail:  mcallaghan@neelycallaghan.com