UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

THE COURTLAND COMPANY, INC.,
a West Virginia Business Corporation,

      Plaintiff,

v.                         Civil Action No. 2:21-cv-00101

UNION CARBIDE CORPORATION,
a New York Corporation,

      Defendant.

MEMORANDUM OPINION AND ORDER

Pending is the plaintiff's application for a temporary restraining order, filed on February 10, 2021 (ECF No. 5).

I.   Background

A.   The complaint

The plaintiff initiated this action by filing a complaint on February 9, 2021.  See ECF No. 1.  The complaint alleges the following.  The plaintiff is a corporation that owns a parcel of real property abutting Davis Creek in Kanawha County, West Virginia.  See id. ¶ 8.  The defendant is a corporation that owns two adjoining parcels of real property, both adjacent to the plaintiff's property.  See id. ¶ 9.  The

first, referred to as the Filmont Site,[1] lies roughly northeast
of the plaintiff's property and also abuts Davis Creek.  See id.
¶¶ 9, 12-13, 18.  The second, referred to as the UCC Railyard,[2]
lies roughly east of the plaintiff's property.  See id. ¶¶ 12-
13.

        Beginning no later than the 1950s and continuing
through the 1980s, the defendant received and disposed of solid
wastes and hazardous wastes and substances at the Filmont Site.
See id. ¶¶ 9, 13-14.  Some of these wastes were received from
two coal-burning power plants and a chemical plant operated by
the defendant, as well as from a wastewater treatment plant.
See id. ¶¶ 15, 61.  The wastes included unknown wastes
associated with the manufacture of Dynel, a fiber made from

---

[1] In another case, discussed below, the parties and the court
referred to this property as the "Filmont Landfill."  However,
the parties now dispute whether the property should be referred
to as a "landfill" or instead as a "dump."  Of course, mere
reference to a property as a "landfill" in a memorandum opinion
and order, which does not purport to address whether the
property constitutes either a dump or a landfill under any
relevant law, would not amount to an adjudication of that issue.
Nevertheless, the court refers to the property as the "Filmont
Site" in this memorandum opinion and order to avoid further
needless controversy.

[2] The parties sometimes refer to the UCC Railyard as the Massey
Railyard.  Testimony offered by David Carpenter at the hearing
in this matter indicated that a small portion of the railyard,
at its eastern extreme, is owned by third parties.  It is not
clear whether this portion of the railyard is part of the UCC
Railyard, which is the subject of this case, or instead
comprises some or all of a separate parcel of property.

vinyl chloride and acrylonitrile; bottom-ash from the coal-
burning power plants; wastewater treatment grit containing
biphenyl, 2,6-di-tert-butyl-p-cresol, isophorone, phenyl ether,
arsenic, chrome, lead, and mercury; mercury batteries; 1,4-
dioxane; and other unknown wastes and ethers.  See id. ¶¶ 13,
15-16.  Additionally, broken concrete, iron rebar, and other
construction debris are found in the portion of the Filmont Site
that forms the eastern bank of Davis Creek.  See id. ¶ 18.

        Because the Filmont Site was not designed to contain
these wastes in a manner that protects public health and the
environment, leachates containing pollutants have seeped and
continue to seep from it and have discharged into nearby
navigable waters, either directly from point sources or through
groundwater.  See id. ¶ 9, 13, 22.  Further, in constructing the
Filmont Site, the defendant covered and filled-in the natural
channels or branches connected to Davis Creek, including much of
Ward Branch,[3] near the northern boundary of the defendant's
property.  See id. ¶¶ 19, 25-26.  The plaintiff alleges that,
since being filled-in, these channels have become the point

---

[3] In their filings, the parties typically refer to this waterway
as "Ward Branch," but, at the hearing on the current
application, counsel and witnesses often referred to it as
"Wards Branch" or "Ward's Branch."

source for discharging pollutants into nearby navigable waters within the Davis Creek watershed.  See id. ¶ 19, 26–27.

Specifically, materials from the Filmont Site discharge from seeps into a drainage ditch located at its northern boundary and then flow into Ward Branch.  See id. ¶ 21. Materials containing contaminated sediments also discharge from seeps into a second drainage ditch near the southern boundary and are ultimately discharged into Davis Creek.  See id. ¶¶ 23-24.  Another discharge consists of materials flowing directly from a seep into Ward Branch, and the plaintiff alleges on information and belief that additional seeps and discharges are also present.  See id. ¶ 21.  The discharged materials include 1,4-dioxane, 2-butanone, acetone, arsenic, barium, beryllium, cadmium, chromium, copper, di-n-butyl phthalate, iron, lead, manganese, mercury, nickel, selenium, and zinc.  See id. ¶ 22.

These discharges began no later than January 1, 1990, and they have continued to the present date.  See id. ¶ 28.  The defendant has never had a federal or state permit for the discharges, though some kind of permit has been required since at least the early 1970s.  See id. ¶¶ 9, 28, 58.

Besides discharges from seeps, the plaintiff also alleges that the Filmont Site and the UCC Railyard have stormwater collection systems that discharge directly into Davis

4

Creek and its channels or into the drainage ditches at the
northern and southern boundaries of the Filmont Site.  See id. ¶
62-64.  The stormwater captured by the system is not treated
before it is discharged.  See id. ¶¶ 63-64, 69-70.  These
discharges have been ongoing for over 30 years without a permit
required by federal statute and regulation.  See id. 64-65, 72.

        The plaintiff alleges that, as part of a related case
discussed below, its expert, Dr. D. Scott Simonton, on September
11, 2020, inspected portions of Davis Creek near the Filmont
Site, sampled discharges from the Filmont Site and nearby
deposits of orange sludge, tested the samples, and reported the
results.[4]  See id. ¶¶ 29-32; see also ECF No. 1-2; ECF No. 1-3;
ECF No. 1-4.  His tests showed the discharges contained
aluminum, arsenic, beryllium, cadmium, chromium, copper, iron,
manganese, nickel, selenium, and zinc and that the sludge
contained arsenic, copper, cadmium, iron, lead, mercury, nickel,
selenium, and zinc.  See ECF No. 1 ¶¶ 32-33.  The plaintiff
alleges that the contaminants discharging from the Filmont Site
that it has identified are pollutants under applicable federal
statute and regulation.  See id. ¶ 34.

---

[4] The plaintiff alleges that Dr. Simonton inspected the site
again on January 18, 2021, and he confirmed his initial
observations from his September 11, 2020, inspection.  See ECF
No. 1 ¶ 47.

The plaintiff alleges that, sometime shortly before 2012, the defendant discovered 1,4-dioxane and other pollutants in monitoring wells it maintains on the western bank of Davis Creek opposite the Filmont Site.  See id. ¶ 13, 35.  The defendant also detected 1,4-dioxane at nearby properties it owns, including the UCC Railyard.  See id. ¶¶ 36-39.  The defendant has further detected numerous other pollutants in surface water, groundwater, sediment, or soil at or near the Filmont Site and the UCC Railyard.  See id. ¶¶ 40-45.

The plaintiff also alleges that on or about October 28, 2020, the West Virginia Department of Environmental Protection ("WVDEP"), after reviewing Dr. Simonton's declaration, issued a notice of violation of the West Virginia Water Pollution Control Act to the defendant, noting that the defendant was allowing wastes to discharge directly and indirectly from seeps and pipes into Ward Branch without the required permit.  See id. ¶ 46 (quoting ECF No. 1-5).

Although, generally, materials discharged from the Filmont Site into Davis Creek flow downstream (i.e., northward), away from the plaintiff's property, the plaintiff alleges that the flow is sometimes southward so that contaminated sediment from the discharges deposit on the plaintiff's property, interfering with its use and adversely impacting its value.  See

6

id. ¶¶ 23-24.  The plaintiff also alleges that materials from the Filmont Site have migrated to its property through groundwater that flows onto it.  See id. ¶ 20.  The plaintiff further alleges that stormwater and seep-related discharges into the Filmont Site's southern drainage ditch deposit contaminated sediment on the plaintiff's property, as the ditch travels across the plaintiff's property on its way to Davis Creek.  See id. ¶ 66-67.

Based on these allegations, the plaintiff asserts two counts against the defendant.  In Count I, the plaintiff seeks citizen-suit relief pursuant to § 505 of the Water Pollution Prevention and Control Act ("Clean Water Act"), 33 U.S.C. § 1365, based on the defendant's ongoing unpermitted discharges of pollutants from the Filmont Site into nearby navigable waters and the continuing adverse impacts on nearby navigable waters resulting from the defendant's past Clean Water Act violations.  See id. ¶¶ 48-59.  In Count II, the plaintiff also seeks citizen-suit relief under § 505 of the Clean Water Act based on the defendant's unpermitted stormwater discharges of pollutants into nearby navigable waters and the continuing adverse impacts on nearby navigable waters resulting from the defendant's past stormwater discharges in violation of the Clean Water Act.  See id. ¶¶ 60-74.

7

The plaintiff seeks a permanent injunction requiring the defendant to (1) cease its illegal discharges of pollutants and stormwater from the Filmont Site into nearby navigable waters without the permits required by the Clean Water Act and (2) investigate and abate its ongoing endangerments to nearby navigable waters resulting from illegal discharges of pollutants and stormwater from the Filmont Site. See id. at 33 (prayer for relief A). The plaintiff also seeks an award of civil penalties to the United States for all violations of the Clean Water Act relating to the Filmont Site and the UCC Railyard, pursuant to 33 U.S.C. §§ 1319(d) and 1365(a). See id. at 33-34 (prayer for relief B). Lastly, the plaintiff seeks an award of reasonable attorney's fees and costs. See id. at 34 (prayer for relief C).

B.   Pre-suit notice for Clean Water Act citizen-suit

This case is not the first one in which the plaintiff has pursued these claims in this court. In Courtland Co. Inc. v. Union Carbide Corp. ("Courtland II"), No. 2:19-cv-00894 (S.D.W. Va.), the plaintiff filed suit against the defendant asserting three federal claims under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") and the Resource Conservation and Recovery Act of 1976 ("RCRA") and seven state-law claims, based on pollutants and other materials allegedly disposed of at the Filmont Site

8

and the UCC Railyard.  See Courtland II, No. 2:19-cv-00894, 2020 WL 6265080, at *1 (S.D.W. Va. Oct. 23, 2020).[5]  The plaintiff's complaint did not assert any Clean Water Act claims.  See id.

The plaintiff thereafter sought leave to file a supplemental complaint in order to include a Clean Water Act claim, nearly identical to the Clean Water Act claims asserted in this action.  Id. at *2.  The court denied the plaintiff's motion for leave to file the supplemental complaint on the ground that the pre-suit notice required by 33 U.S.C. § 1365(b)(1) that the plaintiff had provided was inadequate.  See id. at *6-7; see also 33 U.S.C. § 1365(b)(1)(A) ("No [citizen suit] action may be commenced . . . under [§ 1365(a)(1)] . . . prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator [of the Environmental Protection Agency], (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator . . . .").

In its complaint in this case, the plaintiff states that, on November 10, 2020, it sent a supplemental pre-suit notice to the defendant and applicable state and federal

---

[5] A third suit, Courtland Co. Inc. v. Union Carbide Corp. ("Courtland I"), No. 2:18-cv-01230 (S.D.W. Va.), involves similar allegations and claims as those raised in Courtland II regarding a third property, referred to as the UCC Tech Center, that is also owned by the defendant and located nearby the plaintiff's property.

officials and agencies, in compliance with 33 U.S.C. §
1365(b)(1), and that the sixty-day period has elapsed since the
notice was sent without any state or federal agency commencing
an action in a court under § 1365(b)(1)(B).  See ECF No. 1 ¶ 5-
7.  The plaintiff attached a copy of the notice to its complaint
and incorporated it into its complaint by reference.  See id. ¶
5; see also ECF No. 1-1.

    With respect to discharges from seeps, the notice
states that the Filmont Site "expand[ed] over time to cover and
fill-in the historic Davis Creek channels" and that these
"channels are and have been since their filling the source of
discharges of pollutants and seeps which are releasing and
discharging pollutants" into nearby navigable waters.  See ECF
No. 1-1 at 4.  The notice states that an August 2017
investigation revealed the presence of contaminants, including
2-butanone, arsenic, barium, cadmium, chromium, di-n-butyl
phthalate, lead, and selenium, in environmental media at the
plaintiff's property.  See id. at 4-8.  It also states that
these contaminants have been found in environmental media nearby
the defendant's properties and that the defendant's properties
are the sole plausible source of these contaminants.  See id. at
5, 7.  Similarly, the notice states that 1,4-dioxane is
"ubiquitous" in the groundwater across Davis Creek from the

Filmont Site and in nearby surface water.  See id. at 9.  The
notice further states that arsenic, barium, cadmium, chromium,
iron, lead, mercury, and selenium, were "found in unpermitted
direct discharges to surface waters from the Filmont [Site] to
Ward Branch."  Id. at 8; see also id. at 9 ("Iron is seen in
extremely high concentrations in the direct discharge from the
Filmont [Site] to Ward Bra[n]ch and is also seen in the direct
groundwater discharge from the Filmont [Site] to Davis Creek.").

        The notice states that two seeps that discharge
pollutants from the Filmont Site have been identified.  See id.
at 10.  The first, said to have been identified by the
defendant's consultants, consists of a point, depicted in a
drawing attached to the notice, from which "landfill materials"
flow out of the Filmont Site into the northern drainage ditch.
Id. at 10; see also ECF No. 1-4 at 11.  The second, identified
by Dr. Simonton, is "at a point west of the [first] seep" and
consists of "a continuous and on-going" discharge of "various
liquid dump materials" from the Filmont Site into Ward Branch.
See ECF No. 1-1 at 10.  Aside from these two seeps, the notice
also states, on information and belief, that there are
additional seeps from the Filmont Site that discharge various
pollutants into Davis Creek, Ward Branch, and the northern and
southern drainage ditches.  See id.  The notice states that the

11

northern and southern drainage ditches, along with the Filmont Site itself, are point sources for purposes of the Clean Water Act.  See id. at 10-11 (citing 33 U.S.C. § 1362(14)).  The notice states that the pollutants discharged from these point sources include 1,4 dioxane, 2-butanone, acetone, arsenic, barium, beryllium, cadmium, chromium, copper, di-n-butyl phthalate, iron, lead, manganese, mercury, nickel, selenium, and zinc.  See id. at 11.  The notice states that the defendant has engaged in or allowed these discharges on an ongoing and continuous basis since no later than January 1, 1990, without a permit.  See id.

With respect to stormwater discharges, the notice asserts that the Filmont Site received wastes from facilities engaged in industrial activity, that stormwater at and flowing across the Filmont Site is not controlled or treated but infiltrates through wastes disposed of there and is then discharged to surface waters, and thus that discharges of stormwater flowing from the Filmont Site into Davis Creek, Ward Branch, and the northern and southern drainage ditches constitute stormwater discharge associated with industrial activity.  See id. at 12-13.  The notice asserts that the defendant has been required to have a permit for this stormwater discharge for over 30 years but has never had such permit.  See

12

id. at 13.  The notice states that the defendant has thus been illegally discharging stormwater associated with industrial activity from the Filmont Site into navigable waters "for decades."  Id.

Attached to the notice is an unsworn declaration of the plaintiff's expert, Dr. Simonton.  See ECF No. 1-2 at 2-16 (declaration); see also ECF No. 1-2 at 17-30 (exhibits to declaration); ECF No. 1-3 (same); ECF No. 1-4 at 1-9 (same).[6]  In the declaration, Dr. Simonton states that, on September 11, 2020, he observed portions of the Filmont Site while kayaking in Davis Creek and Ward Branch.  See ECF No. 1-2 ¶¶ 7-17.  He observed orange sludge, consistent with deposits of iron hydroxide or oxyhydroxides, below the waterline all along the portion of the Filmont Site that forms the eastern bank of Davis Creek.  See id. ¶¶ 11-12.  Along the portion of Filmont Site forming the southern bank of Ward Branch, Dr. Simonton observed "landfill material, including broken concrete, bricks, 5-gallon buckets, and a heavy orange sludge" both on the bank and in the water of Ward Branch.  See id. ¶ 13.  East of this material, where, travelling upstream, Ward Branch bends northward and passes under a culvert, Dr. Simonton "observed a continuous

_____

[6] The declaration was also filed in Courtland II on October 5, 2020, in relation to a motion for preliminary injunction.

discharge of liquids and solids flowing from the Filmont [Site] and creating a blanket of orange sludge that entered [Ward Branch]." Id. ¶¶ 13-14. Dr. Simonton took samples of (a) liquid from the discharge where it met the Ward Branch waterline ("Sample 1"), (b) water immediately upstream and on the opposite side of Ward Branch ("Sample 2"), and (c) orange sludge lying immediately below the discharge ("Sample 3"). See id. ¶ 15.

Dr. Simonton had the samples he took tested. He states that the results showed the liquid from Sample 1 and the orange sludge from Sample 3 were "highly contaminated with toxic material" and that Ward Branch was also "highly contaminated." Id. ¶ 20. Specifically, the liquid from Sample 1 contained extremely high concentrations of iron and high concentrations of aluminum, arsenic, lead, and manganese, and it also contained beryllium, cadmium, chromium, copper, nickel, selenium, and zinc. See id. ¶ 21. The orange sludge from Sample 3 contained extremely high concentrations of iron and elevated concentrations of arsenic, copper, cadmium, lead, mercury, nickel, selenium, and zinc. See id. ¶ 25. The upstream water from Sample 2 contained high concentrations of aluminum and arsenic, but Dr. Simonton indicates that other sources may be responsible for higher concentration of arsenic in the water. See id. ¶¶ 22-23. Although he notes that, according to the

WVDEP, Ward Branch and Davis Creek have been identified as being polluted with iron, see id. ¶ 22, he states that, based on his testing and the orange sludge he observed in Davis Creek, Ward Branch, and the southern drainage ditch, "it is obvious . . . that high concentrations of iron" have been added to these waters by the Filmont Site.  Id. ¶ 24.

On September 12, 2020, Dr. Simonton visited the plaintiff's property and from there observed the southern drainage ditch, which, he notes, flows from the UCC Railyard, across the plaintiff's property, and into Davis Creek.  Id. ¶ 18.  He observed orange materials along the eastern bank of Davis Creek formed by the Filmont Site that "extended 30 yards or so" southwards in Davis Creek, "upstream of [its] confluence" with the southern drainage ditch.  Id.  He also observed orange sludge in the southern drainage ditch "immediately upstream of [its] confluence" with Davis Creek.  Id.  He further states that a photograph he took of the area, which he attached to his declaration, "shows a channel of orange staining coming from the Filmont [Site] across the [plaintiff's] [p]roperty into the [s]outh[ern] [drainage ditch] and discharging to Davis Creek."  Id. (citing ECF No. 1-3 at 2).[7]

_____

[7] A color version of the photograph may be found at ECF No. 5-2 at 32.

"Based on [his] observations . . . and related sample results," Dr. Simonton "concluded that waste material has contaminated groundwater and is flowing from" the Filmont Site "from the discharge" he observed and sampled "and other" unidentified "locations" "in the form of liquids and sludges containing aluminum, arsenic, beryllium, cadmium, chromium, copper, lead, manganese, mercury, nickel, selenium, and zinc" "into the [s]outh[ern] [drainage ditch], Davis Creek, and Ward Branch." Id. ¶ 27. He further stated that, at the discharge he sampled,

> solid and liquid landfill materials flow continuously through a discernable, confined, and discrete conveyance, which is clearly a ditch, channel, tunnel, conduit, or discrete fissure, from which pollutants . . . are discharged into Ward Branch, which flows into Davis Creek, a stream that flows into the Kanawha River. This unmonitored and uncontrolled discharge does not now have and never has had an NPDES Permit and is, therefore, a clear violation of the federal Clean Water Act[.]

Id. ¶ 32.

Notably, the declaration attached to the pre-suit notice does not mention stormwater discharge.

C.   WVDEP notice and order and administrative proceedings before the Environmental Quality Board

As adverted to in the plaintiff's complaint, on or about October 28, 2020, the WVDEP issued a notice of violation

16

of the West Virginia Water Pollution Control Act to the
defendant after reviewing Dr. Simonton's declaration and
conducting its own site visit to the Filmont Site.  See ECF No.
1 ¶ 46; see also ECF No. 1-5.  The notice states that an
inspection of the Filmont Site revealed that the defendant
"[a]llow[s] industrial or other wastes to discharge directly and
indirectly from seeps and pipes on [the] property into Ward
Branch without a valid WV/NPDES permit," in violation of W. Va.
Code § 22-11-8(b)(1).  ECF No. 1-5 at 1.  The notice directed
the defendant to provide, within 20 days, a written response
detailing abatement actions it has taken.  See id.

On December 8, 2020, the Director of WVDEP's Division
of Water and Waste Management issued a unilateral order to the
defendant.  See EFC No. 7-3 at 2-6.  In the order, the Director
noted that, on October 30 and November 17, 2020, WVDEP personnel
and the defendant's representatives conferred and discussed
deadlines for the defendant to respond to the notice of
violation and to provide information, including groundwater
sampling data, documentation regarding the materials disposed of
at the Filmont Site, and documents related to a purported
closure of Filmont Site by the health department and a covering
of the landfill that was overseen by the West Virginia Division

17

of Natural Resources.  See id. at 4.  The Director then ordered

the defendant to:

> 1. "immediately take measures to initiate compliance
>    with all pertinent laws and rules";
>
> 2. within 30 days, "either cease the discharge of
>    industrial waste into waters of the State or
>    electronically submit an administratively complete
>    application for a WV/NPDES permit";
>
> 3. within 30 days, submit for approval a proposed
>    corrective action plan and schedule, outlining "how
>    and when [the defendant] will achieve compliance
>    with all pertinent laws and rules," including
>    "permanent measures . . . to eliminate . . .
>    discharge of industrial waste into waters of the
>    State" or "interim measures . . . to prevent
>    further discharges" until a permit is obtained; and
>
> 4. within 30 days, in an effort to determine the
>    impact on groundwater and the extent of the
>    discharges into waters of the State, submit "[a]ll
>    available groundwater sampling data for the Filmont
>    [Site] after 2010," "[a]ll available information
>    that would provide for a characterization of the
>    material in the Filmont [Site] and a timeline
>    reflecting the date of placement of these materials
>    in the Filmont [Site]," and "[a]ll available
>    information related to a 'closure' by the health
>    department and placement of 'cover' on the landfill
>    that was overseen by the West Virginia Division of
>    Natural Resources."

Id. at 4-5.

On January 7, 2021, the defendant filed an appeal of

the Director's December 8, 2020 unilateral order to the West

Virginia Environmental Quality Board (the "Board").  See id. at

1; see also W. Va. Code § 22-11-21.  In proceedings before the

Board, the defendant filed a motion to stay the Director's

unilateral order pending resolution of the appeal.  See id. at
10.  On February 1, 2021, the Board granted in part the
defendant's motion and stayed the Director's order for 30 days.
See id. at 11.  The Board's order specified that the stay can be
extended for an additional 30 days if, within the initial 30-day
period, the defendant provides to WVDEP two current samples —
one from upstream of the Filmont Site and another from
downstream — that satisfy certain sampling criteria.  See id.

     The court also takes judicial notice that in a January
11, 2021 order, the Board set an evidentiary hearing regarding
the defendant's appeal for May 13 and 14, 2021, with a pre-
hearing conference set for April 29, 2021.  See Order, Union
Carbide Corp. v. Dir., Div. of Water & Waste Mgmt., Appeal No.
21-01-EQB (Jan. 11, 2021), available at www.wveqb.org.

D.   Application for temporary restraining order

     On February 10, 2021, the plaintiff filed the current
application for a temporary restraining order.  See ECF No. 5.[8]

---

[8] The Local Rules limit memoranda accompanying most motions to
not more than 20 pages and impose the same page limitation on
response and reply memoranda.  See LR Civ P 7.1(a)(2).  This
page limitation is expressly applicable to opening, response,
and reply memoranda filed in relation to a request for a
temporary restraining order.  See id.  To discourage
gamesmanship, the Local Rules also specify the font size that
memoranda must use, a restriction that applies to both above-
the-line text and footnote text.  See LR Civ P 7.1(a)(3)-(4).

In support of its application, the plaintiff provides an unsworn declaration from Dr. Simonton setting forth the same assertions he made regarding his September 11 and 12, 2020 observations and sampling discussed above, as well as his additional observations during a January 18, 2021 visit to the Filmont Site.  See ECF No. 5-2.  Based largely on Dr. Simonton's declaration, the plaintiff argues that it meets the requirements for the issuance of a temporary restraining order.  See ECF No. 6.  Thus, the plaintiff seeks a temporary restraining order that directs the defendant to either (1) "eliminate, within 14 days, all point source and stormwater discharges from [the Filmont Site] to the waters of the United States" or, alternatively, (2) "submit to the [WVDEP] within 14 days, a fully compliant [NPDES] permit

---

If a party believes it needs more pages, the Local Rules permit the party to file a motion to exceed the 20-page limitation, which may be granted upon a showing of good cause.  See LR Civ P 7.1(a)(2).

        Both parties have submitted memoranda that violate the 20-page limitation.  See ECF No. 6; ECF No. 7.  Further, the parties' already overly-long memoranda include footnotes that violate the required minimum font size.  See ECF No. 6; ECF No. 7.  Neither party has filed a motion to exceed the page limitation.  A review of the dockets in Courtland I and Courtland II shows that counsel for the parties are well-aware of the page limitation and of the relief available through a motion to exceed the page limitation.  Indeed, the court has regularly found good cause to grant such motions.  Counsel should not have to be reminded of these rules.  Their continued violation will not be countenanced.

application and a stormwater permit application for all such point source and stormwater discharges." Id. at 21-22.

        The defendant's briefing is devoted mainly to non-merits-based attacks on the plaintiff's application. For instance, the defendant argues that the plaintiff lacks standing to pursue its Clean Water Act claims; that the plaintiff is barred from pursuing the claims in a citizen suit in this court because of the administrative proceeding before the WVDEP and the Board; that the claims are not ripe because of the administrative proceeding before the Board; and that the plaintiff failed to provide sufficient pre-suit notice before commencing the action. See id. at 5-16. To the extent the defendant presents merits-based argument in its briefing, it relies on a declaration of its environmental consultant, David Carpenter, see ECF No. 7-1; a declaration and a report of its expert, Charles H. MacPherson, Jr., see ECF No. 7-2; ECF No. 7-4; a transcript of the deposition testimony of the plaintiff's vice president, John A. Truslow, see ECF No. 7-5; and two reports from its expert, Dr. Allen D. Uhler, see ECF No. 17-1.[9]

_____

[9] Dr. Uhler's reports are attached as exhibits to his declaration, see ECF No. 17-1 at 2-5, which was filed by the defendant on February 25, 2021, as a supplement to its response to the application, see ECF No. 17.

The plaintiff's reply brief addresses the defendant's arguments that the plaintiff lacks standing to bring the Clean Water Act claims, that the citizen suit is barred because of the administrative proceedings before the Board, and that the pre-suit notice was insufficient.  See ECF No. 8 at 8-14.[10]  However, much of the reply brief is devoted to arguing that, based on Dr. Simonton's declaration, the defendant is in violation of the Clean Water Act, see id. at 3-5, and that the defendant has long been aware of the discharges from the Filmont Site and of the discharges' impact on the plaintiff's property, see id. at 5-7. To support its arguments regarding the defendant's knowledge of the discharges, the plaintiff relies on deposition testimony from Paul Weber, an employee of an engineering firm hired by the defendant to perform work regarding the Filmont Site, see ECF No. 8-1, and a slideshow prepared by Mr. Weber's firm for a presentation regarding the Filmont Site given by the defendant to the WVDEP in October 2010, see ECF No. 8-2.

The court held a three-day hearing on the application on February 26, March 1, and March 2, 2021.  See ECF No. 20; ECF No. 21; ECF No. 22.  At the hearing, the court received exhibits

---

[10] The plaintiff's reply brief does not appear to address the defendant's argument that the plaintiff's Clean Water Act claims are not ripe in light of the administrative proceedings before the WVDEP and the Board.

and heard testimony from Dr. Simonton; Ryan Harbison, a WVDEP environmental inspector supervisor; Jerome Cibrik, a remediation leader for the defendant who has worked on the Filmont Site; Brad Wright, a WVDEP assistant chief inspector; and Mr. Carpenter.  The application is now ready for disposition.

## II.  Legal Standard

The Federal Rules of Civil Procedure authorize federal courts to issue temporary restraining orders.  See Fed. R. Civ. P. 65(b).  The decision to issue or deny a temporary restraining order is committed to the discretion of the trial court.  See Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980).

The standard for deciding an application for a temporary restraining order is identical to that for deciding a motion for preliminary injunction.  See S.C. Progressive Network Educ. Fund v. Andino, ___ F. Supp. 3d ___, 2020 WL 5995325, at *2 (D.S.C. Oct. 9, 2020) (citing Virginia v. Kelly, 29 F.3d 145, 47 (4th Cir. 1994)).  To be granted a temporary restraining order, "the plaintiff must establish '[(1)] that [it] is likely to succeed on the merits, [(2)] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in [its] favor, and [(4)] that a[] [temporary restraining order] is in the public interest.'"

23

_Real Truth About Obama, Inc. v. Fed. Election Comm'n_, 575 F.3d 342, 346 (4th Cir. 2009) (quoting _Winter v. Nat. Res. Def. Council, Inc._, 555 U.S. 7, 20 (2008)), _judgment vacated_ 130 S. Ct. 2371 (2010) (Mem.), _reissued in relevant part_ 607 F.3d 355 (4th Cir. 2010) (per curiam).  "'All four requirements must be satisfied.'"  _S.C. Progressive Network_, ___ F. Supp. 3d at ___, 2020 WL 5995325, at *3 (brackets omitted) (quoting _Real Truth_, 575 F.3d at 346); _see also_ _Winter_, 555 U.S. at 20.  Both preliminary injunctions and temporary restraining orders "are 'extraordinary remedies involving the exercise of a very far-reaching power to be granted only sparingly and in limited circumstances.'"  _Sarsour v. Trump_, 245 F. Supp. 3d 719, 728 (E.D. Va. 2017) (quoting _MicroStrategy Inc. v. Motorola_, 245 F.3d 335, 339 (4th Cir. 2001)).  The applicant for a temporary restraining order has the burden to "demonstrate by a 'clear showing'" that it is entitled to relief.  _Real Truth_, 575 F.3d at 345 (quoting _Winter_, 555 U.S. at 22); _see id._ at 346-47; _see also_ _S.C. Progressive Network_, ___ F. Supp. 3d at ___, 2020 WL 5995325, at *3 (citing _Di Biase v. SPX Corp._, 872 F.3d 224, 230 (4th Cir. 2017)).

"The purpose of a temporary restraining order . . . or a preliminary injunction is to 'protect the status quo and to prevent irreparable harm during the pendency of a lawsuit,

24

ultimately to preserve the court's ability to render a
meaningful judgment on the merits.'" <u>J.O.P. v. Dep't of
Homeland Sec.</u>, 409 F. Supp. 3d 367, 375 (D. Md. 2019) (quoting
<u>Sun Microsystems, Inc v. Microsoft Corp. (In re Microsoft Corp.
Antitrust Litig.)</u>, 333 F.3d 517, 525 (4th Cir. 2003), <u>abrogated
on other grounds by</u> <u>eBay Inc. v. MercExchange, L.L.C.</u>, 547 U.S.
388 (2006), <u>as recognized by</u> <u>Di Biase</u>, 872 F.3d 224); <u>see also</u>
<u>Accident, Injury & Rehab., PC v. Azar</u>, 336 F. Supp. 3d 599, 604
(D.S.C. 2014) (citing <u>Granny Goose Foods, Inc. v. Bd. of
Teamsters & Auto Truck Drivers</u>, 415 U.S. 423, 439 (1974)).  For
purposes of preliminary relief, "[t]he Fourth Circuit has
'defined the status quo . . . to be the last uncontested status
between the parties which preceded the controversy.'" <u>S.C.
Progressive Network</u>, ___ F. Supp. 3d at ___, 2020 WL 5995325, at
*3 (quoting <u>League of Women Voters of N.C. v. North Carolina</u>,
769 F.3d 224, 236 (4th Cir. 2014)).[11]

---

[11] The plaintiff cites out-of-circuit authority for the
proposition that the "modern view" is to "reject[] the primacy
of the <u>status quo</u> where the <u>status quo</u> is itself an illegality."
ECF No. 6 at 16 (citing <u>Baggett Transp. Co. v. Hughes Transp.,
Inc.</u>, 393 F.2d 710 (8th Cir. 1968); <u>Att'y Gen. v. Thomas Solvent
Co.</u>, 380 N.W.2d 53, 58 (Mich. Ct. App. 1985); <u>State ex rel.
Stream Pollution control Bd. v. Town of Wolcott</u>, 433 N.E.2d 62
(Ind. Ct. App. 1982)).  This court however follows the precedent
of the Fourth Circuit, which has not jettisoned the primacy of
status quo but has, instead, consistently said that a chief
concern for courts faced with a request for preliminary relief
must be to preserve the status quo.  <u>See</u> <u>Di Biase</u>, 872 F.3d at
231 ("The principal function of . . . preliminary [relief] is to

"Injunctive relief 'may be characterized as being either prohibitory or mandatory'": "mandatory temporary restraining orders . . . alter the status quo generally by requiring the non-movant to do something," while "prohibitory ones aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending.'" S.C. Progressive Network, ___ F. Supp. 3d at ___, 2020 WL 5995325, at *3 (brackets omitted) (quoting League of Women Voters, 769 F.3d at 235). The "tendency" of the temporary restraining order sought "to preserve the status quo determines whether it is prohibitory or mandatory." Pashby v. Delia, 709 F.3d 307, 320 (4th Cir. 2013). Here, the preliminary relief the plaintiff seeks would alter, rather than preserve, the last uncontested status between the parties prior to the controversy. Thus, the temporary restraining order requested in this matter would be a mandatory one.[12]

Although mandatory preliminary relief may be granted in some circumstances, it is disfavored. See Mountain Valley

_____

maintain the status quo."); see also Wise v. Circosta, 978 F.3d 93, 103 (4th Cir. 2020) (en banc).

[12] The plaintiff acknowledges that it seeks, through the proposed temporary restraining order, to alter the status quo in this case, and all but expressly concedes that the preliminary relief it seeks is mandatory, not prohibitory. See ECF No. 6 at 4, 11, 16.

Pipeline, LLC v. 6.56 Acres of Land, 915 F.3d 197, 216 n.8 (4th Cir. 2019); Taylor v. Freeman, 34 F.3d 266, 270 n.2 (4th Cir. 1994).  The Fourth Circuit has said that mandatory relief is "warranted only in the most extraordinary circumstances," Taylor, 34 F.3d at 270 n.2, and available "where 'the applicant['s] right to relief is indisputably clear,'" Mountain Valley Pipeline, 915 F.3d at 216 n.8 (quoting Communist Party of Ind. v. Whitcomb, 409 U.S. 1235, 1235 (1972)).  Indeed, while appellate review of prohibitory preliminary relief — which itself is an "extraordinary remedy involving the exercise of very far-reaching power," — is already "particularly exacting," the Fourth Circuit has emphasized that its "review is even more searching" "when the preliminary [relief] is mandatory rather than prohibitory in nature."  Pashby, 709 F.3d at 319 (quotation marks and alteration omitted).

## III. Discussion

### A.   Likelihood of Success on the Merits

To demonstrate a likelihood of success on the merits, "[a] plaintiff need not establish a 'certainty of success,' but must make a clear showing that [it] is likely to succeed at trial."  Di Biase, 872 F.3d at 230.  The defendant raises a host of threshold issues that it argues preclude the plaintiff from

succeeding on the merits of its Clean Water Act claims. Addressing these threshold issues in turn, the court finds that that the plaintiff has failed to show that it is likely to succeed on the merits.[13]

1.   <u>Standing</u>

Federal district courts are courts of limited subject-matter jurisdiction, possessing "only the jurisdiction authorized them by the United States Constitution and by federal statute." <u>United States ex rel. Vuyyuru v. Jadhav</u>, 555 F.3d 337, 347 (4th Cir. 2008).  As such, "there is no presumption that the court has jurisdiction." <u>Pinkley, Inc. v. City of Frederick</u>, 191 F.3d 394, 399 (4th Cir. 1999).  Indeed, when the existence of subject matter jurisdiction is challenged, "[t]he plaintiff has the burden of proving that subject matter jurisdiction exists." <u>Evans v. B.F. Perkins Co.</u>, 166 F.3d 642, 647 (4th Cir. 1999); <u>see also Richmond, Fredericksburg, & Potomac R.R. Co. v. United States</u>, 945 F.2d 765, 768 (4th Cir. 1991).

---

[13] Because the court reaches this finding based on the threshold issues asserted by the defendant, the court declines at this stage to assess the merits of the plaintiff's claims.

"The standing doctrine derives from 'the Constitution's limitation on Article III courts' power to adjudicate cases and controversies'" and thus "implicates the court's subject matter jurisdiction." South Carolina v. United States, 912 F.3d 720, 726 (4th Cir. 2019) (quoting Frank Krasner Enters. v. Montgomery Cty., 401 F.3d 230, 234 (4th Cir. 2005)). "To establish Article III standing, 'a plaintiff must show (1) it has suffered an injury in fact . . . ; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" Id. (quoting Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000)).

The defendant argues that the plaintiff has not demonstrated standing to bring its Clean Water Act claims. See Action NC v. Strach, 216 F. Supp. 3d 597, 630 (M.D.N.C. 2016) ("On a motion for a preliminary injunction, a plaintiff's 'burden of showing a likelihood of success on the merits necessarily depends on a likelihood that plaintiff has standing." (ellipses omitted) (quoting Obama v. Klayman, 800 F.3d 559, 565 (D.C. Cir. 2015))). "The Clean Water Act confers standing on 'any person or persons having an interest which is or may be adversely affected.'" Friends of the Earth, Inc. v.

29

Gaston Copper Recycling Corp., 629 F.3d 387, 396 (4th Cir. 2011)

(quoting 33 U.S.C. § 1365(a), (g)).  "Thus, so long as a citizen

plaintiff satisfies the constitutional standing requirements,

there is standing to bring a suit under the Clean Water Act."

Ohio Valley Envtl. Coal., Inc. v. Maple Coal Co., 808 F. Supp.

2d 868, 879 (S.D.W. Va. 2011) (citing Gaston Copper Recycling,

629 F.3d at 396).

        "[T]he procedural posture of the case dictates the

plaintiff's burden as to standing."  Beck v. McDonald, 848 F.3d

262, 270 (4th Cir. 2017); see Lujan v. Defs. of Wildlife, 504

U.S. 555, 561 (1992) ("[E]ach element must be supported in the .

. . manner and degree of evidence required at the successive

stages of the litigation.").  Few courts have addressed the

standard to apply in determining whether a plaintiff has

satisfied the standing requirements at the temporary-

restraining-order stage.  Several courts, however, have held

that, "[i]n the context of a preliminary injunction motion,

[courts] require the plaintiff to show a substantial likelihood

of standing under the heightened standard for evaluating a

motion for summary judgment."  Elec. Priv. Info. Ctr. v.

Presidential Advisory Comm'n on Election Integrity, 878 F.3d

371, 377 (D.C. Cir. 2017) (internal quotation marks omitted);

accord Waskul v. Washtenaw Cty. Cmty. Mental Health, 900 F.3d

250, 255 n.3 (6th Cir. 2018); <u>Cacchillo v. Insmed, Inc.</u>, 638
F.3d 401, 404 (2d Cir. 2011); <u>see also</u> <u>Lujan v. Nat'l Wildlife
Fed'n</u>, 497 U.S. 871, 907 n.8 (1990) (Blackmun, J., dissenting);
<u>cf.</u> <u>City of Miami Gardens v. Wells Fargo & Co.</u>, 956 F.3d 1319,
1322-23 (11th Cir. 2020) (opinion of Pryor, William, J.)
(suggesting heightened standard applies when the defendant
asserts a lack of standing and the plaintiff is accorded
sufficient time to adduce evidence of standing).  <u>But see</u> <u>Pavek
v. Simon</u>, 467 F. Supp. 3d 718, 737–38 (D. Minn. 2020) (requiring
"more . . . than mere allegations of standing, but less than
would be required in the face of a motion for summary
judgment").[14]  At least one court has applied the summary-
judgment standard at the temporary-restraining-order stage.  <u>See
Nguyen v. U.S. Dep't of Homeland Sec.</u>, 460 F. Supp. 3d 27, 30
(D.D.C. 2020).

     To establish standing at this stage, then, the
plaintiff is "not entitled to rest on . . .  mere allegations"
of standing "but must set forth by affidavit or other evidence

---

[14] Other courts have simply said that a "clear showing" of the
elements of standing is required in the preliminary-injunction
context.  <u>See</u> <u>Barber v. Bryant</u>, 860 F.3d 345, 352 (5th Cir.
2017); <u>Townley v. Miller</u>, 722 F.3d 1128, 1133 (9th Cir. 2013);
<u>Pennsylvania v. DeJoy</u>, ___ F. Supp. 3d ___, 2020 WL 5763553, at
*24 (E.D. Pa. Sept. 28, 2020) (citing <u>Doe v. Nat'l Bd. of Med.
Exam'rs</u>, 199 F.3d 146, 152 (3d Cir. 1999)).

specific facts" demonstrating the elements of standing.  Beck, 848 F.3d at 270 (quoting Lujan, 504 U.S. at 561).  For purposes of deciding the application, the court must take such evidence as true and draw all reasonable inferences therefrom in a light most favorable to the plaintiff.  See Md. Shall Issue, Inc. v. Hogan, 971 F.3d 199, 213 (4th Cir. 2020); Pye v. United States, 269 F.3d 459, 467 (4th Cir. 2001) (citing Lujan, 504 U.S. at 561).  The plaintiff must establish standing for each claim it seeks to press and for each form of relief it seeks.  See Md. Shall Issue, 971 F.3d at 209.

    (a)   Injury in fact

       The defendant has argued both in its briefing and at the hearing that the plaintiff fails to identify a cognizable injury it has suffered.  In its reply brief, the plaintiff points to injuries that it has alleged in its complaint, see ECF No. 8 at 9-10, and, at the hearing, it argued that it had supported its asserted injuries with evidence.[15]  The court

---

[15] At the hearing, the plaintiff also argued that, because a Clean Water Act citizen suit is brought on behalf of the general public, it could assert injuries sustained by the general public for purposes of standing.  Although the Ninth Circuit has said that citizen plaintiffs bringing Clean Water Act claims act as private attorneys general suing on behalf of the public, see Sw. Marine, Inc. v. United States, 535 F.3d 1012, 1017 (9th Cir. 2008), it does not appear to have held that citizen plaintiffs may rely on injury to the general public for purposes of meeting the standing requirements, and this court is aware of no such

addresses the injury-in-fact issue by first noting the injury the plaintiff asserts and then evaluates the evidence presented to support the assertions.

The injury the plaintiff asserts is that contaminants from defendant's properties have been and are being deposited on the plaintiff's property.[16]  The plaintiff asserts the contaminants are being deposited on its property in two ways. First, contaminants from the defendant's properties flow into the southern drainage ditch through seep-related discharges or

---

ruling from any other jurisdiction.  In any event, Fourth Circuit precedent is clear that a Clean Water Act citizen plaintiff must demonstrate an injury to itself, not the public at large.  See Gaston Copper Recycling, 629 F.3d at 396-97.

[16] The defendant argues that, even assuming contaminants from its properties are being deposited on the plaintiff's property, the plaintiff has not identified any harm — for example, "impact to its property, to its business, or anything that it cannot do" — resulting from such deposits.  ECF No. 7 at 5-6.  The defendant provides no authority, however, requiring some sort of business or impedimentary harm for Clean Water Act standing, and the Fourth Circuit has noted that, "[i]n some instances", "a traditional trespass on property" is a sufficient "environmental injury."  See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 154 (4th Cir. 2000) (en banc). The court is satisfied that the depositing of contaminants on the plaintiff's property would itself constitute a sufficiently concrete and particularized injury to the plaintiff.  See id. at 159 ("[A] property owner in the path of a toxic discharge whose injury is ongoing . . . is . . . precisely the type of plaintiff who is acting to protect a 'threatened concrete interest of [its]' own." (quoting Lujan, 504 U.S. at 573 n.8)); Historic Green Springs Inc. v. Louisa Cty. Water Auth., 833 F. Supp. 2d 562, 570 (W.D. Va. 2011) ("[I]njured property rights provide an irrefutable basis for standing." (citing Massachusetts v. EPA, 549 U.S. 497, 522 (2007))).

stormwater discharges and are then deposited on the plaintiff's property where the southern drainage ditch traverses it.  See id. at 9.  Second, contaminants from the defendant's properties flow into Ward Branch or Davis Creek from seep-related discharges or stormwater discharges along the portion of the Filmont Site forming the eastern bank of Davis Creek or through seep-related discharges or uncontrolled stormwater discharges that flow into the northern drainage ditch or Ward Branch, which then ultimately flow into Davis Creek.  See id.  These contaminants are then deposited on the plaintiff's property when, at certain times, Davis Creek flows southward, toward the plaintiff's property, instead of maintaining its normal flow northward, away from the plaintiff's property.  See id.

As to the first method by which it asserts contaminants are deposited on its property, the plaintiff relies on Dr. Simonton's unsworn declaration and testimony.  In his unsworn declaration submitted along with the application, Dr. Simonton states that, during his September 12, 2020 visit to the plaintiff's property, he took a photograph "showing a channel of orange staining coming from the Filmont [Site] across the [plaintiff's] [p]roperty into the [s]outh[ern] [drainage ditch] and discharging to Davis Creek."  ECF No. 5-2 ¶ 22; see also id.

at 32.[17]  Relying on unspecified reports from the defendant,
which, he says, have concluded that groundwater from the Filmont
Site is contaminated, and on a drawing created by the
defendant's engineering consultant, which, he says, indicates
groundwater flows from the Filmont Site toward the southern
drainage ditch, Dr. Simonton also states that groundwater
containing pollutants is flowing from the Filmont Site, through
seeps, into the southern drainage ditch.  See id. ¶¶ 36-39; see
also id. at 25.  He further states that stormwater will flow
uncontrolled across the Filmont Site's surface, come into
contact with pollutants, and then flow into the southern
drainage ditch.  See id. ¶ 50.

At the hearing, Dr. Simonton testified that the
photograph he had taken depicted orange staining coming into the
southern drainage ditch from the Filmont Site.[18]  He testified

_____

[17] The assertions made regarding Dr. Simonton's observations and
sampling on September 11 and 12, 2020, in his unsworn
declaration submitted along with the application (ECF No. 5-2)
are nearly identical to those found in his unsworn declaration
attached to the pre-suit notice (ECF No. 1-2).  The declaration
submitted with the application, however, contains assertions
regarding Dr. Simonton's January 18, 2021 visit to the Filmont
Site that are not contained in the declaration attached to the
pre-suit notice.

[18] A slightly different sized version of the photograph is set
forth as photograph 14 in the exhibit marked as Plaintiff's
Exhibit 5, which the plaintiff submitted at the hearing and
which, with the limitation that certain language — "sludge" and

35

that groundwater from the Filmont Site was contaminated with pollutants and that contaminated groundwater would flow toward the southern drainage ditch.  On cross-examination, Dr. Simonton confirmed that his conclusion that contaminated groundwater from the Filmont Site flowed toward the southern drainage ditch was based on the defendant's engineering firm's potentiometric mapping, rather than his own, and on unspecified data provided by the defendant that had not been placed in the record in this case.  Dr. Simonton further testified regarding photographs he had taken during his visit to the Filmont Site on January 18, 2021.[19]  He testified that the photographs were taken at a point near a fence line that runs roughly parallel to the Filmont Site's southwest border and about 50 yards from Davis Creek.  At that location, there is what he describes as a "gully" that cuts into the Filmont Site's southwest embankment and terminates at the fence line.  He testified that stormwater flowing across the Filmont Site would flow into this gully and then into the southern drainage ditch and that the stormwater would take contaminants, including what he believed to be bottom ash, that

---

"leachate" – contained in some of the captioning of the photographs would be disregarded, was admitted into evidence.

[19] The photographs are marked as photographs 15, 16, and 17 in Plaintiff's Exhibit 5.

he observed in the gully and deposit them on the plaintiff's property via the southern drainage ditch.

In response, the defendant elicited testimony from Mr. Carpenter.  Mr. Carpenter testified that, on December 16, 2020, he visited the same area of the Filmont Site depicted in the photographs Dr. Simonton took on January 18, 2021, near the southwest fence line.  He testified that, although the day of his visit was a rainy day and it had rained the previous day as well, he observed no stormwater flowing in the area and specifically no gully or other channel and no stormwater moving through a gully or other channel from the Filmont Site toward the southern drainage ditch.  Mr. Carpenter's sworn declaration likewise states that, on December 16, 2020, he "walked along the southern boundary fence line and drainage channel area to where it meets Davis Creek," and although "[i]t had been raining the days prior to the visit and all during the day of [his] visit," "no discernable flows or discharges [were] observed originating from the [Filmont Site]."  ECF No. 7-1 ¶ 13.

The defendant has also pointed to evidence indicating that any orange staining in the southern drainage ditch came from another source.  In his unsworn declaration, Mr. MacPherson states that he observed and photographed a pile of scrap metal on the plaintiff's property located "immediately adjacent" to

the southern drainage ditch and notes that a tenant currently operates a scrap metal recycling business on the plaintiff's property. See ECF No. 7-2 ¶¶ 17-18.[20]  The plaintiff attempted to rebut this evidence by eliciting testimony from Dr. Simonton that the scrap metal pile is located roughly 300 feet from the southern drainage ditch, rather than immediately adjacent to it. Dr. Simonton also testified that the scrap metal pile was not the source of iron oxides in nearby surface waters, but he admitted on cross-examination that water infiltrating the pile would flow to a nearby detention pond, which in turn flows into the southern drainage ditch.  He also testified on cross-examination that he could not rule out the plaintiff's property as a contributor to contamination in Davis Creek because he had not performed any testing of Davis Creek upstream of its confluence with the southern drainage ditch.

In light of the foregoing evidence, the court finds that the plaintiff has presented sufficient evidence from which it may be reasonably inferred that seeps in the Filmont Site are discharging contaminants into the southern drainage ditch and thereby depositing them on the plaintiff's property.  The court first finds that the photograph Dr. Simonton took on September

---

[20] The photograph was presented at that hearing, marked as Defendant's Exhibit 4, and admitted into evidence.

12, 2020, is of little value.  It does not show orange staining on the Filmont Site; instead, it depicts orange coloring around the final few feet of the southern drainage ditch before it terminates in Davis Creek, all of which lies on the plaintiff's property.  However, Dr. Simonton testified that contaminated groundwater at the Filmont Site would flow toward and seep into the southern drainage ditch.  Although the data underlying his testimony that the Filmont Site's groundwater is contaminated is not in the record, other record evidence, particularly Mr. Cibrik's testimony, supports the conclusion that it is contaminated.  Dr. Simonton also offered unrebutted evidence that groundwater from the Filmont Site flows toward the southern drainage ditch.  Although there is no evidence of anyone else having observed a seep near the southern drainage ditch, Dr. Simonton testified that groundwater in this area tends to manifest through seeps or otherwise as surface water such as may be found in ditches.  Viewing this evidence in a light favorable to the plaintiff, it is reasonable to infer, for purposes of standing, that contaminated groundwater from the Filmont Site discharges from seeps into the southern drainage ditch, which deposits contaminants on the plaintiff's property as it flows toward Davis Creek.

The court also finds that the plaintiff has presented sufficient evidence that stormwater is discharging contaminants into the southern drainage ditch.  Dr. Simonton's testimony as to the existence of a gully and of contaminants found within it must be accepted as true at the standing stage despite the contrary testimony of Mr. Carpenter.  Thus, it is reasonable to infer for purposes of standing that stormwater flowing across the Filmont Site flows through the gully into the southern drainage ditch, picking up contaminants from the gully and depositing them on the plaintiff's property.

As to the second method by which the plaintiff asserts contaminants are deposited on its property, the court notes first that, based on the testimony of Dr. Simonton and Mr. Carpenter particularly, there is no dispute as to the existence of two seep areas or seep zones – areas of soft, wet, saturated soil where groundwater intersects with the surface – near the Filmont Site's northern boundary.  The first seep area is located just south of, and on an embankment above, the discharge that Dr. Simonton observed and from which he collected two samples at the bend in Ward Branch on September 11, 2020.[21]  The

---

[21] The first seep area and its relation to the discharge Dr. Simonton sampled is depicted in photographs 20 and 21 of Plaintiff's Exhibit 5.

Filmont Site's northern boundary fence line runs through or near the first seep area.  The second seep area is an elongated area, observed but not sampled by Dr. Simonton, beginning a few feet east of the first seep area and extending for 200 to 300 feet eastward along the Filmont Site's northern boundary's fence line.

Dr. Simonton testified that, on his January 18, 2021 visit to the Filmont Site, he observed water from the first seep area collect and flow northward to the location where he conducted sampling on September 11, 2020, and from there discharge into Ward Branch.  He testified that, during the same visit, he observed locations where water from the second seep area discharged and flowed northward to the northern drainage ditch, which flows into Ward Branch.  The discharge points he observed are located at intervals of roughly between 25 to 30 feet, 100 to 150 feet, and 130 to 190 feet east of the bend in Ward Branch.[22]

Other witnesses did not observe discharges.  Mr. Harbison testified that, during a February 23, 2021 visit to the Filmont Site, he observed the seep areas but could not confirm

--------

[22] The discharge points and their relation to the northern drainage ditch are depicted in photographs 23 to 30 of Plaintiff's Exhibit 5.

any discharges from them due to elevated water levels.  Mr. Carpenter likewise testified that, during a November 5, 2020 visit, he observed the seep areas but did not observe any discharge or flow from them.  Mr. Carpenter's sworn declaration is consistent with this testimony.  See ECF No. 7-1 ¶¶ 5-6.

Dr. Simonton testified regarding the results of his sampling, as discussed above, from the discharge point associated with the first seep area that is located at the bend in Ward Branch.  The results from his sampling show that the liquid discharging from the first seep area into Ward Branch contains extremely high concentrations of iron and high concentrations of aluminum, arsenic, lead, and manganese, and it also contains beryllium, cadmium, chromium, copper, nickel, selenium, and zinc.  See ECF No. 5-2 ¶ 25.  The orange sludge he sampled contained extremely high concentrations of iron and elevated concentrations of arsenic, copper, cadmium, lead, mercury, nickel, selenium, and zinc.  See id. ¶ 34.  Dr. Simonton testified that discharges from other seeps at the Filmont Site – presumably including the second seep area along the northern boundary's fence line as well as seeps associated with the southern drainage ditch, the location of which neither he nor anyone else has identified in the record – would contain the same contaminants shown by these testing results.

42

Mr. Carpenter testified regarding sampling he conducted pursuant to the stay order issued in administrative proceedings before the board.  On February 23, 2021, he sampled water from three locations, and he received testing results on March 1, 2021.[23]  The first sample is from water in the northern drainage ditch roughly 300 to 500 feet east of the bend in Ward Branch.  It contained 14.6 milligrams of iron and 0.8 milligrams of manganese per liter, and no aluminum or selenium was detected.  The second sample is from water midstream in Ward Branch about 10 feet south of the culvert located where a highway passes over Ward Branch and about 30 feet north, or upstream, of where the northern drainage ditch flows into Ward Branch and upstream of the bend in Ward Branch.  It contained 0.1 milligrams of aluminum, 0.4 milligrams of iron, and 0.09 milligrams of manganese per liter, and no selenium was detected.  The third sample is also from midstream in Ward Branch about 20 feet east, or upstream, of where it terminates in Davis Creek, and thus downstream of both the locations where the first and second samples were taken.  It contained 0.4 milligrams of aluminum, 0.5 milligrams of iron, and 0.1 milligrams of manganese, and no selenium was detected.  Comparing these

---

[23] A report of the testing results, along with a table summarizing them, was presented at the hearing as Defendant's Exhibit 13, which was admitted into evidence.

samples, Mr. Carpenter testified that the testing results indicate that the Filmont Site is not materially contributing to the metals found in Ward Branch right before it terminates in Davis Creek.

The defendant also presented evidence of other sources of contamination in the northern drainage ditch and Ward Branch. Mr. Carpenter testified that, during a January 21, 2021 visit to the Filmont Site, he observed a sandstone boulder about 20 feet east of the bend in Ward Branch and 2 feet above the water line.[24] He observed orange material, which he determined to be naturally occurring iron oxide, coming from the boulder. Additionally, Mr. Carpenter testified that, west and upstream of the two identified seep areas near the northern boundary of the Filmont Site, the north bank of the northern drainage ditch is stained orange from discharges coming from a highway embankment located near and north of the Filmont Site. In his sworn declaration, Mr. Carpenter's likewise states that, on several visits, he observed orange coloration on the north bank of the northern drainage ditch upstream from the two identified seep areas, near the highway embankment, as well as orange water

---

[24] A photograph taken by Mr. Carpenter depicting the boulder was presented at the hearing, marked as Defendant's Exhibit 12, and admitted into evidence.

flowing into the northern drainage ditch from a depression in
the highway embankment.  See ECF No. 7-1 ¶¶ 6, 12, 15-16.  Mr.
MacPherson, in his unsworn declaration, likewise states that,
during his December 16, 2020 visit to the Filmont Site, he
observed orange seeps of iron oxides near the highway
embankment, on the northern side of the northern drainage ditch,
east and upstream of the two identified seep areas near the
northern boundary of the Filmont Site.  See ECF No. 7-2 ¶ 15.
Dr. Simonton testified, however, that during his inspections of
the same area he observed no orange staining or indications of
seeps associated with the highway embankment.  He also testified
that the highway would act as a "cap" over the soil on which it
lies, preventing groundwater from accumulating and seeps from
developing on the embankment.

        The court finds that the plaintiff has presented
sufficient evidence, for purposes of standing, to demonstrate
that the two seep areas located on the Filmont Site's northern
boundary are discharging contaminants into Ward Branch directly
or indirectly via the northern drainage ditch.  There is no
dispute as to the two seep areas' existence or general location,
and, at this stage, the court must accept as true, Dr.
Simonton's testimony that discharges from the two seep areas
have flowed or are flowing into Ward Branch and the northern

drainage ditch, despite the testimony and declarations of Mr. Carpenter, Mr. MacPherson, and Mr. Harbison that they did not observe discharges during their inspections of the two seep areas.  And, viewing the evidence in the plaintiff's favor, the court concludes that the results of Dr. Simonton's sampling is sufficient to demonstrate that the discharges from the two seep areas contain pollutants.[25]  The court notes in this regard that the results of Mr. Carpenter's sampling demonstrate increases — albeit slight ones — in the concentrations of aluminum, iron, and manganese in Ward Branch downstream of where the northern drainage ditch and the discharge from the first seep area enter Ward Branch.  And, at this stage, viewing the evidence in favor of the plaintiff, it can be reasonably inferred that increased contamination in Ward Branch is caused at least in part by discharges of pollutants from the Filmont Site, even if there is evidence of other sources of contamination.

However, the court finds that the plaintiff has not presented sufficient evidence that pollutants discharged from the Filmont Site to the northern drainage ditch and Ward Branch

---

[25] The court notes that the defendant has presented no argument regarding Dr. Uhler's challenge to the reliability of Dr. Simonton's sampling.  In any case, the court concludes that Dr. Simonton's sampling and the results of that sampling are sufficiently reliable at this stage.

are being deposited on its property.  These pollutants could reach the plaintiff's property, if at all, by being carried there by Davis Creek.  But, as the plaintiff itself has acknowledged, see ECF No. 1 ¶ 24; ECF No. 8 at 9, Davis Creek normally flows northward, away from the plaintiff's property. It is undisputed that the plaintiff's property is located south or upstream from the confluence of Ward Branch and Davis Creek and is separated from that confluence by the portion of Davis Creek that abuts the Filmont Site.  Nor is there any dispute that the confluence of Ward Branch and Davis Creek is downstream and down gradient of the location where Davis Creek abuts the plaintiff's property.  Thus, absent some evidence that Davis Creek reverses its normal northward flow and flows southward from its confluence with Ward Branch to where it abuts the plaintiff's property, the plaintiff has failed to show that contaminants discharged from the Filmont Site into the northern drainage ditch and Ward Branch are being deposited on the plaintiff's property.

Although the plaintiff alleges that Davis Creek sometimes flows southward, see ECF No. 1 ¶ 24, it has presented no evidence to substantiate this allegation.  Even assuming Davis Creek sometimes reverses it flow, there is no evidence in the record providing any indication of the conditions under

which the reversed flow would carry contaminants discharged into the northern drainage ditch and Ward Branch to the plaintiff's property.  Nor is there any evidence indicating the frequency with which reversed flows – and, more particularly, reversed flows substantial enough to carry contaminants from the northern drainage ditch and Ward Branch to the plaintiff's property – occur.  Accordingly, the court finds that the plaintiff has failed to demonstrate an injury to its property caused by discharges into the Ward Branch and the northern drainage ditch.

     (b)   <u>Traceability</u>

The defendant next argues that the plaintiff's alleged injury is not fairly traceable to the defendant's conduct.  It asserts that the two seep areas that have been identified as located near the northern drainage ditch and Ward Branch are downgradient and downstream from the plaintiff's property and thus cannot be responsible for deposits of contaminants on the plaintiff's property.  For the reasons set forth in the previous section, the court agrees with the defendant that the plaintiff has failed to show that its asserted injury – the depositing of contaminants on its property – is fairly traceable to discharges from the two seep areas near the northern drainage ditch and Ward Branch.

The defendant does not appear to argue that contaminants deposited on the plaintiff's property are not traceable to seep-related discharges and stormwater discharges from the Filmont Site into the southern drainage ditch.  For the reasons set forth in the previous section, the court finds that the plaintiff has presented sufficient evidence to demonstrate at this stage that contaminants deposited on its property are traceable, at least in part, to seep-related discharges and stormwater discharges from the Filmont Site into the southern drainage ditch.

The court notes, however, that none of the evidence outlined above and none of the evidence the court has reviewed demonstrates that any of the contaminants being deposited onto the plaintiff's property in this manner are being discharged or otherwise migrating from the UCC Railyard.  Thus, the court concludes that the evidence is insufficient at this stage to demonstrate that the plaintiff's alleged injuries are fairly traceable to the UCC Railyard.

(c)  Redressability

Next, the defendant argues that part of the relief the plaintiff seeks — ordering the defendant to cease discharging contaminants from its properties — would not redress the

49

plaintiff's alleged injury.  This is so, the defendant chiefly
contends, because there is no indication that discharges from
its properties are contributing to the contamination of the
plaintiff's property.  To the extent the defendant refers to
discharges into the northern drainage ditch or Ward Branch, the
court agrees, for the reasons set forth above, that the
plaintiff has failed to show that an order to cease such
discharges would redress the contamination of its property that
it asserts as its injury.  To the extent the defendant refers to
seep-related and stormwater discharges from the Filmont Site
into the southern drainage ditch, the court disagrees and finds,
for the reasons set forth above, that an order to cease such
discharges would redress the contamination of the plaintiff's
property caused by such discharges.

        The defendant also seems to argue that the alleged
injury is only redressable by the complete "eliminat[ion]" of
contaminants from the plaintiff's property, ECF No. 7 at 7,
which could not result from ordering the defendant alone to
cease its discharges because other sources — discharges from the
interstate highway embankment as well as ongoing operations on
the plaintiff's property — that the defendant does not control
are also contributing to the contamination.  However, "[c]ourts
have recognized that 'complete redressability' is not required"

and that "a plaintiff need only show that a favorable decision would alleviate the plaintiff's problem 'to some extent.'" S. Envtl. Law Ctr. v. Bernhardt, 432 F. Supp. 3d 626, 634 (W.D. Va. 2020) (quoting Consumer Data Indus. Ass'n v. King, 678 F.3d 898, 902 (10th Cir. 2012).  The elimination of one source of contamination to the plaintiff's property would decrease the rate of contamination that is currently ongoing, which is sufficient for purposes of standing.

The court notes, however, that, in its application, the plaintiff requests, as one alternative, an order directing the defendant to submit an application to the appropriate governmental authority for a permit for all discharges from the Filmont Site.  See ECF No. 5 at 1; ECF No. 5-3 at 3; ECF No. 6 at 21-22.  Curiously, the plaintiff's complaint does not seek an injunction requiring the defendant to apply for or obtain such a permit, although it does seek an injunction requiring the defendant to cease "illegal [d]ischarges" from the Filmont Site "without the [required] permits."  ECF No. 1 at 33.

There are two problems with the plaintiff's request for an order requiring the defendant to apply for a permit. First, the relief sought in the current application is not of the same character as the ultimate relief sought in the complaint.  See United States ex rel. Rahman v. Oncology

51

Assocs., P.C., 198 F.3d 489, 498 (4th Cir. 1999) (considering whether "the preliminary injunction entered. . . is a reasonable measure to preserve the status quo in aid of the claims in suit or whether it grants interim relief of the same character as that which may be granted finally" (internal citation omitted)). The relief sought in the current application would not preserve the court's ability to order the defendant to cease any illegal discharge. Rather, if the defendant applied for and obtained such a license, it appears the court would be deprived of the ability to issue such an injunction.

Second, and more pertinent to the standing analysis, if entered as part of the final relief in this matter, an order directing the defendant to apply for a permit would not redress the injury the plaintiff alleges. If the application were to be granted and the permit issued, the ongoing contamination of the plaintiff's property would continue with the government's imprimatur. If the application were to be denied, the court would still be left with determining whether the discharges are illegal, and the endeavor for a permit would have been futile.

Accordingly, the court concludes that, to the extent the plaintiff seeks an order requiring the defendant to apply for a permit as part of its final relief, the plaintiff has failed to demonstrate its standing to seek such relief.

In sum, although the plaintiff has clearly shown standing in other respects, it has failed to clearly show it has standing to bring its claims insofar as (1) its claims relate to discharges from the Filmont Site into Ward Branch and the northern drainage ditch; (2) its claims relate to the UCC Railyard; and (3) it seeks relief in the form an order requiring the defendant to apply for a discharge permit. Because the plaintiff has failed to make a clear showing of standing in these respects, its application for a temporary restraining order must be denied to the extent it seeks interim relief as to discharges from the UCC Railyard and from the Filmont Site into the northern drainage ditch and Ward Branch or in the form of an order requiring the defendant to apply for a permit. See In re Microsoft, 333 F.3d at 525 ("[P]reliminary relief may never be granted that addresses matters 'which in no circumstances can be dealt with in any final injunction that may be entered.'" (quoting De Beers Consol. Mines, Ltd. v. United States, 325 U.S. 212, 220 (1945))).

2.  Pre-suit notice

The defendant next argues that the plaintiff has not provided sufficient pre-suit notice as required by § 1365(b). The court set forth the applicable law regarding the pre-suit

53

notice required for the plaintiff's Clean Water Act claims in

<u>Courtland II</u>:

> The Clean Water Act prohibits the discharge of pollutants into navigable waters of the United States without a permit.  33 U.S.C. § 1251 <u>et seq.</u> Section 505(b) of the Clean Water Act, <u>id.</u> § 1365(b), provides for "citizen suits" to enforce provisions of the Act.  "[A]ny citizen may commence a civil action on his own behalf" against any person.  <u>Id.</u> § 1365(a)(1).  No citizen suit under § 1365(a)(1) may commence "prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator [of the Environmental Protection Agency], (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator." <u>See id.</u> § 1365(b)(1)(A).  The requirements concerning the contents of such notice are governed by 40 C.F.R. § 135.3(a).

> . . . .

> Compliance with the notice requirement of 40 C.F.R. § 135.3(a) "is a mandatory condition precedent to filing suit under the Clean Water Act."  <u>Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.</u>, 629 F.3d 387, 400 (4th Cir. 2011).  Notice regarding an alleged violation of the Clean Water Act "shall include sufficient information to permit the recipient to identify" the following information: (1) the specific standard, limitation, or order alleged to have been violated; (2) the activity alleged to constitute a violation; (3) the person or persons responsible for the alleged violation; (4) the location of the alleged violation; (5) the date or dates of such violation; and (6) the full name, address, and telephone number of the person giving notice.  40 C.F.R. § 135.3(a).  "The requirement of adequate notice does not mandate that citizen plaintiffs list every specific aspect or detail of every alleged violation," but notice "must provide the alleged violator with enough information to attempt to correct the violation and avert the citizen suit." <u>Friends of the Earth</u>, 629 F.3d at 400 (internal quotation marks omitted) (quoting <u>Pub. Interest Research Group of N.J., Inc. v. Hercules, Inc.</u>, 50

> F.3d 1239, 1248 (3d Cir. 1995)).  A plaintiff's lack
> of information cannot excuse deficiencies in a notice.
> Id. at 402.

Courtland II, 2020 WL 6265080, at *2, 4.[26]

The defendant challenges the plaintiff's pre-suit notice with respect to both its claim regarding discharges from seeps and its claim regarding stormwater discharges.  The court assesses these arguments separately.

### (a)   Discharges from seeps

As an initial matter, the plaintiff appears to argue that, because it is alleging that the defendant is discharging pollutants without any permit (rather than discharging pollutants in violation of a specific standard, limitation, or order set by an already-issued permit), its pre-suit notice need not specify the violation of a specific standard or limitation. See ECF No. 6 at 2 n.2; ECF No. 8 at 3 n.2.  However, the plaintiff does not appear to dispute that, even where a citizen plaintiff alleges a Clean Water Act violation premised on

---

[26] In its briefing, the plaintiff argues at length that the court erred in its decision in Courtland II to deny the plaintiff leave to supplement its complaint with the Clean Water Act claims it now pursues in this action.  See ECF No. 6 at 2 n.2; ECF No. 8 at 3 & n.2.  This action is not an appropriate forum to challenge that decision, and the court thus has no occasion to consider the plaintiff's arguments in this regard.

unpermitted discharges (rather than discharges that violate an existing permit), the statute still requires pre-suit notice. See 33 U.S.C. § 1365(a)(1) (authorizing the "commence[ment] [of] a civil action" "by any citizen . . . against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation under [the Clean Water Act]"); 33 U.S.C. § 1365(b)(1)(A) ("No action may be commenced . . . under [§ 1365(a)(1)] . . . prior to sixty days after the plaintiff has given notice of the alleged violation," except in circumstance absent here (emphasis added)).

In such cases, the standard or limitation at issue is the absolute ban on the discharge of any pollutant under 33 U.S.C. § 1311(a) in the absence of a permit that otherwise sets a limitation or standard for such discharge. See 33 U.S.C. § 1311(a) ("Except as in compliance with [applicable statutes], the discharge of any pollutant by any person shall be unlawful."); see also Upstate Forever v. Kinder Morgan Energy Partners, L.P., 887 F.3d 637, 642-43 (4th Cir. 2018) ("An 'effluent standard or limitation' is defined to include the [Clean Water] Act's central prohibition on the 'discharge of any pollutant' without a permit." (quoting 33 U.S.C. §§ 1311(a), 1365(f))), abrogated on other grounds by Cty. Maui v. Haw. Wildlife Fund, 140 S. Ct. 1462 (2020), judgment vacated sub nom.

Kinder Morgan Energy Partners, L.P. v. Upstate Forever, 140 S.
Ct. 2736 (2020) (Mem.); Highlands Conservancy v. E.R.O., Inc.,
Civ. A. No. A:90-0489, 1991 WL 698124, at *3 (S.D.W. Va. Apr.
18, 1991) ("[B]y alleging in the [notice] that [the defendant]
discharged pollutants and fill materials without a permit, [the
plaintiff] has alleged that [the defendant] has and is violating
the effluent limitation of zero found in 33 U.S.C. §
1311(a))."). When a citizen plaintiff alleges an unpermitted
discharge of pollutants, the pre-suit notice must still comply
with applicable regulations. See 33 U.S.C. § 1365(b) ("Notice .
. . shall be given in such manner as . . . prescribe[d] by
regulation."); see also Cmty. Ass'n for Restoration of the Env't
v. Henry Bosma Dairy, 305 F.3d 943, 946, 949-50 (9th 2002)
(applying regulations to notice regarding unpermitted
discharge); Potomac Riverkeeper, Inc. v. Marcella M. Klinger,
LLC, No. JKB-13-801, 2013 WL 5505397, at *1-6 (D. Md. Oct. 1,
2013) (same); Highlands Conservancy, 1991 WL 698124, at *3
(same).

        With respect to the discharges from seeps alleged in
the complaint, the defendant argues, primarily, that the notice
fails to provide sufficient information regarding the dates and
locations of discharges from its properties that violate the ban

on unpermitted discharges of pollutants in § 1311(a).  See ECF

No. 7 at 16.

A defendant violates § 1311(a) by discharging any

pollutant from a point source.  See 33 U.S.C. § 1311(a); see

also 33 U.S.C. § 1362 (defining "discharge of a pollutant" as

"any addition of any pollutant to navigable waters from any

point source").  A plaintiff alleging a point-source discharge

violation must identify the point source in the pre-suit notice.

See Assateague Coastkeeper v. Alan & Kristin Hudson Farm, 727 F.

Supp. 2d 433, 439 (D. Md. 2010) (citing Karr v. Hefner, 475 F.3d

1192, 1203 (10th Cir. 2007)); see also Courtland II, 2020 WL

6265080, at *7.

The plaintiff's pre-suit notice identifies two point

sources from which it asserts the defendant discharges

pollutants: the northern drainage ditch and the southern

drainage ditch.[27]  The notice further identifies two seeps

---

[27] In both its notice and complaint, the plaintiff also
identifies the entire Filmont Site as a "point source" of
pollution discharge, as that term is defined by 33 U.S.C. §
1362(14).  Under Fourth Circuit precedent, however, the Filmont
Site cannot constitute a point source for purposes of §
1362(14).  See Sierra Club v. Va. Elec. & Power Co., 903 F.3d
403, 405-06, 409-13 (4th Cir. 2018) (concluding that a landfill
is not a point source because it does not function as a discrete
conveyance, i.e., a facility for the movement of something from
one place to another, but rather acts as a static recipient of
water, which flows diffusely through it).

located on the northern boundary of the Filmont Site near the
northern drainage ditch – one that discharges into the northern
drainage ditch and another that discharges into Ward Branch.
See ECF No. 1-1 at 10-11; see also ECF No. 1-4 at 11.  The
notice states, on the plaintiff's information and belief, that
other seeps exist discharging into the southern drainage ditch,
but it does not identify their location.  See ECF No. 1-1 at 10.
The court finds that the plaintiff's notice sufficiently
identifies the northern and southern drainage ditches as point
sources.  See Assateague Coastkeeper, 727 F. Supp. 2d at 439.
However, the court finds that, although the notice sufficiently
identifies the location of violations with respect to seeps
associated with the northern drainage ditch and Ward Branch, it
does not sufficiently identify the locations of violations with
respect to seeps associate with the southern drainage ditch.
See 40 C.F.R. § 135.3(a).

        The regulations require that the pre-suit notice
include sufficient information to permit the defendant to
identify the dates of the alleged violations.  See id.  "When,"
as here, "the notice alleges continuing unlawful discharges of
pollutants, 'the notice need not list every date on which
alleged discharges occurred," so long as "other information in
the notice regarding the cause and source of the alleged

discharges permits the defendant to identify an adequate number
of likely dates and to take remedial action." Courtland II,
2020 WL 6265080, at *5 (citing Waterkeepers N. Cal. v. AG Indus.
Mfg., Inc., 375 F.3d 913, 917-18 (9th Cir. 2004); San Francisco
BayKeeper, Inc. v. Tosco Corp., 309 F.3d 1153, 1158-59 (9th Cir.
2002)).

        The plaintiff's pre-suit notice states that the two
seep areas associated with Ward Branch and the northern drainage
ditch have been discharging pollutants on a "continuing,
ongoing" basis for "many years" beginning "no later than January
1, 1990[,] to the present date." ECF No. 1-1 at 10-11. The
notice likewise states that unidentified seeps associated with
the southern drainage ditch have been discharging pollutants on
a continuous and ongoing basis since no later than January 1,
1990. See id. The notice thus does not attempt to identify any
dates of the point-source discharge violations alleged in the
complaint. This failure is curable only insofar as the notice
provides additional information regarding the source and cause
of the alleged violations so as to permit the defendant to
identify plausible timeframes for the alleged violations. See
Courtland II, 2020 WL 6265080, at *5, 7.

        The court finds that the additional information the
plaintiff provides in the notice and the attached declaration of

60

Dr. Simonton regarding discharges associated with Ward Branch
and the northern drainage ditch are sufficient to permit the
defendant to identify plausible timeframes for the alleged
violations.   The notice, along with Dr. Simonton's declaration,
informed the defendant of two specific locations near Ward
Branch and the northern drainage ditch where seeps exist and
identified, following Dr. Simonton's sampling and testing,
specific pollutants associated with at least one of those seep
areas.   Further, the notice and the declaration informed the
defendant that one of the seep areas had been observed
discharging on a date certain and that the defendant's own
consulting firm had been aware of the other seep area for
roughly 15 years.   This additional information would permit the
defendant to plausibly identify a timeframe in which discharges
into Ward Branch and the northern drainage ditch had occurred.

However, the court concludes that the notice fails to
provide additional information from which the defendant could
plausibly identify dates or a timeframe in which alleged
discharges associated with the southern drainage ditch occurred.
The notice provides an exceptionally indefinite point in which
it alleges such discharges began to occur.   See ECF No. 1-1 at
("from a date no later than January 1, 1990" (emphasis added)).
Unlike with alleged discharges into the northern drainage ditch,

the notice provides no additional indications regarding a timeframe for discharges into the southern drainage ditch, and there is no additional information regarding the specific locations of any seeps or of the specific pollutants discharging from them at any given time.

Accordingly, although the court is satisfied that the plaintiff provided sufficient pre-suit notice regarding the discharges associated with Ward Branch and the northern drainage ditch, the court concludes that the plaintiff has not clearly shown that it satisfied the pre-suit notice requirement with respect to discharges associated with the southern drainage ditch. Because the plaintiff has failed to make this showing, it cannot succeed in its application for a temporary restraining order to the extent the application is premised on alleged seep-related discharges associated with the southern drainage ditch. See Gaston Copper Recycling, 629 F.3d 387, 402 (explaining that a citizen plaintiff may not prevail on alleged violations for which pre-suit notice was insufficient); In re Microsoft, 333 F.3d at 525 ("[P]reliminary relief may never be granted that addresses matters which in no circumstances can be dealt with in any final injunction that may be entered." (internal quotation marks omitted)).

(b)  Stormwater discharges

          The plaintiff's pre-suit notice also asserts a Clean
Water Act violation based on the alleged discharge of stormwater
associated with industrial activity from the Filmont Site
without a permit, in contravention of 33 U.S.C. § 1342(p) and 40
C.F.R. § 122.26.  See ECF No. 1-1 at 12-13.  The pre-suit notice
requirements of § 135.3(a) apply to Clean Water Act citizen-suit
claims based on stormwater discharges.  See 33 U.S.C. §
1365(b)(1)(A).  Most pertinent here, as with other discharges,
the pre-suit notice must provide sufficient information to
permit the defendant to identify the location and dates of the
alleged violations involving stormwater discharges.  See 40
C.F.R. § 135.3(a)(4)-(5); see also Sierra Club Ohio Ch. v. City
of Columbus, 282 F. Supp. 2d 756, 772-73 (S.D. Ohio 2003).  The
defendant argues that the notice is insufficient with respect to
locations and dates of the alleged violations.

          (i) Location.  Stormwater can be discharged from
either a point source, as defined by § 1362(14), or from a
nonpoint source.  See Ecological Rights Found. v. Pac. Gas &
Elec. Co., 713 F.3d 502, 508 (9th Cir. 2013) ("Stormwater runoff
is a nonpoint or point source depending on whether it is allowed
to run off naturally (and is thus a nonpoint source) or is
collected, channeled, and discharged through a system of

ditches, culverts, channels, and similar conveyances (and is
thus a point source discharge)." (internal quotation marks and
ellipsis omitted)); see id. (collecting cases).  Stormwater that
is not discharged from a point source cannot form the basis of a
Clean Water Act citizen suit.  See 307 Campostella, LLC v.
Mullane, 143 F. Supp. 3d 407, 416 (E.D. Va. 2015) ("Most
discharges composed entirely of stormwater constitute nonpoint
source pollution and therefore do not require a permit; however,
for those stormwater discharges that do stem from point sources,
Congress directed the EPA to continue to require permits for
stormwater discharges associated with industrial activity.");
Highlands Conservancy, 1991 WL 698124, at *8 ("[Alleged]
violations based upon . . . storm water being discharged from
non-point sources[] . . . [are] not actionable."); see also Cty.
of Maui, 140 S. Ct. at 1468, 1471, 1476 (concluding that the
Clean Water Act applies to discharges traveling from a point
source through a nonpoint source into navigable waters and
noting the Clean Water Act does not govern discharges from
nonpoint sources).  Thus, as with other discharges, a plaintiff
alleging a Clean Water Act violation based on stormwater
discharge must provide sufficient information in its pre-suit
notice to permit the identification of a point source for the
discharge.  See Karr, 475 F.3d at 1203; Courtland II, 2020 WL
6265080, at *7; Assateague Coastkeeper, 727 F. Supp. 2d at 439.

The plaintiff's pre-suit notice asserts that
"[s]tormwater at and flowing from [the Filmont Site] is not
controlled or treated" but, instead, either "infiltrates
th[r]ough" the Site and is "then discharged to surface water" or
"flows across the [Filmont] [S]ite and directly to surface
waters."  ECF No. 1-1 at 12-13.  The notice further states that
the stormwater discharges "directly into Davis Creek, . . . Ward
Branch," the northern drainage ditch, and the southern drainage
ditch.  Id. at 13.

The court finds that the plaintiff's pre-suit notice
fails to provide sufficient information to identify a point
source for the discharge of stormwater.  By alleging that
stormwater is "not controlled" and either "infiltrates" the
Filmont Site or "flows across" it before being discharged into
surface waters, id. at 12-13, the pre-suit notice asserts that
the stormwater is discharged through a nonpoint source, see
Ecological Rights Found., 713 F.3d at 508-09 (explaining that
allegation of uncollected stormwater that migrates over or
through the ground to reach navigable waters is a nonactionable
assertion of a nonpoint source discharge); Simsbury-Avon Pres.
Club, Inc. v. Metacon Gun Club, Inc., 575 F.3d 199, 219-22 (2d
Cir. 2009) (same).  Although the pre-suit notice states that
these uncontrolled discharges are to Davis Creek, Ward Branch,

and the two drainage ditches, it does not identify any of these features as point sources <u>from</u> which the Filmont Site is discharging stormwater.  And, given the assertion in the notice that stormwater flows uncontrolled across and infiltrates into the Filmont Site, the court cannot conclude that the mere reference to these features is sufficient to identify the location of the violations alleged in the notice.

      (ii) <u>Dates</u>.  Where the violation a citizen plaintiff alleges is the discharge of stormwater without a permit, courts have typically found a pre-suit notice to be sufficient with respect to the alleged dates of the violation when the notice provides either at least some dates certain when stormwater discharges occurred or information from which defendant could ascertain the dates on which stormwater discharges likely occurred.  <u>See, e.g.</u>, <u>Puget Soundkeeper All. v. Rainier Petroleum Corp.</u>, 138 F. Supp. 3d 1170, 1175 (W.D. Wash. 2015) (citing <u>Waterkeepers N. Cal. v. AG Indus. Mfg., Inc.</u>, 375 F.3d 913, 917-18 (9th Cir. 2004).  The identification of such dates is not inconsequential, as each violative discharge on each day is subject to civil penalties.  <u>See</u> 33 U.S.C. § 1319(d).

      The plaintiff's pre-suit notice asserts that, because regulations concerning stormwater discharges became effective in November 1990, the defendant has been "continuously . . .

required to have a stormwater discharge permit" for the Filmont Site "for the past 30 years." ECF No. 1-1 at 13. And, because the defendant has never had such a permit, the notice asserts, the defendant has been "illegally discharging" stormwater from the Filmont Site, in violation of the Clean Water Act, "for decades." Id.

The court finds that the plaintiff's pre-suit notice fails to provide sufficient information to identify dates for the alleged discharge of stormwater. It identifies no date certain on which any stormwater discharge occurred, nor does it attempt to provide any information from which the dates that stormwater discharges likely occurred may be ascertained. The assertion that violative stormwater discharges have occurred "for decades" is simply not enough.

Accordingly, the court concludes that the plaintiff has not clearly shown that it satisfied the pre-suit notice requirement with respect to stormwater discharges. Because the plaintiff has failed to make this showing, it cannot succeed in its application for a temporary restraining order to the extent the application is premised on alleged stormwater discharges.

3.   <u>Diligent prosecution bars</u>

        The defendant next argues that the plaintiff is barred from bringing its Clean Water Act claims pursuant to the diligent prosecution bars to citizen suits found in 33 U.S.C. §§ 1319(g)(6)(A)(ii) and 1365(b)(1)(B).  The defendant asserts that the December 8, 2020 unilateral order of the Director of WVDEP's Division of Water and Waste Management and the subsequent appellate proceedings regarding that order before the Environmental Quality Board trigger these bars to the plaintiff's citizen suit.  The court addresses the bars separately.

        (a)   <u>Bar under § 1365(b)(1)(B)</u>

        As discussed above, § 1365(a)(1) authorizes citizen plaintiffs to commence suits against a defendant alleged to be in violation of a limitation under the Clean Water Act, including the ban on unpermitted discharges of pollutants under § 1311(a).  However, § 1365(b)(1)(B) provides an exception to this authorization.  Under § 1365(b)(1)(B), no citizen suit may be commenced "if the . . . State has commenced and is diligently prosecuting a civil or criminal action in a court of . . . a State to require compliance with the . . . limitation" alleged to be violated.  <u>See</u> 33 U.S.C. § 1365(b)(1)(B).

68

As the parties recognize, the threshold issue for
application of the § 1365(b)(1)(B) diligent prosecution bar is
whether the state action at issue constitutes "a civil or
criminal action in a court."  33 U.S.C. § 1365(b)(1)(B)
(emphasis added).  As the defendant appears to concede, the
proceedings before the WVDEP and the Board are administrative
proceedings, not court proceedings.  However, the defendant
relies on a District of Maryland decision, which explains that,
"under certain circumstances[,] an administrative proceeding may
be considered the equivalent of court action and thus bar
citizen suits" under § 1365(b)(1)(B).  Sierra Club v. Simkins
Indus., Inc., 617 F. Supp. 1120, 1126 (D. Md. 1985) (citing
Baughman v. Bradford Coal Co., 592 F.2d 2015 (3d Cir. 1979)).

This court, however, agrees with another District of
Maryland decision, issued in the same year, which, noting that
nearly identical language in the Clean Air Act referring to an
action in a state or federal court is unqualified and
unambiguous and that Congress knows how to enact legislation
barring citizen suits in the face of administrative actions (and
has done so before), ruled that such language does not bar
citizen suits in the absence of a court action.  See Md. Waste
Coal. v. SCM Corp., 616 F. Supp. 1474, 1481 (D. Md. 1985)
(citing Friends of the Earth v. Consol. Rail Corp., 768 F.2d 57,

62 (2d Cir. 1985)); see also Jones v. City of Lakeland, 224 F.3d 518, 521-22 (6th Cir. 2000) (adopting Second Circuit's analysis); Texans United for a Safe Economy Educ. Fund v. Crown Cent. Petroleum Corp., 207 F.3d 789, 794-95 (5th Cir. 2000) (same); Sierra Club v. Chevron U.S.A., Inc., 834 F.2d 1517, 1525 (9th Cir. 1987) (same).

Further, the fact that, within the same statute, Congress provided in § 1319(g)(6)(A)(ii) for a separate bar that applies to administrative proceedings strongly suggests that the bar in § 1365(b)(1)(B) is limited, by its own terms, to court actions. See Paper, Allied-Indus., Chem. & Energy Workers Int'l Union v. Cont'l Carbon Co., 428 F.3d 1285, 1298 (10th Cir. 2005) ("Section 1365(b)(1)(B) precludes any civil action when a state initiates judicial proceedings against a polluter. However, if a state only opts for administrative enforcement, then § 1365(b)(1)(B) will not apply." (emphasis in original)).

Because the administrative proceedings at issue are not court actions, the § 1365(b)(1)(B) diligent prosecution bar does not apply.

(b)   Bar under § 1319(g)(6)(A)(ii)

When a citizen suit is commenced, § 1365(a) expressly vests jurisdiction in federal district courts not only to

70

enforce the Clean Water Act limitations alleged to have been violated but also to apply appropriate penalties under 33 U.S.C. § 1319(d). <u>See</u> 33 U.S.C. § 1365(a). Section 1319(d) subjects a person who violates such limitations, including the prohibition on unpermitted discharges in § 1311(a), to a civil penalty of up to $25,000 per day per violation. <u>See</u> 33 U.S.C. § 1319(d).

Further, § 1319 authorizes the Administrator of the Environmental Protection Agency and the Secretary of the Army to initiate various kinds of actions to enforce Clean Water Act limitations and to prosecute violations. <u>See generally</u> 33 U.S.C. § 1319. Subsection (g) authorizes the Administrator and the Secretary to assess administrative penalties on violators. <u>See</u> 33 U.S.C. § 1319(g)(1)-(5). Paragraph (6) of subsection (g) generally provides that actions taken by the Administrator or the Secretary to assess administrative penalties under subsection (g) "shall not affect or limit the Administrator's or Secretary's authority to enforce any provision of [the Clean Water Act]." 33 U.S.C. § 1319(g)(6)(A). In subparagraph (A), however, the statute provides several exceptions to this plenary authorization for the Administrator and the Secretary to enforce the Clean Water Act. As relevant here, subparagraph (A) provides that "any violation . . . with respect to which a State has commenced and is diligently prosecuting an action under a

State law comparable to [§ 1319(g)] . . . shall not be the subject of a civil penalty action under [§ 1319(d)] . . . or [§ 1365]."  33 U.S.C. § 1319(g)(6)(A)(ii).

As the plaintiff acknowledges, a threshold issue for application of the § 1319(g)(6)(A)(ii) diligent prosecution bar is whether the state law under which the state is prosecuting the action is comparable to § 1319(g).  See Sierra Club v. Powellton Coal Co., LLC, 662 F. Supp. 2d 514, 525 (S.D.W. Va. 2009) (citing Friends of Milwaukee's Rivers v. Milwaukee Metro. Sewerage Dist., 382 F.3d 743, 755 (7th Cir. 2004); McAbee v. City of Fort Payne, 318 F.3d 1248, 1251 (11th Cir. 2003)).  The defendant argues that the West Virginia Water Pollution Control Act, the statutory scheme under which the WVDEP initiated its administrative proceedings and issued its unilateral order, is comparable to § 1319(g).  This court reached the opposite conclusion in Sierra Club.  See 662 F. Supp. 2d at 526 ("[T]he court concludes that West Virginia law is not 'comparable' to [1319(g)].").

In Sierra Club, the court outlined the tests some courts have developed to determine whether a state's statutory scheme is comparable to § 1319(g) and noted that the Fourth Circuit had not yet adopted any such test.  See id. at 526–28. However, the court noted that in United States v. Smithfield

72

Foods, Inc., 191 F.3d 516, 526 (4th Cir. 1999), the Fourth
Circuit had affirmed the reasoning employed by the Eastern
District of Virginia in the case below.  See id. at 528 (citing
United States v. Smithfield Foods, Inc., 965 F. Supp. 769 (E.D.
Va. 1997)).  Applying the Smithfield Foods analysis to the West
Virginia statutory scheme, the court concluded it is not
comparable to § 1319(g) largely because "West Virginia law does
not empower the WVDEP to unilaterally assess civil penalties"
and because the administrative proceedings before the WVDEP,
available pursuant to regulations promulgated under the
statute's authority, permit alleged violators to terminate the
proceedings at any time.  See id. at 529-30.

    Following this court's decision in Sierra Club, the
Fourth Circuit does not appear to have addressed the
comparability issue it touched upon in Smithfield Foods.  See
Sierra Club v. U.S. Army Corps of Eng'rs, 909 F.3d 635 (4th Cir.
2018) (noting prior affirmance of the Eastern District of
Virginia's decision).  Further, it does not appear that the
relevant portions of the West Virginia Water Pollution Control
Act, or the relevant regulations promulgated thereunder, have
been amended in a way that would alter the analysis.  See W. Va.
Code § 22-11-22(a) (providing that "any . . . civil penalty may
be imposed and collected only by a civil action instituted . . .

73

in [a] circuit court"); W. Va. Code. R. § 47-1-5.4 ("The administrative proceeding may be terminated at any time and for any reason by any party involved in the proceeding.").[28]

Furthermore, as the plaintiff argues, for the § 1319(g)(6)(A) diligent prosecution bar to apply, the state agency pursuing an administrative action "must seek and assess administrative penalties." Cal. Sportfishing Prot. All. v. Chico Scrap Metal, Inc., 728 F.3d 868, 877 (9th Cir. 2013); see Knee Deep Cattle Co. v. Bindana Inv. Co., 94 F.3d 514, 516 (9th Cir. 1996) ("[F]or § 1319(g)(6)(A) to apply, the comparable state law must contain penalty provisions and a penalty must actually have been assessed under the state law."); PennEnvironment v. RRI Energy Ne. Mgmt., Co., 744 F. Supp. 2d 466, 472 (W.D. Pa. 2010) ("[S]ection 1319(g)(6)(A) only serves to bar a citizen suit where administrative penalties are already being sought or have already been imposed by the EPA or the state."). Here, the December 8, 2020 unilateral order issued by

---

[28] The court notes that relevant portions of the West Virginia Water Pollution Control Act appear to have been last amended by an act that was passed on April 11, 2009, and became effective on July 10, 2009, see Act of April 11, 2009, ch. 97, 2009 W. Va. Acts 743, shortly before this court's August 18, 2009 decision in Sierra Club. The court further notes that the regulations authorizing administrative proceedings do not appear to have been amended since 2002, several years before the court's decision in Sierra Club. See W. Va. Code. R. § 47-1-1.3 to 1.4.

the Director did not purport to seek or impose any penalties,
and the appeal of the unilateral order pending before the Board
likewise implicates no penalties.  See ECF No. 7-3.

Because the West Virginia statutory scheme is not
comparable to § 1319(g) and because the state has not sought or
imposed penalties in the administrative proceedings at issue,
the § 1319(g)(6)(A) diligent prosecution bar does not apply.

    4.   Ripeness

Lastly, the defendant argues that the pending state
administrative proceedings before the Board and the WVDEP render
the plaintiff's claims "susceptible to considerations of
ripeness."  ECF No. 7 at 13.  "Like standing, the ripeness
doctrine 'originates in the case or controversy constraint of
Article III,'" so that "'[a]nalyzing ripeness is similar to
determining whether a party has standing.'"  South Carolina, 912
F.3d at 730 (internal quotation marks omitted) (quoting Miller
v. Brown, 462 F.3d 312, 319 (4th Cir. 2006)).  "To be fit for
judicial review, a controversy should be presented in a 'clean-
cut and concrete form,'" id. (quoting Miller, 462 F.3d at 319),
and "a plaintiff's claim is not ripe for judicial review 'if it
rests upon contingent future events that may not occur as
anticipated, or indeed may not occur at all,'" id. (quoting

Scoggins v. Lee's Crossing Homeowners Ass'n, 718 F.3d 262, 270
(4th Cir. 2013)).  Thus, a claim is not ripe for review if it is
"dependent on . . . intervening agency rulings."  Id. (quoting
Franks v. Ross, 313 F.3d 184, 195 (4th Cir. 2002)).

        Ripeness considerations do not militate against the
exercise of jurisdiction here.  The plaintiff's claims are fit
for judicial review as they stand.  The merits of the
plaintiff's claims do not depend on the outcome of the state
proceedings.  This is not a case in which prematurity is argued
because the court is asked to enjoin an agency's policy or
ruling that has yet to be issued; rather, the defendant's
prematurity argument appears to be premised on the notion that a
future agency decision might make the current controversy moot.
That is not a basis for questioning ripeness.  See Town of
Barnstable v. O'Connor, 786 F.3d 130, 143 (1st Cir. 2015)
("[T]he possibility of future mootness . . . [is not] the type
of contingency that would create a lack of ripeness.").

        The defendant does not address the hardship inquiry
that normally inheres when a plaintiff seeks to enjoin future
agency action.  See South Carolina, 912 F.3d at 730.  The court
sees no reason to do so either.  Indeed, the ripeness doctrine,
and especially the hardship inquiry, seems inapt here.  Although
clothed in the garb of the ripeness doctrine, the defendant's

76

argument appears to be more accurately described as a primary jurisdiction or abstention issue. See Benham v. Ozark Materials River Rock, LLC, 885 F.3d 1267, 1278 (2018) (rejecting a "primary jurisdiction argument" "frame[d] . . . as a ripeness issue"). No matter how characterized, courts have long rejected application of judicial doctrines that "would be an end run around" limitations Congress placed on diligent prosecution bars in environmental statutes. PMC, Inc. v. Sherwin-Williams Co., 151 F.3d 610, 619 (7th Cir. 1998); accord Ky. Waterways All. v. Ky. Utils. Co., 905 F.3d 925, 939-40 (6th Cir. 2018), abrogated on other grounds by Cty. of Maui, 140 S. Ct. 1462; Chico Serv. Station, Inc. v. Sol Puerto Rico Ltd., 663 F.3d 20, 31 (1st Cir. 2011); Raritan Baykeeper v. NL Indus., Inc., 660 F.3d 686, 694-95 (3d Cir. 2011); Chesapeake Bay Found. v. Severstal Sparrows Point, LLC, 794 F. Supp. 2d 602, 617 n.12 (D. Md. 2011). Here too, concluding that the plaintiff's claims are not ripe because of state administrative proceedings that do not satisfy the diligent prosecution bars would amount to an end run around the balance Congress wrought in the Clean Water Act.

\*          \*          \*

In sum, although the court is not persuaded that either the diligent prosecution bars or the ripeness doctrine would preclude the plaintiff from achieving success on the

77

merits, the court finds that the plaintiff has failed to show it
is likely to succeed on the merits because (a) it has failed to
demonstrate standing with respect to discharges from the UCC
Railyard and from the Filmont Site into the northern drainage
ditch and Ward Branch or with respect to an order requiring the
defendant to apply for a permit, and (b) its pre-suit notice is
insufficient with respect to stormwater discharges and seep-
related discharges into the southern drainage ditch.

B.     <u>Irreparable Harm</u>

        "A plaintiff seeking a preliminary injunction must
demonstrate 'that [it] is likely to . . . suffer irreparable
harm in the absence of preliminary relief.'"  <u>Di Biase</u>, 872 F.3d
at 230 (quoting <u>Winter</u>, 555 U.S. at 20).  "[A] plaintiff must
demonstrate more than just a 'possibility' of irreparable harm,"
as granting preliminary relief based on the mere possibility of
harm "is inconsistent with [the] characterization of injunctive
relief as an extraordinary remedy."  <u>Id.</u> at 230 (quoting <u>Winter</u>,
555 U.S. at 22).  Instead, the plaintiff is required to "make a
clear showing that it is likely to be irreparably harmed absent
preliminary relief."  <u>Real Truth</u>, 575 F.3d at 347 (citing
<u>Winter</u>, 555 U.S. at 20-23).

The plaintiff argues that it has demonstrated harm to the environment and that, because harm to the environment is generally considered irreparable, it has met the requirement to show irreparable harm to itself and to others in the general public.  See ECF No. 6 at 19-20.  This argument misses the mark.

The traditional equitable analysis for obtaining preliminary relief requires a showing that <u>the plaintiff</u> itself will be irreparably harmed unless preliminary relief is granted. <u>See</u> <u>Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.</u>, 886 F.3d 803, 822 (9th Cir. 2018) ("Plaintiffs seeking injunctive relief must show that they themselves are likely to suffer irreparable harm absent an injunction.").  A plaintiff cannot satisfy this requirement by showing only that, in the absence of relief, a third party will be harmed.  <u>See</u> <u>Immigrant Legal Res. Ctr. v. City of McFarland</u>, 827 F. App'x 749, 751 (9th Cir. 2020) (Mem.) ("The district court abused its discretion in . . . focus[ing] its irreparable harm analysis on the prospect of harm to third parties."); <u>see also</u> <u>Moore v. Consol. Edison Co. of N.Y., Inc.</u>, 124 F. App'x 39, 41 (2d Cir. 2005); <u>Holly Sugar Corp. v. Goshen Cty. Co-op. Beet Growers Ass'n</u>, 725 F.2d 564, 570 (10th Cir. 1984).  Thus, the Supreme Court and the Fourth Circuit have consistently described the irreparable-harm requirement as necessitating a showing of harm <u>to the plaintiff</u>.

See, e.g., Winter, 555 U.S. at 20; MercExchange, 547 U.S. at
381; SAS Inst., Inc. v. World Programming Ltd., 952 F.3d 513,
527 (4th Cir. 2020); Di Biase, 872 F.3d at 230; Real Truth, 575
F.3d at 345.  Other courts have also described the requirement
in these same terms, even when the claims under review are Clean
Water Act claims.  See, e.g., Defs. of Wildlife v. U.S. Army
Corps of Engr's, 730 F. App'x 413, 415 (9th Cir. 2018); Huron
Mountain Club v. U.S. Army Corps of Eng'rs, 545 F. App'x 390,
392 (6th Cir. 2013).

        Of course, a plaintiff may claim that its interest in
the environment is or will be irreparably harmed by a
defendant's conduct that is harming or will harm the
environment.  For instance, plaintiffs may claim their interest
in "hunting, fishing, birdwatching, and nature-indulging" will
be irreparably harmed by a defendant's actions that harm the
environment in which these activities occur.  Sierra Club v.
U.S. Army Corps of Eng'rs, 645 F.3d 978, 994 (8th Cir. 2011).
In such cases, "imprecise language" can suggest that proof of
harm to the environment itself, "rather than to the plaintiff's
. . . enjoyment of it" is sufficient, but the harm, if it is to
meet the requirements for preliminary relief, is "necessarily"
"to the plaintiffs' specific aesthetic, educational and
ecological interests."  Id. at 995.

Here, the plaintiff asserts that the discharges from
the defendant's properties irreparably harm the environment and
thereby irreparably harm the plaintiff.  But the plaintiff has
not asserted a harm to aesthetic or educational interests in the
environment; rather, the harm the plaintiff asserts is the
injury to its property when contaminants discharged from the
defendant's properties are deposited there.  The issue then is
whether the plaintiff has clearly shown a likelihood that it
will — not the mere possibility that it might — suffer this
harm.  See Winter, 555 U.S. at 20, 22); Di Biase, 872 F.3d at
230.

The court concludes that the plaintiff has failed to
clearly show that it is likely to be irreparably harmed in the
manner it asserts in the absence of preliminary relief.  As
discussed above, the plaintiff asserts that contaminants are
deposited on its property in two ways: (1) seep-related
discharges place contaminants into Ward Branch and the northern
drainage ditch, which flow to Davis Creek and, when Davis Creek
reverses its normal flow, deposit on the plaintiff's property,
and (2) seep-related and stormwater discharges place
contaminants in the southern drainage ditch, which are deposited
on the plaintiff's property where the ditch transverses it.

With respect to discharges into Ward Branch and the
northern drainage ditch, as the court has discussed above,
contaminants from those discharges normally will not be
deposited on the plaintiff's property because they enter Davis
Creek downstream and downgradient from the plaintiff's property.
Only when Davis Creek's normal northward flow is reversed and it
instead flows southward, toward the plaintiff's property, would
contaminants from these discharges be deposited on the
plaintiff's property.  There is no evidence in the record
regarding the conditions under which Davis Creek reverses its
normal flow, how often it does so, or how often such flow is
strong and continuous enough to carry contaminants entering
Davis Creek from the northern drainage ditch and Ward Branch all
the way southward to the plaintiff's property.  Thus, there is
simply no evidence clearly showing that the conditions under
which the contaminants from these discharges would reach the
plaintiff's property are likely to occur any time in the near
future.  See Mountain Valley Pipeline, 915 F.3d at 216 ("To
establish irreparable harm, the movant must make a 'clear
showing' that it will suffer harm that is 'neither remote nor
speculative, but actual and imminent.'" (quoting Direx Israel,
Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir.
1991))).

With respect to discharges into the southern drainage ditch, the court found above that the evidence the plaintiff presented as to those discharges is sufficient to meet the summary-judgment standard applicable to an evaluation of standing.  When assessing irreparable harm in determining whether a temporary restraining order should issue, however, the court does not apply the more favorable summary-judgment standard but, instead, considers the evidence as a whole.  The court finds that the plaintiff has failed to clearly show it will be irreparably harmed by contaminants discharging from the Filmont Site depositing on its property via the southern drainage ditch.

First, the plaintiff has failed to clearly show the existence of seep-related discharges from the Filmont Site into the southern drainage ditch.  As discussed above, Dr. Simonton's photograph purporting to show orange staining coming from the Filmont Site into the southern drainage ditch shows no such thing.  Instead, the plaintiff's evidence of seep-related discharges into the southern drainage ditch is largely inferential: Dr. Simonton testified that groundwater at the Filmont Site flows toward the southern drainage ditch and that its groundwater is contaminated.  However, the basis for his opinion that the groundwater is contaminated is not in the

record and, more importantly, there is no evidence in the record concerning the existence of any seep on the Filmont Site discharging water or materials into the southern drainage ditch. Further, Mr. Carpenter testified that when he inspected the area during a rainy period he observed no seeps or contaminants flowing from the Filmont Site into the southern drainage ditch. And, there is evidence demonstrating that scrap-metal operations on the plaintiff's property might be the source of orange coloration in the southern drainage ditch.  In the court's view, the evidence in the record does not clearly show that contaminants from the Filmont Site are discharging from seeps into the southern drainage ditch and thereby depositing on the plaintiff's property.

        Second, the plaintiff has failed to clearly show that stormwater is flowing across the Filmont Site, picking up contaminants, discharging into the southern drainage ditch, and depositing contaminants on the plaintiff's property.  Dr. Simonton testified that he observed a gully on the Filmont Site's embankment that would discharge stormwater into the southern drainage ditch after picking up contaminants that he observed in the gully.  However, Mr. Carpenter testified that he inspected the same area during a rainy period and observed no gully, no contaminants, no stormwater flowing, and spcifically

no stormwater flowing through a gully carrying contaminants to the southern drainage ditch.  In the court's view, this evidence does not clearly show that stormwater is discharging from the Filmont Site and carrying contaminants into the southern drainage ditch and depositing them on the plaintiff's property.

Because the plaintiff has not made the required clear showing that it is likely to be irreparably harmed in the manner it has identified, the application for a temporary restraining order must be denied.  See Di Biase, 872 F.3d at 235 (preliminarily relief is appropriately denied when a plaintiff fails to make a clear showing that "the potential irreparable harms identified . . . were imminent").

C.   Balance of the equities

"In order to obtain the requested [relief], [the] plaintiff[] must establish . . . that the 'balance of equities' weighs in [its] favor." Sarsour, 245 F. Supp. 3d at 740. "In determining whether [a] plaintiff[] ha[s] made that showing, 'in each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or

withholding of the requested relief.'"  Id. (internal quotation marks and brackets omitted) (quoting Winter, 555 U.S. at 24).[29]

As explained above, the injury the plaintiff claims it will suffer in the absence of preliminary relief — imminent contamination of its property resulting from discharges from the Filmont Site — is speculative.  See id. at 741-42 (noting speculative nature of alleged harm); see also ISCO Indus., LLC v. Erdle, No. 5:11-cv-552-F, 2011 WL 5101599, at *3 (W.D.N.C. Oct. 26, 2011) ("In making [the balance-of-the-equities]

---

[29] At the hearing, the plaintiff argued that, when a citizen plaintiff brings a Clean Water Act suit, the court need not address the balance of the equities or the public interest — and, apparently, may presume that the citizen plaintiff has made its required showing as to those two factors — when faced with a request for preliminary relief.  Although there is some authority to support this view, see Or. State Pub. Interest Research Grp. v. Pac. Coast Seafoods Co., 374 F. Supp. 2d 902, 908 (D. Or. 2005) (citing United States v. Bethlehem Steel Corp., 38 F.3d 862, 868 (7th Cir. 1994)), the court is aware of no such ruling by the Fourth Circuit and notes that courts in this circuit consistently consider the two equitable factors in the context of Clean Water Act citizen suits, see, e.g., Ohio Valley Envt'l Coal. v. Bulen, 315 F. Supp. 2d 821, 824-26, 831 (S.D.W. Va. 2004); see also Weinberger v. Romero-Barcelo, 465 U.S. 305, 315-19 (1982) (explaining that the Clean Water Act's language, structure, and legislative history contemplate that a reviewing court will employ traditional equitable considerations in determining the injunctive relief to be ordered).  Further, following the Supreme Court's decision in Winter, the Fourth Circuit has emphasized that "all four requirements must be satisfied" and that its previous standard permitting some factors to be largely ignored so long as other factors were satisfied has been abrogated.  See Real Truth, 575 F.3d at 346-47.  This court will follow the Fourth Circuit's pronouncement.

assessment, the court should consider the harm likely to be suffered by the plaintiff if relief that is denied is actual and imminent or merely remote and speculative." (citing N.C. Right to Life, Inc. v. Leake, 108 F. Supp. 2d 498, 503 (E.D.N.C. 2000))).  Further, the court notes that, although any addition of contaminants to the plaintiff's property from illegal discharges is certainly concerning, the extent of the incremental addition that might possibly occur during the period in which a temporary restraining order would be in effect seems to pale in comparison to the amount of contamination – somewhere between 15 and 70 years' worth – that the plaintiff alleges has heretofore accumulated on its property.  Thus, even assuming that the discharges were likely to result in additional contaminants being deposited on the plaintiff's property in the near future, it is difficult to estimate the extent of any incremental harm to the plaintiff in its use of the property. The difficulty in identifying any appreciable harm to the plaintiff's use of its property in the near future is compounded by evidence that the property is currently used for processing recyclable scrap metal containing iron oxide, see EFC No. 7-2 ¶¶

17-18, and that the plaintiff has no plans to use the property for non-industrial purposes, see ECF No. 7-5 at 4-5.[30]

On the other hand, if the plaintiff's requested relief were to be granted, the defendant would face a mandatory injunction, which is always disfavored.  See Taylor, 34 F.3d at 270 n.2 ("Mandatory preliminary injunctive relief in any circumstance is disfavored[] and warranted only in the most extraordinary circumstances.").  Further, as the defendant points out, the plaintiff's requested relief would require the defendant to ensure that its discharges are eliminated almost immediately — by the end of 14 days, see ECF No. 5 at 1; ECF No. 5-3 at 3 — despite the facts that (a) typically, developing and executing a comprehensive study and plan to eliminate and remediate such discharges would require much more time and (b) the governmental authorities with the expertise to ensure the

---

[30] To the extent the plaintiff argues that the balance of the equities should weigh more heavily in its favor based on its evidence that the defendant has known of discharges from the Filmont Site for roughly 15 years, see ECF No. 8 at 5-8, the court believes the plaintiff's point is somewhat undercut by the defendant's evidence that the plaintiff's property has been used for salvage and reclamation storage and has thus been contributing iron oxides to nearby waterways for roughly 13 years, see ECF No. 7-2 ¶¶ 17-18; ECF No. 7-5 at 4-5; see also In re Search Warrant Issued June 13, 2019, 942 F.3d 159, 182 (4th Cir. 2019) (citing Koster v. Lumbermens Mut. Cas. Co., 330 US. 518, 522 (1947), for proposition that "'he who seeks equity must do equity'" in conducting a balance-of-the-equities analysis (alteration omitted)).

proper development and execution of such plans have only recently become involved.  Although the court agrees with the plaintiff that a Clean Water Act violator should not escape the costs — even high costs — of its violation, the temporary restraining order the plaintiff seeks is a blunt instrument for achieving the relief the plaintiff seeks.

On balance, the court concludes that the plaintiff has failed to show that the equities tip in its favor.  This failure provides an additional reason for denying the current application.  See S.C. Progressive Network, ___ F. Supp. 3d at ___, 2020 WL 5995325, at *3 ("'All four requirements must be satisfied.'"  (brackets omitted) (quoting Real Truth, 575 F.3d at 346)).

D.   Public interest

The plaintiff argues that the public's interest is served by enforcing the Clean Water Act, which Congress enacted "'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'"  Piney Run Pres. Ass'n v. Cty. Cmm'rs of Carroll Cty., 523 F.3d 453, 455 (4th Cir. 2008) (quoting 33 U.S.C. § 1251).  The defendant responds that the public interest weighs in favor of denying the application because deferring to the state governmental authorities with

expertise in this area is preferable to the expedited intervention of an inexpert court.  The court finds that the public interest is in equipoise and that, accordingly, the plaintiff has failed to meet its burden in this regard as well.

## IV.  Conclusion

For the foregoing reasons, it is ORDERED that the plaintiff's application for a temporary restraining order (ECF No. 5) be, and hereby it is, denied.

The Clerk is directed to transmit copies of this order to all counsel of record and any unrepresented parties.

ENTER: April 5, 2021

John T. Copenhaver, Jr.
Senior United States District Judge