UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

THE COURTLAND COMPANY, INC.,

       Plaintiff,

v.                          Civil Action No. 2:21-cv-00101
                                Civil Action No. 2:21-cv-00487

UNION CARBIDE CORPORATION,

       Defendant.

## MEMORANDUM OPINION AND ORDER

       Pending in Civil Action Nos. 2:21-cv-00101 ("Courtland III") and 2:21-cv-00487 ("Courtland IV") is defendant Union Carbide Corporation's ("UCC") consolidated motion for summary judgment.  ECF No. 152 (Courtland III); ECF No. 68 (Courtland IV).  Inasmuch as Courtland III and Courtland IV have been consolidated, all docket numbers hereinafter shall be made in reference to Courtland III unless otherwise stated.

### I. Background

       A thorough factual background of Courtland III and Courtland IV, including the parties' competing versions of events, can be found in the court's order concerning the parties' summary judgment motions filed in the related actions,

Courtland I (Civil Action No. 2:18-cv-01230) and Courtland II
(Civil Action No. 2:19-cv-00894).  The court need not repeat
them here and incorporates that background herein.

        For reference in this memorandum opinion and order,
the court recounts the following.  The parties are corporations
owning adjoining parcels of real property near Davis Creek in
Kanawha County, West Virginia.  Plaintiff The Courtland Company,
Inc. ("Courtland"), is the owner of one of the parcels (the
"Courtland Property").  UCC is the owner of two of the sites at
issue in these two consolidated matters: the Filmont Landfill
("Filmont" or "Filmont Site") and the Massey Railyard, which are
separate sites but share the same parcel.

        The image below, provided to the court by the parties,
sets forth the relevant positioning of Filmont, Massey Railyard,
and the Courtland Property.  It is noted that Davis Creek flows
generally south to north and into the Kanawha River.  The
Southern Drainage Ditch is a tributary of Davis Creek.  The
Northern Drainage Ditch is a tributary of Ward Brach, which is a
tributary of Davis Creek.



On February 9, 2021, Courtland instituted Courtland III by filing a complaint alleging that pollutants at Filmont and the Massey Railyard discharge, without a required federal or state permit, from seeps into the waters of the United States and West Virginia, namely, Davis Creek and its tributary, Ward Branch.  Courtland further alleged that seepage and untreated stormwater collected at Filmont and the Massey Railyard discharge directly or indirectly into Davis Creek and that such discharges have been continuously occurring for over thirty (30) years without a permit said to have been required by federal statute and regulation.

Based on these allegations, Courtland asserts two claims for citizen-suit relief pursuant to Section 505 of the Clean Water Act, 33 U.S.C. § 1365 ("Clean Water Act" or the "Act"). Specifically, Count I (the north prong) in Courtland III seeks relief based on UCC's alleged ongoing unpermitted discharges of pollutants from Filmont into nearby navigable waters in violation of Sections 301 and 402 of the Clean Water Act, and Count II (the south prong) seeks relief based on UCC's alleged unpermitted discharges of pollutants from Filmont and the Massey Railyard into nearby navigable waters in violation of Sections 301 and 402 of the Clean Water Act.

The day after instituting Courtland III, Courtland filed an application for a temporary restraining order ("TRO") on February 10, 2021, in Courtland III. The court held a three-day hearing on the matter on February 26, 2021, March 1, 2021, and March 2, 2021. UCC subsequently moved to dismiss the complaint in Courtland III on March 5, 2021.

On April 5, 2021, following the three-day TRO hearing, the court denied Courtland's TRO application inasmuch as Courtland had failed to show that it was likely to succeed on

4

the merits.[1]   The court concluded, <u>inter alia</u>, that Courtland had failed to demonstrate "standing to bring its claims insofar as (1) its [Count I] claims relate to discharges from the Filmont Site into Ward Branch and the [N]orthern [D]rainage [D]itch; [and] (2) its [Count II] claims related to the [Massey] Railyard;" and the court also denied relief in the form of an order requiring UCC to apply for a discharge permit.  ECF No. 32 at 53.

The court further concluded that while it was satisfied that Courtland had provided sufficient pre-suit notice respecting the alleged seep-related discharges associated with Ward Branch and the Northern Drainage Ditch, Courtland had failed to satisfy the pre-suit notice requirement with respect to seep-related discharges associated with the Southern Drainage Ditch and alleged stormwater discharge.  <u>See</u> <u>id.</u> at 62, 67.

On May 13, 2021, the court granted UCC's motion to dismiss the complaint in Courtland III for lack of pre-suit notice insofar as it sought "dismissal of [Courtland's Count II] claims to the extent they concern stormwater discharges and discharges associated with the [S]outhern [D]rainage [D]itch"

---

[1] The court reached this conclusion on threshold issues asserted by UCC and thus declined to assess the merits of Courtland's claims.  <u>See</u> ECF No. 32 at 28, n.13.

and denied the motion otherwise.  ECF No. 44 at 21-22.
Thereafter, on June 25, 2021, Courtland sought leave to file an
amended complaint in Courtland III, which purportedly cured the
pre-suit notice deficiencies outlined in the court's opinion
respecting UCC's motion to dismiss.

Before the court was able to address the motion,
however, Courtland filed an entirely separate action, Courtland
IV, on September 1, 2021.  The claims asserted in Courtland IV
are nearly identical to the claims set forth in Courtland III
but are based upon the June 16, 2021, Notice of Violation issued
by Courtland to UCC.  Count I (north) seeks relief based on
UCC's alleged ongoing unpermitted discharges of pollutants from
Filmont into nearby navigable waters, and Count II (south) seeks
relief based on UCC's alleged unpermitted discharges of seeps
and stormwater associated with industrial activity from Filmont
and the Massey Railyard into nearby navigable waters in
violation of Sections 301(a) and 402(p) of the Clean Water Act.

On March 30, 2022, UCC filed its consolidated motion
for summary judgment as to all of Courtland's outstanding claims
pursuant to the Clean Water Act asserted in Courtland III and
Courtland IV.  UCC Consol. Mot. Summ. J., ECF No. 152.  Broadly
speaking, UCC argues that (1) Courtland lacks standing to bring
its Clean Water Act claims, (2) Courtland's Clean Water Act

claims are time-barred by the five-year limitations period set forth in the applicable statute of limitations, and (3) Courtland has failed to support various aspects of its Clean Water Act claims on evidentiary grounds.  See id.  Courtland filed a response on April 13, 2022.[2]  Courtland Resp., ECF No. 176.

## II. Governing Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The burden is on the nonmoving party to show that there is a genuine issue of material fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "The nonmoving party must do so by offering 'sufficient proof in the form of admissible evidence' rather than relying solely on the allegations of her pleadings."  Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016) (quoting Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993)).  The

---

[2] Courtland's response also purports to request summary judgment in its favor.  See Courtland Resp.  Courtland's dubious request was nonetheless untimely and is denied.

7

Court must "view the evidence in the light most favorable to the [nonmoving] party." Tolan v. Cotton, 572 U.S. 650, 657 (2014) (internal quotation marks omitted); Variety Stores, Inc. v. Wal-Mart Stores, Inc., 888 F.3d 651, 659 (4th Cir. 2018).

## III. Discussion

"The Clean Water Act . . . created a comprehensive scheme to 'restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'" Sanitary Bd. of City of Charleston v. Wheeler, 918 F.3d 324, 328 (4th Cir. 2019) (quoting 33 U.S.C. § 1251 (2012)). "Although the primary responsibility for enforcement [of the Clean Water Act] rests with the state and federal governments," the Clean Water Act also authorizes private citizens to file citizen suits against persons or entities in violation of the Act. The Piney Run Preservation Ass'n v. The Cnty. Comm'rs of Carroll Cnty., 523 F.3d 453, 456 (4th Cir. 2008). The court considers UCC's summary judgment arguments in turn.

### A. Standing

"Article III of the Constitution restricts the federal courts to the adjudication of 'cases' and 'controversies,'" that

8

is, a plaintiff must have standing to sue.  <u>Friends of the</u>
<u>Earth, Inc. v. Gaston Copper Recycling Corp.</u>, 204 F.3d 149, 153
(4th Cir. 2000) (en banc).  In addition to Article III, a
plaintiff "must also satisfy any statutory requirements for
standing before bringing suit."  <u>Id.</u> at 155.  Because the Clean
Water Act's citizen standing provision is coextensive with
Article III, standing to bring a citizen suit is analyzed under
the framework for testing Article III standing.  <u>See id.</u>; <u>see</u>
<u>also</u> 33 U.S.C. § 1365(g) (defining "citizen").

        The Fourth Circuit, in its seminal environmental
standing case, sets forth the Article III standing framework as
follows:

> To meet the constitutional minimum for standing, "[a]
> plaintiff must allege personal injury fairly traceable
> to the defendant's allegedly unlawful conduct and
> likely to be redressed by the requested relief."  This
> formula includes three elements: (1) injury in fact;
> (2) traceability; and (3) redressability.  The injury
> in fact prong requires that a plaintiff suffer an
> invasion of a legally protected interest which is
> concrete and particularized, as well as actual or
> imminent.  The traceability prong means it must be
> likely that the injury was caused by the conduct
> complained of and not by the independent action of
> some third party not before the court.  Finally, the
> redressability prong entails that it must be likely,
> and not merely speculative, that a favorable decision
> will remedy the injury.

<u>Gaston Copper</u>, 204 F.3d at 154 (citations omitted) (first
quoting <u>Allen v. Wright</u>, 468 U.S. 737, 751 (1984); and then
citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61

(1992)).  On a motion for summary judgment, the plaintiff bears the burden to adduce evidence that, taken as true and drawing all reasonable inferences in the plaintiff's favor, satisfy each of the three Article III standing elements.  See Baehr v. Creig Northrop Team, P.C., 953 F.3d 244, 253 (4th Cir. 2020); see also Beck v. McDonald, 848 F.3d 262, 270 (4th Cir. 2017).

At the outset, the court notes that the Supreme Court recognizes standing to sue in environmental cases even for relatively abstract injuries.  To show standing, "a plaintiff need only show that he used the affected area, and that he is an individual 'for whom the aesthetic and recreational values of the area [are] lessened' by the defendant's activity."  Piney Run Preservation, 268 F.3d at 263 (quoting Sierra Club v. Morton, 405 U.S. 727, 735 (1972)).  The inquiry is often more straightforward where, as here, the plaintiff has adduced evidence that, taken as true, he has suffered an injury to interests in his own real property.  See generally Gaston Copper, 204 F.3d at 154-55.

1. Injury in fact

The injury-in-fact element requires that a plaintiff "suffer an invasion of a legally protected interest that is concrete and particularized" and actual or imminent "before he

can bring an action." Id. at 156 (quotation marks omitted).
The Fourth Circuit posits that "traditional trespass," id. at
154, and other impingements and diminishments of real property
interests, see id. at 156, are sufficient to satisfy Article
III's injury-in-fact requirement.

In this case, Courtland argues that "the discharge of
toxic pollutants without a permit, on a property adjacent to a
plaintiff's property, obviously impacts the plaintiff's
interests." Courtland Resp. 30. Courtland points to evidence
it has adduced suggesting that discharge from Filmont and Massey
Railyard naturally flows onto the Courtland Property, and that
such discharge contains pollutants originating from Filmont and
Massey Railyard. See id. at 29-31.

Taking Courtland's evidence as true, Courtland has
demonstrated an injury in fact. This case bears a close
resemblance to Gaston Copper, where the Fourth Circuit found
that the plaintiff "ha[d] plainly demonstrated injury in fact"
because the plaintiff's property was "in the path of [the
defendant's] toxic chemical discharge." 204 F.3d at 156.

For its part, UCC seems to conflate the standing
inquiry with the merits of Courtland's Clean Water Act claims.
See UCC Reply 9-13, ECF No. 183. It is well established,
however, that "a court is not required to determine the merits

11

of the environmental violations alleged when deciding if standing exists." Ohio Valley Envtl. Coalition v. Foal Coal Co., 274 F. Supp. 3d 378, 385 (S.D. W. Va. 2017). The merits will be taken up below.

2. Traceability

"The traceability prong means it must be likely that the injury was caused by the conduct complained of and not by the independent action of some third party not before the court." Gaston Copper, 204 F.3d at 154.

Courtland's argument concerning traceability is straightforward. Courtland has adduced evidence suggesting that the portion of its property near the confluence of the Southern Drainage Ditch and Davis Creek, which is downgradient from Filmont and is situated between Filmont and the Southern Drainage Ditch, contains contaminants of the kind discharged from Filmont and Massey Railyard. See Courtland Resp. 31 (citing McPherson Dep. 37-38, Courtland II ECF No. 381-2; and Simonton Rep. ¶¶ 72-76, ECF No. 150-64).

Taking this evidence as true, Courtland has shown that its alleged injuries are fairly traceable to Filmont and Massey Railyard concerning the Southern Drainage Ditch. Again, this

case bears a close resemblance to Gaston Copper, where the
Fourth Circuit found traceability where the pollutants found on
the plaintiff's property were the type discharged from the
defendant's and that the plaintiff's property was downstream of
the defendant's.  204 F.3d at 161-62.  Likewise, the Courtland
Property is downstream of UCC's alleged pollutant discharges at
each point where the Southern Drainage Ditch runs along the
boundary between the Courtland Property and either Filmont or
Massey Railyard, and in the area where the Southern Drainage
Ditch traverses the Courtland Property.

Additionally, Courtland has shown that its alleged
injuries are also fairly traceable to Filmont and Massey
Railyard concerning the Northern Drainage Ditch and discharges
into Ward Branch.  Although the Courtland Property is not
downstream of UCC's alleged pollutant discharges into the
Northern Drainage Ditch and Ward Branch, Courtland has adduced
evidence that, taken as true, shows that Davis Creek, into which
water from the Northern Drainage Ditch and Ward Branch
eventually flow, reverses its flow during certain flooding
events such that downstream water could be deemed to migrate to
the Courtland Property and deposit sediment and contaminants.

To support reverse flow, Courtland references the
deposition testimony of UCC's Rule 30(b)(6) witness, Jerome

13

Cibrik ("Cibrik").  See Courtland Resp. 23.  Cibrik testified
that "any time the river backs up and floods, water would come
in" the groundwater.  See Cibrik Dep. 208-09, Courtland II ECF
No. 288-9.

Moreover, the court notes that Charles McPherson, one
of UCC's experts, testified as follows concerning flooding and
reverse flow in Davis Creek:

> Q.  Okay.  In your response, you mentioned something
> about the flooding of the river and you cut out a
> little bit when you were talking about the
> developmental history.  What did you mean when you
> said the flooding of the river?  I didn't get that.
>
> A.  As the river backs up in Davis Creek and those
> areas go out into a flood plain, they deposit silt and
> sediment, and that obviously has occurred in this area
> because it's referred to, I believe, as luvum [sic,
> alluvium?] in a lot of the boring logs that I've seen
> or discussions I've read.
>
> Q.  Sure.  When you say river backs up, you're talking
> about Davis Creek.  Yes?
>
> A.  I think it all starts with the river.  If the
> river backs up, then those back up.
>
> Q.  Sure.  So during flooding events, it's not unusual
> for the Davis Creek to back up; is that right?
>
> A.  Correct.
>
> . . .
>
> Q.  Again, I am trying to get my arms around that idea
> of there being fly ash fill at [the] Courtland
> [Property].  So we've got the boring log.  We've got
> the issue of flooding of the river and back up.  How
> else do we get the idea or the impression that there

is fly ash in fill material at [the] Courtland
[Property]?

A.  I think I've already listed one.  Looking at
aerial photographs, there may be other instances that
have shown that, but more recently, there's been some
historical topographic maps that have shown this area
as obviously being built up over the years, either
through natural and/or manmade assistance.  And the
typical materials that are used around this area have
been typically fly ash or flooded materials from the
river backing up.

McPherson Dep. 105-07, Courtland II ECF No. 288-13.

Consequently, Courtland has shown traceability
concerning discharges related to the Northern Drainage Ditch and
Ward Branch and the Southern Drainage Ditch.  See Md. Shall
Issue, Inc. v. Hogan, 971 F.3d 199, 212 (4th Cir. 2020) ("An
injury is traceable if 'there [is] a causal connection between
the injury and the conduct complained of' by the plaintiff."
(quoting Lujan, 504 U.S. at 560)).

UCC generally launches, in vain, a broad-based
evidentiary attack on traceability related to standing.  See UCC
Mem. Supp. 19-22; UCC Reply 9-13.  As the Fourth Circuit
explains, inasmuch as standing is "a threshold jurisdictional
requirement," a plaintiff does not need to "show to a scientific
certainty that defendant's effluent . . . caused the precise
harm suffered by the plaintiffs."  Gaston Copper, 204 F.3d at
161 (quotation marks omitted).  Instead, "a plaintiff must
merely show," as Courtland has done, "that a defendant

discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern," id., and that "no alternative culprit" is the one causing the plaintiff's injuries, see id. at 162.

### 3. Redressability

Redressability means "that it must be likely, and not merely speculative, that a favorable decision will remedy the injury." Gaston Copper, 204 F.3d at 154. "A plaintiff seeking injunctive relief shows redressability by alleg[ing] a continuing violation or the imminence of a future violation of the statute at issue." Id. at 162 (quotation marks omitted).

In this case, Courtland seeks, inter alia, to enjoin what it alleges to be ongoing violations of the Clean Water Act. Courtland III Compl. ad damnum cl., ECF No. 1; Courtland IV Compl. ad damnum cl., ECF No. 1. Indeed, Courtland has adduced evidence that UCC is discharging pollutants without a Clean Water Act permit. See, e.g., Courtland Resp. 5-7, 26-27. This is enough to show redressability. See Gaston Copper, 204 F.3d at 163.

UCC insists that Courtland has not shown that any alleged Clean Water Act violations are ongoing or likely to

16

occur in the future.  See UCC Mem. Supp. 22-23; UCC Reply 9-13.
However, as UCC recognizes, the Fourth Circuit allows a
plaintiff to establish an ongoing, redressable injury sufficient
to pursue injunctive relief by, at least, "adducing evidence
from which a reasonable trier of fact could find a continuing
likelihood of a recurrence in intermittent or sporadic
violations."  Chesapeake Bay Found., Inc. v. Gwaltney of
Smithfield, Ltd., 844 F.2d 170, 171-72 (4th Cir. 1988).  As
explained above, Courtland has adduced evidence that unpermitted
Clean Water Act discharges occur upgradient from the Courtland
Property, which is within the drainage path of such discharges,
as well as downgradient discharges that flow into Davis Creek
which is said to be subject to back up flooding.  A reasonable
trier of fact could find that the discharges are ongoing and
likely to occur at least sporadically.  Accordingly, for
purposes of summary judgment, Courtland has established that it
has standing to bring its Clean Water Act claims against UCC
concerning discharges into and from the Southern Drainage Ditch
and the Northern Draining Ditch and into Ward Branch.


    B. Statute of Limitations


        The court set forth in its May 13, 2021, memorandum
opinion and order the analytical framework for evaluating UCC's

17

limitations-period challenge to Courtland's Clean Water Act
claims.  See ECF No. 44.  To summarize, the Clean Water Act is
subject to the five-year limitations period set forth in 28
U.S.C. § 2462.[3]  However, under the continuing violation
doctrine, the limitations period is tolled when the violation
giving rise to the claim continues in an ongoing fashion.  See,
e.g., Nat'l Parks & Conservation Ass'n v. Tenn. Valley Auth.,
502 F.3d 1316, 1322 (11th Cir. 2007).

        There are generally two approaches to the continuing
violation doctrine for Clean Water Act cases.  Under the first,
a violation is continuing only where the unlawful conduct,
rather than the ill effects from an initial unlawful act, is
ongoing.  See id.  Under the second, a violation is continuing
if it is either "continuous or intermittent."  Congaree
Riverkeeper, Inc. v. Carolina Water Serv., Inc., 248 F. Supp. 3d
733, 745 (D.S.C. 2017).  It is unclear whether, in a given
instance, there is any appreciable difference between these two
approaches.

        As in the court's prior decision, the court need not
decide which version of the continuing violation doctrine to
apply because Courtland's Clean Water Act claims of ongoing

_____

[3] The plaintiff does not dispute that § 2462 sets forth the
applicable limitations period for its Clean Water Act claims.

seepage and stormwater flow centering around the Northern
Drainage Ditch and Ward Branch and the Southern Drainage Ditch
discharging pollutants on its property satisfy either one.[4]   See,
e.g., Voluntary Remediation Program, Conceptual Site Model
Worksheet 1, 3, 5, Courtland II ECF No. 288-6 (UCC averring that
contaminants from Filmont and Massey Railyard are entering
surface waters around the sites, including the Northern Drainage
Ditch and the Southern Drainage Ditch).

### C. Merits of Clean Water Act claims

Congress enacted the Clean Water Act "to restore and
maintain the chemical, physical, and biological integrity of the
Nation's waters."  33 U.S.C. § 1251(a).  To pursue those
objectives, the Clean Water Act, inter alia, prohibits the
discharge of pollutants without a permit.  See id. § 1311(a).

---

[4] Courtland also argues that "there is no statute of limitations
for [its] claims for injunctive relief" and that the limitations
period is tolled by the discovery rule.  Courtland Resp. 32.
The court need not address those arguments because it has
already decided that the above claims are not time-barred under
the continuing tort doctrine.  The court further notes that
while there is a colorable argument to exempt injunctive relief
from § 2462, see SEC v. Marin, 982 F.3d 1341, 1355 (11th Cir.
2020), Courtland also seeks non-injunctive relief such as civil
penalties, see Courtland III Compl. ad damnum cl.

"To establish liability for a violation of the [Clean Water Act's] . . . permit requirement, plaintiffs must show that [a "person"] (1) discharged or added [or committed the functional equivalent of a direct discharge of] (2) a pollutant (3) to waters of the United States (4) from a point source (5) without a permit." W. Va. Highlands Conservancy, Inc. v. Huffman (Huffman I), 651 F. Supp. 2d 512, 518 (S.D. W. Va. 2009); see also Cnty. of Maui v. Haw. Wildlife Fund, 140 S. Ct. 1462, 1476 (2020) (holding that the Clean Water Act's permit requirement extends to "the functional equivalent of a direct discharge"). Analytically, it is difficult to separate the discharge and point source elements of a Clean Water Act violation. Cf. 33 U.S.C. §§ 1362(12) (defining "discharge of a pollutant" as "any addition of any pollutant to navigable waters from any point source"), 1362(14) (defining "point source" as "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged).

UCC tacitly admits it did not have a Clean Water Act permit for Filmont and Massey Railyard. See UCC Mem. Supp. 36. UCC also does not challenge that the chemical compounds and elements at issue are "pollutants." See id. at 31-32. See generally W. Va. Highlands Conservancy, Inc. v. Huffman (Huffman II), 625 F.3d 159, 165-66 (4th Cir. 2010) (explaining that

20

"pollutant" is broadly defined).[5]  In fact, UCC has admitted to the West Virginia Department of Environmental Protection that pollutants from Filmont and Massey Railyard are making their way into the groundwater and surface water.  See generally Voluntary Remediation Program Application, Courtland II ECF No. 288-6; Voluntary Remediation Program, Conceptual Site Model Worksheet, supra.  Last, UCC admits that the rail operations at Massey Railyard "generate[] a small amount of waste due to rail maintenance."  UCC Reply 19.  Thus, the only matter at issue is whether a reasonable trier of fact could find that UCC is committing a discharge or functional equivalent of a discharge from a point source into navigable waters.

### 1. Point source

Courtland identifies four possible point sources: (1) seepage and stormwater from Filmont draining into the Southern Drainage Ditch and the Northern Drainage Ditch and Ward Branch, and also across the Courtland Property before reaching the Southern Drainage Ditch, (2) groundwater percolating from Filmont into the Southern Drainage Ditch and the Northern Drainage Ditch, and into Ward Branch, (3) stormwater culverts

---

[5] Huffman II is not an appeal from Huffman I.

located on Massey Railyard that discharge into the Southern
Drainage Ditch, and (4) the Southern Drainage Ditch and the
Northern Drainage Ditch themselves.

UCC argues that "[Courtland] has not sufficiently
identified any specific location or channel by which storm water
is collected from [Filmont or Massey Railyard] and directed to a
discharge point." UCC Mem. Supp. 35. Instead, according to
UCC, Courtland merely alleges "that stormwater runs uncontrolled
across [Filmont]" in generalized manner. Id.

A "point source" is "any discernible, confined and
discrete conveyance, including but not limited to any pipe,
ditch, channel, tunnel, conduit, well, discrete fissure,
container, rolling stock, concentrated animal feeding operation,
or vessel or other floating craft, from which pollutants are or
may be discharged." 33 U.S.C. § 1362(14). The use of "any" in
the definition of "point source" suggests that the term should
be broadly construed. See Peconic Baykeeper, Inc. v. Suffolk
Cnty., 600 F.3d 180, 188 (2d Cir. 2010). However, "point
source" "cannot be interpreted so broadly as to read the . . .
requirement out of the statute." Simsbury-Avon Preservation
Club, Inc. v. Metacon Gun Club, Inc., 575 F.3d 199, 219 (2d Cir.
2009). "[T]he addition of pollutants to navigable waters from
nonpoint sources does not violate" the Clean Water Act. Sierra

22

Club v. Va. Elec. & Power Co., 903 F.3d 403, 406 (4th Cir. 2018)
(emphasis omitted).

First, the court begins with the seepage and
stormwater draining and flowing down the surface of Filmont into
the Northern Drainage Ditch and Ward Branch, the Southern
Drainage Ditch, and across the Courtland Property before
reaching the Southern Drainage Ditch.  Courtland's expert, Dr.
David Scott Simonton, reports that "[s]tormwater . . . flows
uncontrolled . . . across the surface" of Filmont via "channels,
ditches, or trenches" to the Northern Drainage Ditch and the
Southern Drainage Ditch.  Simonton Rep. ¶ 69 (cited by Courtland
Resp. 23, 27); see also id. ¶ 67 (stating that "contaminated
water . . . flows out of [Filmont] via the various seeps, and/or
into trenches or groundwater") (cited by Courtland Resp. 22,
27).

The case law makes clear that, even viewing the facts
in Courtland's favor, the unlocalized, natural flow of water
from seepage and stormwater into the Northern Drainage Ditch and
Ward Branch and the Southern Drainage Ditch is a nonpoint source
and thus not subject to the Clean Water Act.  "In practical
terms, nonpoint source pollution does not result from a
discharge at a specific, single location (such as a single pipe)
but generally results from land runoff, precipitation,

atmospheric deposition, or percolation." Simsbury-Avon

Preservation Club, Inc. v. Metacon Gun Club, Inc., 575 F.3d 199,

220 (2d Cir. 2009) (quoting EPA Office of Water, Nonpoint Source

Guidance 3 (1987)); see also id. at 220-22 (citing and quoting

various administrative guidance and case law).[6] And "the

addition of pollutants to navigable waters from nonpoint sources

does not violate [the Clean Water Act]." Va. Elec. & Power, 903

F.3d at 406. Indeed, "[i]n regulating discharges of pollutants

from point sources, Congress clearly intended to target the

measurable discharge of pollutants." Id. at 411. That end is

---

[6] See also Cnty. of Maui, 140 S. Ct. at 1471 ("Rainwater, for
example, can carry pollutants (say, as might otherwise collect
on a roadway); it can pollute groundwater, and pollution
collected by unchanneled rainwater runoff is not ordinarily
considered point source pollution."); Friends of the Everglades
v. S. Fla. Water Mgmt. Dist., 570 F.3d 1210, 1226-27 (11th Cir.
2009) ("Non-point source pollution, chiefly runoff, is widely
recognized as a serious water quality problem, but the [Clean
Water Act's permitting] program does not even address it.");
Env't Def. Ctr., Inc. v. EPA, 344 F.3d 832, 841 n.8 (9th Cir.
2003) ("Diffuse runoff, such as rainwater that is not channeled
through a point source, is considered nonpoint source pollution
and is not subject to federal regulation."); 307 Campostella,
LLC v. Mullane, 143 F. Supp. 3d 407, 417 (E.D. Va. 2015) ("The
classification of stormwater runoff as discharge from a point
source or a nonpoint source, however, depends on whether the
runoff is allow to run naturally or whether it is collected or
channeled before being discharged."); Tri-Realty Co. v. Ursinus
Coll., 124 F. Supp. 3d 418, 459 (E.D. Pa. 2015) ("[T]here is an
outer limit to what may constitute a 'point source.'  For
example, [a] discharge of pollutants into navigable waters
occurring only through migration of groundwater and uncontrolled
soil runoff represents 'nonpoint source' pollution and is
outside the scope of the [Clean Water Act]." (quotation marks
omitted)).

accomplished by focusing on "source[s that] work[] affirmatively to convey a pollutant, [where] the concentration of the pollutant and the rate at which it is discharged by that conveyance can be measured." Id. But such measurement "is impossible" in cases where, as in the case of water flowing unlocalized and naturally down the hillside of Filmont, "the alleged discharge is diffuse and not the product of a discrete conveyance." Id.

Courtland insists that the numerous uncontrolled "channels, ditches, or trenches" and "gullies" across the hillside above the Northern Drainage Ditch and Ward Branch and the Southern Drainage Ditch are each individual point sources. See Courtland Resp. 38-39; see also Simonton Rep. ¶¶ 69-70; see also id. ¶ 70 (two photographs of an alleged "gully"). But Courtland does not cite any case law or other authority for that proposition. A finding that uncontrolled water running off the width of a hillside in a natural, diffuse manner in any number of channels, ditches, trenches, gullies, or otherwise are each individual point sources would expand the term out of existence. See Simsbury-Avon, 575 F.3d at 219 (stating that "point source" "cannot be interpreted so broadly as to read the . . . requirement out of the statute").

25

Relatedly, many courts limit "point source" "to
surface runoff that is collected or channeled by human beings"
rather than the natural diffusion of water over surfaces like
what is described as happening on the hillside of Filmont.  Id.
at 221; see also Ecological Rights Found. v. Pac. Gas & Elec.
Co., 713 F.3d 502, 508 (9th Cir. 2013) ("Stormwater runoff is a
nonpoint or point source . . . depending on whether it is
allowed to run off naturally (and is thus a nonpoint source) or
is collected, channeled, and discharged through a system of
ditches, culverts, channels, and similar conveyances (and is
thus a point source discharge)."); Froebel v. Meyer, 217 F.3d
928, 937 (7th Cir. 2000) ("The structure of the CWA's definition
of 'point source' (a 'discernible, confined, and discrete
conveyance . . . from which pollutants are or may be
discharged') connotes the terminal end of an artificial system
for moving water, waste, or other materials."); Tri-Realty Co.,
124 F. Supp. 3d at 460 (stating that a "point source" turns on
"whether the [pollutant is] collected or channeled by man"
(quotation marks omitted)); cf. Va. Elec. & Power, 903 F.3d at
411 (finding that a "point source" must involve "some facility"
"created" to "function[] as a discrete, not generalized,
'conveyance'"); 40 C.F.R. § 122.2 (defining "discharge of a
pollutant" as that which comes from a "point source," which
"includes . . . surface runoff which is collected or channelled

by man[ and] discharges through pipes, sewers, or other conveyances").

Therefore, seepage and stormwater draining and flowing down the surface of Filmont is not a point source. A possible exception is the "collection trench" Simonton identifies, as well as any other possible discrete conveyance point sources, that presumably flow into Ward Branch. See Simonton Rep. ¶¶ 58-59. A "collection trench" would be a Clean Water Act point source. See 33 U.S.C. § 1362(14).

Second, the court turns to groundwater percolating from Filmont to the Northern Drainage Ditch, Ward Branch, and the Southern Drainage Ditch. Courtland relies on Dr. Simonton's report, which provides that "contaminated groundwater [from Filmont] . . . flow[s] into the alluvial[7] deposits associated with the [Southern Drainage Ditch] . . . and flow[s] into the [Southern Drainage Ditch]." Simonton Rep. ¶ 50; see also id. ¶¶ 48-50. Dr. Simonton also concludes that "polluted groundwater . . . is flowing from [Filmont] . . . into the South[ern Drainage Ditch], Davis Creek, and Ward Branch via the Northern [Drainage] Ditch." Id. ¶ 48. Further, Courtland points to Cibrik's Rule

---

[7] "Alluvium" means "clay, silt, sand, gravel, or similar detrital material deposited by running water." Alluvium, Merriam-Webster, https://www.merriam-webster.com/dictionary/alluvium.

30(b)(6) deposition testimony on behalf of UCC where he states that Filmont does not have "a le[a]chate[8] collection system," which is "[u]sually a system of pipes or rock running material under the waste that would allow collection of le[a]chate." Cibrik Dep. 14.

The Fourth Circuit's decision in <u>Virginia Electric & Power</u> is instructive in finding that the uncontrolled percolation of groundwater is a nonpoint source and thus not subject to the Clean Water Act.  In that case, the Fourth Circuit concluded that arsenic from stored coal ash that "leached from the coal ash by rainwater and groundwater and ultimately carried by groundwater into navigable waters" was not a point source.  <u>Va. Elec. & Power</u>, 903 F.3d at 410.  The Fourth Circuit explained that, "[b]y its carefully defined terms, the Clean Water Act limits its regulation under § 1311(a) to [point source] discharges from 'any discernible, confined and discrete conveyance.'"  <u>Id.</u> (quoting 33 U.S.C. § 1362(14)).  The Fourth Circuit considered "conveyance" to be "a well-understood term" that "requires a channel or medium -- i.e. a facility -- for the

---

[8] "Leachate" means "a solution or product obtained by leaching." <u>Leachate</u>, Merriam-Webster, https://www.merriam-webster.com/dictionary/leachate.  "Leaching" means "to remove (nutritive or harmful elements) from soil by percolation," among other similar definitions.  <u>Leaching</u>, Merriam-Webster, https://www.merriam-webster.com/dictionary/leaching.

movement of something from one place or another." Id.  Without
such a conveyance, the Fourth Circuit concluded, "the discharge
would not be regulated by the Clean Water Act." Id. at 411.

Applying its discussion of "point source" to the
percolation of groundwater contaminated with arsenic from stored
coal ash, the Fourth Circuit reasoned as follows:

> In this context, the landfill and ponds were not
> created to convey anything and did not function in
> that manner; they certainly were not discrete
> conveyances, such as would be a pipe or channel, for
> example.  Indeed, the actual means of conveyance of
> the arsenic was the rainwater and groundwater flowing
> diffusely through the soil.  This diffuse seepage,
> moreover, was a generalized, site-wide condition that
> allowed rainwater to distribute the leached arsenic
> widely into the groundwater of the entire peninsula.
> Thus, the landfill and settling ponds could not be
> characterized as discrete "points," nor did they
> function as conveyances.  Rather, they were, like the
> rest of the soil at the site, static recipients of the
> precipitation and groundwater that flowed through
> them.

Id.

Viewing the facts most favorably to Courtland, the
percolation of contaminated groundwater from Filmont to the
Northern Drainage Ditch and Ward Branch and the Southern
Drainage Ditch is not a point source regulated by the Clean
Water Act.  Just as in Virginia Electric & Power, the seepage
described by Courtland is "diffuse" and a "generalized, site-
wide condition." Id.  Filmont is simply a "static recipient[]
of the precipitation and groundwater that flow[s] through [it]."

Id.  Indeed, Cibrik's testimony, which Courtland highlights, makes clear that Filmont has no system of collecting or channeling groundwater.  Cibrik Dep. 14.

Courtland argues that the generalized diffusion of groundwater is nevertheless the "functional equivalent of point sources" under the Supreme Court's recent decision in County of Maui v. Hawaii Wildlife Fund, 140 S. Ct. 1462 (2020).  Courtland Resp. 39-41.  In County of Maui, the Supreme Court held that the Clean Water Act covers "direct discharge[s] from a point source into navigable waters or when there is the functional equivalent of a direct discharge."  140 S. Ct. at 1476 (emphasis in original).

County of Maui does not hold that diffuse groundwater itself can constitute a point source; rather, the Supreme Court explained that a point source may be regarded as directly discharging into navigable waters even if the discharge first passes through some quantity of groundwater before reaching the navigable waters.  Id.  The Supreme Court explained:

> Where a pipe ends a few feet from navigable waters and the pipe emits pollutants that travel those few feet through groundwater (or over the beach), the [Clean Water Act] clearly applies.  If the pipe ends 50 miles from navigable waters and the pipe emits pollutants that travel with groundwater, mix with much other material, and end up in navigable waters only many years later, the [Clean Water Act] likely do[es] not apply.

_Id._  _County of Maui_ still requires an unqualified point source before the Clean Water Act applies, and diffuse groundwater seepage like that described as occurring at Filmont is not a point source.

Third, the court considers the stormwater culverts located on Massey Railyard that discharge into the Southern Drainage Ditch.  Dr. Brian Wellington, an expert retained by UCC, reports as follows:

> During my site visit I observed two small culverts from Massey Rail Yard discharging at the top of the hill above the Southern [Drainage] Ditch that is on the property line between the UCC Property and the Courtland property.  . . . However, neither is a significant source of storm water discharges and the lack of discernible flow path or ditch on the slope indicates that very little water is traveling down the slope to the Southern [Drainage] [D]itch.

Wellington Rep. 13-14, ECF No. 150-52; _see_ _also_ _id._ at 13 (photo locating the two stormwater culverts).  At his deposition, Dr. Wellington testified that the "culverts are designed to remove [storm]water that falls on the rail track and sits in the ditches" that lead to the culverts.  Wellington Dep. 181, Courtland II ECF No. 381-4; _see_ _also_ _id._ at 169-70, 182.

Courtland contends that the two culverts are point sources.  Courtland Resp. 36.  UCC does not address whether the culverts constitute point sources.  _See_ _generally_ UCC Mem. Supp.; UCC Reply.  However, UCC does contend that a discharge

cannot be from a point source if "no significant amount of stormwater flows" through the conveyance.  UCC Reply 18.

Viewing the evidence most favorably to Courtland, the two culverts are clearly point sources.  See Ecological Rights Found., 713 F.3d at 508 ("Stormwater runoff is a nonpoint or point source . . . depending on whether it is allowed to run off naturally (and is thus a nonpoint source) or is collected, channeled, and discharged through a system of ditches, culverts, channels, and similar conveyances (and is thus a point source discharge).").  UCC's water-volume argument is unavailing because the Clean Water Act reaches even "intermittent or sporadic violations."  Chesapeake Bay Found., 844 F.2d at 172.

Fourth, the court considers the Northern Drainage Ditch and the Southern Drainage Ditch themselves.  Courtland argues that the Northern Drainage Ditch and the Southern Boundary Ditch are point sources.  Courtland Resp. 36.  Indeed, the Northern Drainage Ditch and the Southern Drainage Ditch bear the hallmarks of Clean Water Act point sources: they are manmade ditches designed to drain water to Davis Creek.  See 33 U.S.C. § 1362(14) (defining "point source" to include a "ditch").  UCC does not argue otherwise.  Thus, the Northern Drainage Ditch and the Southern Boundary Ditch are deemed point sources.

There are accordingly three point sources at issue in this matter: the two stormwater culverts discharging into the Southern Drainage Ditch, the Southern Drainage Ditch itself, and the Northern Drainage Ditch.  Points of seepage into Ward Branch are also potential point sources.

### 2. Whether UCC is committing a discharge or functional equivalent of a discharge

The Clean Water Act prohibits the permitless "discharge of any pollutant by any person."  33 U.S.C. § 1311(a).  "Discharge" means the "discharge of a pollutant," which in turn means "any addition of any pollutant to navigable waters from any point source."  Id. §§ 1362(12), 1362(16).

The Clean Water Act does not define "addition."  In common parlance, it means, inter alia, "anything or anyone added" or "direct chemical combination of substances into a single product."  Addition, Merriam-Webster, https://www.merriam-webster.com/dictionary/addition.  The Fourth Circuit also explains that the Clean Water Act "clearly covers all additions -- no matter how small -- rather than merely net additions."  Huffman II, 625 F.3d at 167.  "In other words," the Fourth Circuit continues, "[the Clean Water Act] does not impose liability only where a point source discharge creates a net

33

increase in the level of pollution.  Rather, the [Clean Water Act] categorically prohibits any discharge of a pollutant from a point source without a permit."  Id.

The courts have read the "addition" requirement as imposing strict liability upon any person who causes the discharge of pollutants to navigable waters from a point source without a permit.  Huffman I, 651 F. Supp. 2d at 519 ("It is generally recognized that liability under the CWA is a form of strict liability."); see also Am. Canoe Ass'n v. Murphy Farms, 412 F.3d 536, 540 (4th Cir. 2005).  "[T]he person responsible for the discharge of any pollutant," that is, the person responsible for adding a pollutant to navigable waters from a point source, "[is] strictly liable."  Huffman I, 651 F. Supp. 2d at 519.  Causation for strict Clean Water Act liability "can be met because of a defendant's control over discharges," id., regardless of whether the person is "responsib[le] for creating the polluting condition," Huffman II, 625 F.3d at 166.

In this case, viewing the record in Courtland's favor, UCC is discharging, or adding, pollutants from the point sources at issue.  As noted above, UCC admits that pollutants from Filmont and Massey Railyard are making their way into groundwater and surface water -- invariably partially through the stormwater culverts, the Southern Drainage Ditch, and the

34

Northern Drainage Ditch.  Accordingly, inasmuch as, viewing the record in Courtland's favor, UCC is responsible for adding pollutants to those point sources and that those point sources are indeed polluted, a reasonable trier of fact could find that UCC is committing a discharge.[9]

### 3. Navigable waters

To violate the Clean Water Act, the discharge of pollutants from a point source must be to navigable waters.  See U.S.C. § 1362(12).  In this case, UCC does not contest that Davis Creek and Ward Branch, which empties into Davis Creek, are navigable waters covered by the Clean Water Act.  The Southern Drainage Ditch plainly empties into Davis Creek, and the

---

[9] There is some suggestion in the case law that Courtland could bear some responsibility for discharges into the Davis Creek watershed as well.  As a reminder, the Southern Drainage Ditch traverses the Courtland Property near its confluence with Davis Creek, and some of the Courtland Property is upgradient from the Southern Drainage Ditch and separates the ditch from the contaminated Filmont.  The Fourth Circuit, for instance, seems concerned with who operates a discharging point source rather than who was the original polluter.  See Huffman II, 625 F.3d at 166; see also S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians, 541 U.S. 95, 105 (2004) ("'[A] point source need not be the original source of the pollutant; it need only convey the pollutant to 'navigable waters.'").  Moreover, evidence in the record points to potential pollution-adding items and areas on the Courtland Property.  See generally UCC Mem. Supp. 7-9.  In any event, those matters are not before the court and need not be addressed further.

Northern Drainage Ditch into Ward Branch.  The analysis is different concerning the stormwater culverts, however, because they empty into the Southern Drainage Ditch.

The decision in Rapanos v. United States is instructive.  There, the plurality of the Supreme Court explained that the Clean Water Act reaches point sources beyond those that directly empty into navigable waters:

> The Act does not forbid the "addition of any pollutant directly to navigable waters from any point source," but rather the "addition of any pollutant to navigable waters."  Thus, from the time of the [Clean Water Act's] enactment, lower courts have held that the discharge into intermittent channels of any pollutant that naturally washes downstream likely violates § 1311(a), even if the pollutants discharged from a point source do not emit "directly into" covered waters, but pass "through conveyances" in between.

Rapanos, 547 U.S. at 743 (citations omitted and emphasis in original).  Thus, a plurality of the Supreme Court was at least "open to the possibility that a permit is required if point source A discharges into point source B, and point source B then discharges into covered waters."  Cnty. of Maui, 140 S. Ct. at 1487 n.5 (Alito, J., dissenting).

The court finds the Rapanos plurality's discussion persuasive.  Even though the stormwater culverts do not empty directly into navigable waters, discharges from the stormwater culverts nevertheless naturally reach navigable waters through a

series of conveyances.  The stormwater culverts are therefore regarded as discharging to navigable waters.

Accordingly, Courtland has demonstrated that a reasonable trier of fact could find that UCC is discharging pollutants from point sources -- the stormwater culverts, the Southern Drainage Ditch, and the Northern Drainage Ditch as well potentially at points of seepage into Ward Branch -- without a permit in violation of the Clean Water Act.

### D. Industrial stormwater discharges

There is an additional issue that bears on Courtland's Clean Water Act claims.  33 U.S.C. § 1342(p) "exempt[s] from the [Clean Water Act's] permitting scheme most 'discharges composed entirely of stormwater.'"  Decker v. Nw. Envt'l Def. Ctr., 568 U.S. 597, 603 (2013) (quoting 33 U.S.C. § 1342(p)).  To begin, the court notes that because the Southern Drainage Ditch is not "composed entirely of stormwater," it is not subject to Section 1342(p)'s general exemption and is therefore not relevant to this discussion.[10]

---

[10] Even if the Southern Drainage Ditch were subject to Section 1342(p), stormwater that enters the ditch comes from Filmont, which doubtlessly qualifies as stormwater associated with "industrial activity" for which a Clean Water Act permit is required.  See 33 U.S.C. § 1342(p)(2)(B); 40 C.F.R. §§

The evidence submitted, however, establishes that the point-source stormwater culverts located at Massey Railyard exclusively serve their eponymous purpose.  See Wellington Dep. 181-83 ("[T]hose culverts are designed to remove water that falls on the rail track and sits in the ditches between the actual rails.")  Consequently, to form the basis of a Clean Water Act violation, the stormwater discharges through the Massey Railyard stormwater culverts must satisfy an exception to Section 1342(p)'s general exemption.

Courtland argues that the stormwater discharges require a permit because they are "associated with industrial activity."  33 U.S.C. § 1342(p)(2)(B); see also id. § 1342(p)(3)(A) ("Permits for discharges associated with industrial activity shall meet all applicable provisions of this section and section 1311 of [the Clean Water Act].").  The regulations promulgated under Section 1342(p)'s "industrial activity" exception describe the following, in relevant part.

> Storm water discharge associated with industrial
> activity means the discharge from any conveyance that
> is used for collecting and conveying storm water and
> that is directly related to manufacturing, processing
> or raw materials storage areas at an industrial plant.
> . . . The following categories of facilities are

122.26(b)(14)(iv) ("industrial activity" includes "[h]azardous waste treatment, storage, or disposal facilities"); 122.26(b)(14)(v) ("industrial activity" includes "[l]andfills, land application sites, and open dumps that receive or have received any industrial wastes").

considered to be engaging in "industrial activity" . . . :

        . . .

        (iv) Hazardous waste treatment, storage, or
        disposal facilities, including those that are
        operating under interim status or a permit under
        subtitle C of [the Resource Conservation and
        Recovery Act ("RCRA"), 42 U.S.C. § 6901 <u>et seq.</u>];

        (v) Landfills, land application sites, and open
        dumps that receive or have received any
        industrial wastes (waste that is received from
        any of the facilities described under this
        subsection) including those that are subject to
        regulation under subtitle D of RCRA.

40 C.F.R. §§ 122.26(b)(14)(iv), (v).

        Courtland contends that Massey Railyard is engaged in
"industrial activity" as defined under 40 C.F.R. §§
122.26(b)(14)(iv), (v).  Courtland Resp. 42.  But Courtland does
not explain why.  <u>See</u> <u>id.</u> at 41-47.

        In response, UCC argues that "[Massey Railyard] has
never been used as a landfill and there is no credible evidence
that supports [its] use as a landfill."  UCC Reply 19.  UCC
concedes that "[Massey Railyard] generates a small amount of
waste due to rail maintenance operations," but UCC evidently
does not consider such activity to be industrial.  <u>See</u> <u>id.</u>

        Absent evidence that Massey Railyard was or is engaged
in the activities described in 40 C.F.R. §§ 122.26(b)(14)(iv),
(v), a reasonable trier of fact could not conclude that UCC

requires a permit for stormwater discharges through the two stormwater culverts at Massey Railyard that empty into the Southern Drainage Ditch.  Thus, there is no Clean Water Act violation associated with those stormwater culverts.

Accordingly, using the point sources as points of reference for Courtland's Clean Water Act claims, UCC's motion for summary judgment is denied with respect to the Northern Drainage Ditch and the Southern Drainage Ditch and potential point source seepage into Ward Branch and otherwise granted.

IV. Conclusion

For the foregoing reasons, it is ORDERED that UCC's consolidated motion for summary judgment be, and hereby is, granted in part and denied in part as set forth above.

The Clerk is requested to transmit copies of this memorandum opinion and order to all counsel of record and any unrepresented parties.

ENTER: July 1, 2022

John T. Copenhaver, Jr.
Senior United States District Judge

40